# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **IN RE:**<br>**GUANTANAMO BAY**<br>**DETAINEE LITIGATION** | **Misc. No. 08-442 (TFH)**<br>**Civil Action Nos.**<br>**02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1194, 04-cv-1254,**<br>**04-cv-1937, 04-cv-2022, 04-cv-2046, 04-cv-2215, 05-cv-0023,**<br>**05-cv-0247, 05-cv-0270, 05-cv-0280, 05-cv-0329, 05-cv-0359,**<br>**05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526, 05-cv-0569,**<br>**05-cv-0634, 05-cv-0748, 05-cv-0763, 05-cv-0764, 05-cv-0877,**<br>**05-cv-0883, 05-cv-0889, 05-cv-0892, 05-cv-0993, 05-cv-0994,**<br>**05-cv-0998, 05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124,**<br>**05-cv-1220, 05-cv-1244, 05-cv-1347, 05-cv-1353, 05-cv-1429,**<br>**05-cv-1457, 05-cv-1458, 05-cv-1487, 05-cv-1490, 05-cv-1497,**<br>**05-cv-1504, 05-cv-1505, 05-cv-1506, 05-cv-1555, 05-cv-1592,**<br>**05-cv-1601, 05-cv-1607, 05-cv-1623, 05-cv-1638, 05-cv-1645,**<br>**05-cv-1646, 05-cv-1678, 05-cv-1971, 05-cv-1983, 05-cv-2010,**<br>**05-cv-2088, 05-cv-2104, 05-cv-2185, 05-cv-2186, 05-cv-2199,**<br>**05-cv-2249, 05-cv-2349, 05-cv-2367, 05-cv-2371, 05-cv-2378,**<br>**05-cv-2379, 05-cv-2380, 05-cv-2384, 05-cv-2385, 05-cv-2386,**<br>**05-cv-2387, 05-cv-2444, 05-cv-2479, 06-cv-0618, 06-cv-1668,**<br>**06-cv-1684, 06-cv-1690, 06-cv-1758, 06-cv-1761, 06-cv-1765,**<br>**06-cv-1766, 06-cv-1767, 07-cv-1710, 07-cv-2337, 07-cv-2338,**<br>**08-cv-0987, 08-cv-1085, 08-cv-1101, 08-cv-1104, 08-cv-1153,**<br>**08-cv-1185, 08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224,**<br>**08-cv-1227, 08-cv-1228, 08-cv-1230, 08-cv-1232, 08-cv-1233,**<br>**08-cv-1235, 08-cv-1236, 08-cv-1237, 08-cv-1238, 08-cv-1360,**<br>**08-cv-1440, 08-cv-1733, 08-cv-1805** |

**THE GOVERNMENT'S MOTION FOR CLARIFICATION AND
RECONSIDERATION OF THIS COURT'S NOVEMBER 6, 2008 CASE
MANAGEMENT ORDER AND SUPPLEMENTAL AMENDED ORDERS OR,
IN THE ALTERNATIVE, MOTION FOR CERTIFICATION FOR APPEAL PURSUANT
TO 28 U.S.C. § 1292(b) AND TO STAY CERTAIN OBLIGATIONS PENDING
RESOLUTION OF THE MOTION AND ANY APPEAL**

## INTRODUCTION

On November 6, 2008, the Court entered a Case Management Order, *see* Dkt. 940 in 08-m-0442 ("CMO"), to provide a general procedural framework for litigation of 113 habeas cases involving nearly 200 enemy combatants challenging their continued detention in the wake of *Boumediene v. Bush*, 128 S. Ct. 2229 (2008).   Respondents are, of course, mindful of the Supreme Court's desire that "prompt" habeas review be provided to the detainees.  *See* CMO at 1 (citing *Boumediene*, 128 S. Ct. at 2275).   To that end, the Government has committed an unprecedented amount of legal resources to respond to these cases, including some 60 attorneys from the Department of Justice, as well as over 100 attorneys and support personnel from the affected agencies.   And the Government is currently in the process of mobilizing significant additional resources to address the new obligations created in the CMO.   However, Respondents are concerned that the CMO is ambiguous in certain important respects and that it would, if excessively construed, create obligations that realistically cannot be met in the limited two-week timeframe established by the order.   These obligations fall not merely on the attorneys committed to expeditious resolution of these cases, but, as explained below and in the classified and public declarations of the Deputy Secretary of Defense, the Director of the FBI, and the Director of Central Intelligence (whose declaration is submitted *in camera* and *ex parte*), on the intelligence agencies and military personnel who are directly involved in intelligence and military operations in at least two ongoing armed conflicts.   Respondents thus respectfully request clarification of several provisions of the CMO.

Specifically, the Government regretfully requests reconsideration and clarification of the following provisions of the CMO:

- The exculpatory evidence provision, CMO ¶ I.D.1, to clarify that disclosure of exculpatory evidence is limited to exculpatory material reviewed by the Government's attorneys preparing the factual returns;

- The automatic discovery provisions, CMO ¶ I.E.1, to reconsider the imposition of any automatic discovery, or to at least clarify that category (1) is limited to objects and documents referenced in the narrative;

- The treatment of classified information, CMO ¶ I.F, to reconsider the required disclosure of classified information or an "adequate substitute" to a Petitioner and the automatic provision of classified information to Petitioners' counsel or the Court when provision to counsel is not appropriate;

- The procedures governing merits determinations, including the appropriateness of presumption afforded the Government's evidence, CMO ¶¶ II.B, use of hearsay, see CMO ¶ II.C, as well as the standard by which evidentiary hearings will be permitted, see CMO ¶ III.B.1.

In addition, beyond the substantive requirements of the CMO, Respondents also seek some relief from the timeline for compliance with various new obligations, which as ordered would impose many simultaneous and inappropriate burdens regarding the handling of sensitive classified intelligence upon the Government.  However, the Government also intends to devote additional resources to these cases and is proceeding as expeditiously as possible with its responses.

Alternatively, Respondents respectfully request certification, pursuant to 28 U.S.C. § 1292(b), of the CMO to the D.C. Circuit for highly expedited appellate review of key procedural issues.  Because the CMO requires broad disclosure of sensitive classified information, it would be far preferable for the scope of those requirements to be settled before such disclosures are ordered, whether to Petitioners (as the CMO seems to contemplate) or their counsel. Respondents would continue to diligently prepare these cases for final disposition on the merits, and would seek only a limited stay of certain obligations pending appeal.  The Government remains committed to expeditious resolution of these cases on the merits and proposes

certification as an alternative to help achieve that goal in lieu of attempting to comply with obligations that could take months to fulfill.[1]

Thus, as set forth below, Respondents respectfully request clarification and reconsideration of the CMO, or, in the alternative, certification, as well as a stay pending resolution of the motion and any appeal.[2]

## BACKGROUND

### A.       Post-*Boumediene* Proceedings in this Court

In June 2008, the Supreme Court in *Boumediene* held that Guantanamo Bay detainees have a constitutional right to seek habeas corpus protected by the Suspension Clause, and that, as applied to challenges to the legality of detention, section 7 of the MCA operated as an unconstitutional suspension of the writ.  128 S. Ct. at 2269-74.

In the wake of that decision, Respondents have worked diligently over the past four months to prepare these cases for litigation on the merits.  To date Respondents have filed 101 factual returns in the proceedings coordinated by this Court as well as an additional 20 returns in other Guantanamo cases pending in the District Court.  These returns were, of course, filed

---

[1] Of course, the Government would continue to prepare factual returns pursuant to the Court's scheduling order, would continue to provide exculpatory information known or found by attorneys preparing the factual return, and would welcome the filing of preliminary traverses.

[2] Pursuant to Local Rule 7(m), Respondents contacted counsel for all petitioners regarding the filing of this motion on November 14, 2008.  Respondents received responses from 51 attorneys representing at least 94 petitioners.  Eleven attorneys stated that the petitioners they represented would oppose the motion.  Five attorneys responded without directly addressing the motion.  Thirty-five attorneys stated that they did not have enough information to decide whether to oppose the motion.  Many requested details regarding the motion that the Respondents were not in a position to discuss at the time.  Respondents assume that the petitioners represented by these 40 attorneys also oppose the motion.  Respondents did not receive responses from counsel for any petitioners who were unopposed to the Respondents' motion.

without the benefit of the Court's CMO.  Thus, the CMO creates new obligations for the 101

cases that have already been filed.  In addition, Respondents expect to file approximately 100

more returns over the next two months.  As previously explained, because these cases are

heavily dependant upon classified intelligence information, the review, handling, and

presentation of this evidence presents tremendous complications, not just for the litigators

involved (who must all have security clearances), but also for the intelligence agencies and

Department of Defense as well.  *See* Resps' Mot. For Partial & Temporary Relief, Dkt. 317

(Aug. 29, 2008).  To respond to this Court's previous scheduling order, the Government has

committed an unprecedented degree of resources to accomplish the Court's requirements and

litigate these cases.  *See id.*  Respondents' motion, supported by the public and *in camera*

declarations from high-level officials at three agencies, explained the constraints faced by the

Government both with respect to resources and necessary clearance issues related to the possible

use of classified information in these habeas cases.

### B.    The Case Management Order

On November 6, 2008, the Court entered the CMO to provide baseline procedures.  In

addition to continuing to require the filing of factual returns at the current pace, the Court first

set new procedural requirements, including that Respondent file:  (i) an explanation of its legal

justification for detaining a Petitioner within 7 days of the CMO for all 100-plus previously filed

factual returns, and (ii) an "unclassified" factual return within 14 days of the date of the CMO

for all previously filed factual returns (and a requirement to file an unclassified factual return

within 14 days of any future factual return).  *See* CMO ¶¶ I.B, I.C.

The Court also required the Government to disclose "all reasonably available evidence in

its possession that tends to materially undermine the information presented to support the

Government's justification for detaining the petitioner" and certify that it has made such disclosure or that it does not possess any such evidence, again within 14 days after the date of the CMO for each of the 100-plus cases where a factual return has been filed. *Id.* ¶ 1.D.[3]  Judges Walton and Kessler have required additional disclosures of "exculpatory" evidence "obtain[able] through reasonable diligence" with Judge Kessler including evidence of treatment and mental or physical capacity.  Further, these Judges have required the Government to disclose "the existence of any evidence within its actual knowledge but not within its possession or capable of being obtained."[4]

The CMO further requires the Government to provide automatic discovery, upon demand by a Petitioner, of:  (1) any documents or objects in the Government's possession that are referenced in the factual return; (2) all statements, in whatever form, made or adopted by the Petitioner that relate to the information contained in the factual return; and (3) information about the circumstances in which such statements of the Petitioner were made or adopted.  CMO ¶ I.E.1.  On its face, the CMO does not expressly require that this information actually have been used against Petitioners to support their detention or that Petitioners establish materiality,

---

[3] For cases in which a factual return has not been filed, such disclosure is mandated within 14 days of the filing of a return.  *Id.*  The CMO also requires the Government to disclose any such evidence that becomes known to the Government after the initial disclosure.  *Id.* ¶ I.D.2.

[4] *See* Case Management Order (Nov. 13, 2008) (dkt. no. 201, No. 05-CV-0280) (Kessler, J.); Case Management Order (Nov. 17, 2008) (dkt. no. 125, No. 04-CV-2035; dkt. no. 115, No. 05-CV-0359; dkt. no. 94; No. 05-CV-1347; dkt. no. 78, No. 05-CV-1457; dkt. no. 130, No. 05-CV-1601; dkt. no. 100, No. 05-CV-1678; dkt. no. 59, No. 05-CV-1668; dkt. no. 77, No. 06-CV-1684; dkt. no. 4, No. 08-CV-1423) (Kessler, J.); Order (Nov. 12, 2008) (dkt. no. 145, No. 04-CV-1164; dkt. no. 78, No. 05-CV-0883; dkt. no. 96, No. 05-CV-2104; dkt. no. 695, No. 05-CV-2386). (Walton, J.).

relevance, or specificity in making their requests.[5]  Discovery must be provided within 14 days

of the later of the date of requests or the date the Government files the factual return.  *Id.*  The

CMO provides that a Merits Judge may, "for good cause," permit the Petitioner to obtain

additional discovery.  *Id.* ¶ I.E.2.

Section I.F addresses classified information and requires that the *detainees themselves* be

provided with every piece of classified exculpatory or discovery information produced or an

"adequate substitute," regardless of whether that information is material or relevant to any

disputed issue in the habeas litigation.  The CMO also generally mandates that Respondents

provide Petitioners' counsel with the actual classified information.  And to seek an exception

from the latter requirement, presumably because a Petitioner's counsel lacks a security clearance

commensurate with the level of classification of the information, Respondents must file a motion

and provide the classified information to the Court *in camera* "for a determination as to whether

the information should be disclosed and, if not disclosed, whether the Government will be

permitted to rely on the information to support the detention."  CMO ¶ I.F.  On its face, the

---

[5]  The Government has already received 74 of requests for production of the automatic discovery under ¶ I.E.1 of the CMO, such that the discovery would be due on November 20, 2008, or shortly thereafter.  These requests do no more than parrot the language of CMO ¶ I.E.1, *see*, *e.g.*, Letter Requesting Automatic Discovery on Behalf of ISN 1463 (attached hereto), although some add language attempting to make the request as broad as possible.  *See* Letter Requesting Automatic Discovery on behalf of ISN 841 (attached hereto) ("With respect to subparagraph (3) of [the CMO], we request a complete verified description of interrogation techniques employed on petitioner [] and, for each statement on which the Government relies to justify detention—and any antecedent statement concerning the same subject matter, of which the Government is aware—a complete verified description of the conditions under which such statement was made in sufficient detail to allow the fact-finder to determine the voluntariness of the statement.  This request applies to statements made while petitioner was in the custody of agencies other than the United States Department of Defense, including the Central Intelligence Agency, and civil or military authorities of the government of Pakistan.").

CMO seems to impose these requirements even where the Government has limited its case-in-chief so as to avoid implicating such classified information.

In addition, the CMO does not provide either an overarching presumption in favor of the accuracy and authenticity of the Government's evidence or permit the introduction of hearsay in all cases. *See* CMO ¶¶ II.B, II.C. Rather, the Court can permit such presumptions only if a Merits Judge, after case-specific briefing, concludes that doing so would alleviate an "undue burden" and that, with respect to hearsay, the evidence is reliable. *See id.* Finally, the CMO sets forth what appears to be a summary-judgment standard for purposes of evidentiary hearings, *see id.* ¶ III.B, which would permit an evidentiary hearing in any case where there is a "substantial issue[] of material fact," and thus likely guarantee an evidentiary hearing in nearly every case. *See id.*

## ARGUMENT

### I.   THE GOVERNMENT RESPECTFULLY REQUESTS CLARIFICATION AND RECONSIDERATION OF THE CMO.

#### A.   The Court Should Clarify that the CMO's Requirements Regarding Exculpatory Evidence Are Satisfied by the Provision of Exculpatory Materials Reviewed by the Government's Attorneys in Preparing the Factual Returns.

The CMO's exculpatory evidence provisions state that the Government "shall disclose to the petitioner all reasonably available evidence in its possession that tends materially to undermine the information presented to support the government's justification for detaining the petitioner" and give Respondents 14 days to certify that this has been completed in the 101 cases in which factual returns had already been filed. CMO ¶ I.D. Although neither *Boumediene* nor *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), require providing a detainee with exculpatory evidence, the Government committed to provide such reasonably available exculpatory

information that is discovered in preparing the factual returns.  The preparation includes review

of all of the information included in the records of a detainee's Combatant Status Review

Tribunal ("CSRT") and Administrative Review Board ("ARB") proceedings, as well as

additional information reasonably available to the Department of Defense.  *See* England Decl.

¶¶ 5-8.  Because the CMO only requires that "reasonably available" evidence be provided, and

only provides an additional 14 days for the Government to certify that disclosure of such

evidence has occurred in over 100 cases where factual returns have already been filed, the

Government reads this provisions as consistent with the practice used for the recently filed

factual returns and amended returns.  The Government respectfully requests that the Court

clarify the CMO to this effect and, absent clarification, will interpret the provision as being

consistent with the Government's current practice.

Indeed, the current schedule would be infeasible, not just for the 101 cases with factual

returns on file to date, but for the additional factual returns being produced at a rate of 50 per

month, if the search for and production of exculpatory evidence were extended beyond that

already undertaken in developing factual returns.  *See* England Decl. ¶¶ 11-14, 16-21; Hayden

Decl; Mueller Decl.  We do not believe the Court intended to, or should, impose such onerous

and expanded search requirements.

As we have previously explained, the Supreme Court in *Hamdi* and *Boumediene*

expressly rejected the imposition of procedures that "would *approach* the process that

accompanies a criminal trial."  *Hamdi*, 542 U.S. at 528 (emphasis added); *see id*. at 532-33;

*Boumediene*, 128 S. Ct. at 2269 ("[h]abeas corpus proceedings need not resemble a criminal

trial, even when the detention is by executive order").  Moreover, there is no general *Brady*

obligation in civil habeas proceedings, and Petitioners have cited no case in the history of

wartime habeas— from *Rex v. Schiever*, 2 Burr. 765 (K.B. 1759), to *Boumediene*—in which the Government has been required to produce *any* exculpatory evidence.

Moreover, requiring the Government to conduct open-ended searches for evidence across multiple agencies that might be in possession of information concerning detainees would be extraordinary burdensome to wartime intelligence operations.[6]  As explained in the declarations of the Deputy Secretary of Defense, the Director of the FBI, and the Director of Central Intelligence, such an undertaking presents practical problems, such that the searches cannot be completed except with significant lead time.  For example, the FBI may use one of two systems to complete such a search, with one system yielding more comprehensive results than the other. Regardless of the system used, however, such an open-ended search could not be completed within the CMO's required time period and would negatively impact other vital FBI operations. Mueller Decl. ¶¶ 4-12.  Moreover, the task does not end once the search is complete; DoJ attorneys must then cull through the documents identified in the search to determine which, if any, are responsive before returning the responsive material to the FBI for the agency to determine—using agents and analysts who must be taken away from other operational tasks—the information that may be released.  *Id.* ¶¶ 13-15.  The magnitude of the task facing other agencies and the risks posed to national security from diverted resources are, if anything, even greater.  *See* England Decl.; Hayden Decl.  Furthermore, as a practical matter, such multi-

---

[6]  As explained in the declaration of the Deputy Secretary of Defense, the repositories of information used in preparing the factual returns have included, at a minimum, the material compiled by the DoD organization responsible for compiling such information for use in the CSRT and ARB processes, as well as the primary DoD organization responsible for gathering intelligence information about Guantanamo detainees.  *See* England Decl. ¶¶ 5-8.  Accordingly, because these two organizations have been engaged in long-term missions that have required them to collect and evaluate information regarding Guantanamo detainees, Respondents have not conducted open-ended searches for evidence relating to Petitioners across multiple agencies that might be in possession of such information to determine if exculpatory information might exist.

agency searches would be extraordinarily burdensome in ways only hinted at in the individual

agency declarations.  Information that derives from multiple sources cannot be cleared for

release by a single agency; rather, each agency holding an equity in the information must be

consulted before the material can be disseminated.  *See*, *e.g.*, Mueller Decl. ¶ 24; England Decl.

¶¶ 16-18.  Indeed, for reasons described in the submitted declarations, in many instances it

would be impossible for such information to be cleared for dissemination, even to the Court *ex*

*parte*.  *See* Hayden Decl; Mueller Decl.

Should the Court have intended searches beyond those already undertaken in developing

the factual returns, Respondents respectfully request reconsideration[7] or certification for

interlocutory appeal in light of the novel and onerous burden such a requirement would impose.[8]

**B.      The Court Should Reconsider the Automatic Discovery Provisions**

The Court should also clarify in part, and reconsider in whole, the CMO's provisions for

automatic discovery.  Currently, these provisions apply to: (i) documents and objects referenced

in the factual return; (ii) a Petitioner's statements relating to information in the return

---

[7]  Federal Rule of Civil Procedure 54(b) governs reconsideration of non-final orders.
Courts retain "broad discretion to grant or deny a motion for reconsideration."  *Cobell v. Norton*,
224 F.R.D. 266, 271-72 (D.D.C. 2004).  While the precise standard governing reconsideration of
interlocutory orders is unsettled, "courts have more flexibility in applying Rule 54(b)" than in
determining whether reconsideration is appropriate under Rules 59(e) or 60(b).  *Moore v.
Hartman*, 332 F. Supp. 2d 252, 256 (D.D.C. 2004).  Reconsideration may be granted "as justice
requires" *see APCC Servs., Inc. v. AT & T Corp.*, 281 F. Supp. 2d 41, 44 (D.D.C. 2003), or upon
previously unavailable evidence or "where the initial decision was clearly erroneous and would
work a manifest injustice."  *In re Vitamins Antitrust Litig.*, 2000 WL 34230081, *1 (D.D.C.
2000) (Hogan, J.).  The standard is met here.

[8]  At a minimum, should the Court adopt a broader interpretation, the Court should permit
additional time to locate and produce any such additional exculpatory material beginning once
all factual returns are filed so as to reduce the burden on the Government's resources that are
already strained to the breaking point through the preparation of factual returns.  That process
requires the careful review and clearing of classified information (including exculpatory
evidence) for use in factual returns, an effort that already requires scores of dedicated U.S.
Government personnel with security clearances.  *See infra* Part I.E.

(irrespective of use by the Government); and (iii) information about the circumstances in which such statements were made.  *See* CMO ¶ I.E.

### 1.    Clarification of the Automatic Discovery Provision Is Essential.

Paragraph I.E.1 of the CMO requires the Government to provide all documents and objects referenced in its "factual return."  The Court should clarify that this obligation applies only to documents and objects referenced in the narrative setting forth the Government's affirmative case for detention and not to documents or objects referenced in the numerous documents attached to the narrative.

The Government's provision of underlying documents as part of its initial submission, rather than merely a summary affidavit narrative, is unprecedented.  Moreover, the attached documents themselves may reference numerous documents or objects that are simply not part of the Government's affirmative case for detention.  Such documents or objects certainly should not be provided absent at least a specific showing of need rising to "good cause."  *See* CMO ¶ I.E.2. For these reasons, at a minimum the CMO should be clarified (or modified) to state that the requirement in I.E.1 refers only to documents or objects referenced in the narrative itself that the Government intends to rely on, and not all the documents or objects referenced in the documents attached to the narrative.[9]

---

[9]  The Court should also clarify in any event that the CMO merely permits Petitioners' counsel to make requests for specifically identified items or discernable information in the three categories of ¶ I.E.1 and does not permit bald categorical requests for such information as reflected in ¶ I.E.1 requests received to date.  *See supra* n.5.  In other words, if an object or document is referenced in the return, and Petitioner's counsel wish to request it, they must ask for it specifically, and not simply for all documents or objects that might happen to be mentioned in the factual return.  The Government should not be put to the burden to identify each and every object or document identified within the factual return, determine whether they are in the Government's possession, and to take the steps necessary to make them available to Petitioners' counsel (and a substitute to Petitioner, if necessary), without any consideration by Petitioners as to whether they in fact have any need for every one of those objects or documents.

### 2.      The Court Should Reconsider the Automatic Discovery Requirement.

Even with the clarifications or modification above, further reconsideration of the

automatic discovery provision of the CMO is also warranted.  Most fundamentally, the Court

should limit all discovery to the process set out in ¶ I.E.2.[10]  Even if narrowly construed, the

authorization of automatic discovery is deeply flawed on both legal and practical grounds,

because it affords greater discovery than that available to criminal defendants or to Petitioners

invoking statutory habeas procedures outside the wartime context.

The procedures required in this habeas proceeding—which is solely based on the

Suspension Clause as construed in *Boumediene*—cannot exceed those available under the habeas

statute and rules.  Significantly, the general federal habeas statute, 28 U.S.C. § 2241 *et seq.*, does

not expressly provide for discovery of documents.  The modern Habeas Rules do permit

discovery, but subject to important limitations:  "leave of court [is] required" before any such

discovery is authorized and a party must first show "good cause," including reasons specific to

the information sought, before the Court "may" authorize discovery.  Habeas R. 6(a); *see* Habeas

R. 6(b) (requiring a party seeking discovery to "specify any requested documents").  The

automatic discovery provisions in the CMO far exceed anything contemplated under the Habeas

Rules.

In support of these requirements, the CMO cites *Harris v. Nelson*, 394 U.S. 286, 300

(1969).  But *Harris* held only that discovery in habeas proceedings should be narrowly tailored

and allowed only upon an affirmative showing that the Petitioner "may, if the facts are fully

developed, be able to demonstrate that he is confined illegally."  *See id.*  Moreover, the narrow

---

[10]  Respondents do not concede that any discovery is appropriate in these wartime habeas cases.  However, if any discovery is to be allowed it should be pursuant to the restrictions set forth in ¶ I.E.2 of the CMO.

discovery provisions of Habeas Rule 6(a), which require a specific showing of good cause, were themselves promulgated in response to *Harris*. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997). There simply is no basis in law or logic for imposing on the Government the type of automatic disclosure obligations frowned upon in *Harris*, and precluded by the Habeas Rules, in what should be the more limited context of wartime constitutional habeas proceedings.

Similarly, except for the constitutionally required disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963)*,* which is inapplicable here given these habeas cases are not criminal prosecutions, "'[t]here is no general constitutional right to discovery in a criminal case'" at all. *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). Yet the CMO imposes three broad discovery obligations above and beyond its requirements to turn over exculpatory information. It simply cannot be that the Constitution affords greater protection for wartime status determinations than it affords for peacetime criminal prosecutions. Such a result is irreconcilable with *Hamdi* and *Boumediene*; both of which expressly rejected the notion that the process required in these cases would "approach" or "resemble" process afforded in a criminal trial. *See Boumediene*, 128 S. Ct. at 2269; *Hamdi*, 542 U.S. at 528, 532-33.[11]

The CMO's automatic discovery provisions seem modeled on the extra-constitutional discovery afforded to criminal defendants under Rule 16(a) of the Federal Rules of Criminal

---

[11] *Hamdi* specifically rejected discovery even narrower than that contemplated under the CMO. There, the district court had "ordered the Government to turn over numerous materials for *in camera* review, including copies of all of Hamdi's statements and the notes taken from interviews with him that related to his reasons for going to Afghanistan and his activities therein; a list of all interrogators who had questioned Hamdi and their names and addresses; statements by members of the Northern Alliance regarding Hamdi's surrender and capture; a list of the dates and locations of his capture and subsequent detentions; and the names and titles of the United States Government officials who made the determinations that Hamdi was an enemy combatant and that he should be moved to a naval brig." *See Hamdi*, 542 U.S. at 513-14.

13

Procedure.  In many respects, however, the CMO exceeds even those standards.  It thus cannot

be fairly described as "prudent and incremental" as mandated by *Hamdi*.

   ***Discovery of Documents and Objects.***  The CMO requires disclosure of "any documents

or objects in [the Government's] possession that are referenced in the factual return."  CMO

¶ 1.E.1(1).  Even accepting Respondents' suggested clarification of this provision, *see supra* Part

I.B.1, ¶ I.E.1(1) also exceeds the disclosure obligations mandated by the similar Federal Rule of

Criminal Procedure 16(a)(1)(E), which permits a criminal defendant, upon demand, to inspect

and copy, among other things, documents and objects in the Government's possession, but only

when:  (i) the items are "material to preparing the defense;" (ii) the Government intends to *use*

the item in its case-in-chief; or (iii) the item was seized from or belongs to the defendant.  *See*

Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii).  The CMO includes no coextensive limitation on disclosure

of documents and objects; rather it provides automatic discovery merely because they are

"referenced in the factual return."  Thus, although no automatic discovery is appropriate in the

habeas context at all, much less wartime habeas, the Court should at least grant reconsideration

and make clear that these same limitations on disclosure are applicable.

   Critically, the CMO on its face does not even require a showing of materiality.[12]  Under

Rule 16, the materiality requirement is essential to ensure "that the pretrial disclosure of the

disputed evidence would have enabled the defendant significantly to alter the quantum of proof

in his favor."  *United States v. Caicedo-Llanos*, 960 F.2d 158, 164 n.4 (D.C. Cir. 1992) (internal

---

[12]   Materiality is critical because the Government's case-in-chief generally relies upon
intelligence reports and other such documents rather than physical objects.  To the extent that the
Government therefore intends to use a document or object in its case-in-chief, *see* Fed. R. Crim.
P. 16(a)(1)(E)(ii), the material is already attached to the factual return in the form upon which
the Government relies.  The Government will frequently rely on intelligence documents
themselves and not underlying materials referenced therein.

quotations omitted).  Simply put, the CMO presents a radical departure from the "prudent and incremental" approach counseled in *Hamdi*.

The CMO's requirement for discovery of documents and objects referred to in a return also presents numerous practical problems for even complying with the standards of Federal Rule of Criminal Procedure 16.  For example, even a law enforcement organization like the FBI, whose mission it is to investigate criminal offenses against the United States, would have serious difficulty complying with the CMO in the context of the present conflict.  *See* Mueller Decl. ¶ 16.  Other agencies are principally charged with the responsibility to *fight* this war.  The practical difficulties and burdens for such organizations in determining whether they even possess responsive material let alone in producing it—all while prosecuting multiple armed conflicts and preventing further attacks on the homeland—are far greater.  *See* England Decl. ¶ 10; Hayden Decl.  Indeed, the CMO seems to *require* the Government to engage "in a futile search for evidence buried under the rubble of war," *Hamdi* 542 U.S. at 532, and ignores the Supreme Court's admonition that the "exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict," *id.* at 533-34.

**Statements by the Detainee.**  The CMO also requires production of "all statements, in whatever form, made or adopted by the petitioner that relate to the information contained in the factual return."  CMO ¶ I.E.1.(2).  This requirement is breathtaking in scope—given that detainees have been interrogated numerous times—and includes none of the limitations included even in Federal Rule of Criminal Procedure 16, such as the requirement that certain oral statements be provided only if they are to be "use[d] . . . at trial," Fed. R. Crim. P. 16(a)(1)(A);

15

that only "relevant" statements need be disclosed, *id.* §§ 16(a)(1)(A), (B)(i) & (ii); that only the

relevant "portion" of a written record of an oral statement need be provided, *id.* § 16(a)(1)(B)(ii);

and that disclosure of the "substance" of the statement, not necessarily the statement itself, is

permissible, *id.* §§ 16(a)(1)(A), (B)(ii).  On its face, the CMO contains no such limitations,

including no requirement of even logical relevance.[13]

Even with such clarification, however, automatic discovery of a detainee's statements

presents numerous practical difficulties and burdens upon agencies prosecuting the present war,

without any appreciable increase in materially distinct information from that the Government has

already produced in the factual returns.  For example, for reasons described above and in the

declaration of FBI Director Mueller, searching the relevant FBI databases and culling through

potentially responsive documents to find detainee statements "relate[d] to the information

contained in the factual return" would likely overwhelm the Bureau's technical capacity unless

significant resources are diverted from other vital national security operations.  *See* Mueller

Decl. ¶¶ 5-15; 17.  Even then, such searches could not be completed within the time period

contemplated by the CMO.  *Id.*  The burden on the Department of Defense is even greater.  An

---

[13]  Moreover, because these habeas proceedings involve primarily classified evidence, even the simple "relevance" standard applicable to the discovery of statements by criminal defendants under Rule 16 would be inappropriate.  Given the Supreme Court's admonitions in *Hamdi* and *Boumediene* about protecting sensitive national security information, *Hamdi*, 542 U.S. at 539; *Boumediene* 128 S. Ct. at 2276, it would be remarkable if a habeas Petitioner had only to demonstrate "relevance" to trigger mandatory disclosure of classified information.  Indeed, even in a domestic criminal prosecution, a defendant must, pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C.App. § 3, demonstrate both relevance *and* materiality before he may discover in appropriate form the same type of information.  *See United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("We hold, in short, that classified information is not discoverable on a mere showing of theoretical relevance in the face of the Government's classified information privilege, but that the threshold for discovery in this context further requires that a defendant seeking classified information . . . is entitled only to information that is at least helpful to the defense of the accused . . . .") (citing *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957)) (internal marks omitted).

open-ended search for detainee statements would encompass a number of separate DoD

agencies, all with their own repositories of information and varying search capacities. *See*

England Decl.   ¶ 11-14.  For example, the agency's Criminal Investigative Task Force (CITF)

does not have the capability to separate a detainee's statements from other material in the

organization's database.  *See* England Decl. ¶ 14.  Instead, to comply with the CMO, CITF must

produce all information in its database related to that detainee, and DoD or DoJ attorneys have to

cull through the produced material to identify responsive documents.  *Id.*  For DoD overall, the

task could involve thousands of man hours— even before responsive documents are vetted to

determine whether and how they may be disseminated.  England Decl. ¶¶ 16-20.  Indeed, apart

from these practical difficulties, given the nature of certain information it may, in some

circumstances, be impossible for an agency to produce information required by the CMO, even

as contemplated in ¶ I.F.  *See* Mueller Decl.; Hayden Decl.  Moreover, there is no reason to

believe that the expenditure of these resources, at the risk of compromising other national

security missions, would yield significantly more information of use to Petitioners than is

already produced in the factual returns.[14]  *See* England ¶ 14.

　　　*Circumstances in Which Statements Made.*  The requirement that the Government

produce "information about the circumstances in which" statements of the Petitioner were made

or adopted, CMO ¶ I.E.1.(3), is an unprecedented obligation with no analogue in statutory

---

[14]  Attorneys producing the factual returns will include excerpts from detainee statements
they have reviewed either if they have inculpatory value or exculpatory value.  The former
generally consist of a detainee's admissions to relevant conduct; the latter generally consist of
the detainee's denials.  To the extent that a search of other repositories would yield additional
statements, they are of marginal use to the detainee: the omission of further inculpatory
statements prejudices only the Government's case; and a detainee's further denials are
cumulative, may be presumed by the court, and, at any rate, are well within the detainee's own
knowledge.

habeas or criminal practice, and is certainly not required by the Constitution itself.  Indeed, in criminal

cases, the failure to disclose the circumstances of an allegedly coerced confession does not run

afoul of *Brady* because such circumstances are well within the defendant's knowledge.  *See*, *e.g.*,

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1028-29 (7th Cir. 2006) ("no *Brady*

obligation to tell [defendant] again that they coerced her into confessing" because the defendant

"already was quite familiar with those circumstances").  Similarly, here, the circumstances under

which a Petitioner made any statements are within his own knowledge and may be raised in the

merits proceeding.

Moreover, disclosing the information required by ¶ I.E.1.(3) would unnecessarily burden

Government agencies charged with prosecuting the present war and would risk serious damage

to national security.  For reasons described in the submitted declarations, the time and resources

required to identify and produce information concerning all of a Petitioner's statements are

considerable—crushingly so when magnified across 113 separate cases for nearly 200

Petitioners.  Such information is not readily accessible and may involve investigation into the

circumstances of numerous interviews for each Petitioner.  *See*, *e.g.*, England Decl. ¶ 15; Mueller

Decl.; Hayden Decl.  Indeed, this provision of the CMO could be used to require the

Government to disclose information about how it conducts interviews and acquires information,

which could be both classified and not appropriately disclosed to the Petitioner or his counsel.

*See* Mueller Decl.; Hayden Decl.  Moreover, the measures outlined in ¶ I.F. of the CMO do not

necessarily protect such core information about sources and methods from disclosure, even apart

from the burden involved in proceeding under ¶ I.F. for the vast amount of information

implicated by the automatic discovery provision.  *See* Mueller Decl.  For reasons described in

the attached declarations, in many instances it will be impossible for the Government to provide the required information, even to the Court *ex parte*.  *See* Mueller Decl.; Hayden Decl.  The automatic discovery could be used to force the Government to disclose information at the very core of material the *Hamdi* Court said must be protected.  *See Hamdi*, 542 U.S. at 535.  Such a requirement ignores the language of the very opinion holding that these Petitioners have constitutional habeas rights in the first place.  In *Boumediene*, the Court explicitly "recognize[d], however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering," and stated its "expect[ation] that the District Court will use its discretion to accommodate this interest to the greatest extent possible."  128 S. Ct. at 2276.  Requiring the Government to disclose the "circumstances" of detainee interviews, thus, is unduly burdensome, implicates core concerns about the disclosure of intelligence collection methods and, in many instances, will place the Government in an impossible position—all to comply with a provision that has no analogue even in federal criminal practice.

    ***Other Considerations.***  Automatic discovery also unfairly prejudices the Government in other ways.  In particular, it effectively prevents the Government from choosing to limit its case-in-chief in order to streamline it, to avoid potentially intractable practical difficulties, or to avoid serious issues involving classified information.[15]  Such self-limitation is a common and appropriate strategy in routine criminal prosecutions.  Here, Respondents in crafting factual

---

[15]  In defending these habeas actions, the Government necessarily must balance the national security interests in preventing inappropriate dissemination of sensitive classified information with the national security interests arising from not including particular information in a given detainee's case, which might result in substantially weakening the case for detention. *See* August 29, 2008 Motion at 8-10.  These sensitive decisions must often be made on a document-by-document, line-by-line basis when a factual return to defend the case is being assembled.  The CMO inappropriately substitutes a broad brush rule for the Executive branch's careful judgments in this area.

returns have sometimes and for a variety of reasons decided not to include certain detainee statements.[16]  Yet the automatic discovery provisions eliminate the Government's ability to appropriately limit its case in such a fashion.  The Constitution does not mandate such an anomalous result.

* * *

At bottom, the CMO's automatic discovery provisions are fundamentally at odds with *Hamdi*'s admonition that courts proceeding in wartime habeas should take a "prudent and incremental" approach to factfinding and not replicate criminal trial proceedings.  These provisions are likewise at odds with Supreme Court precedent concerning discovery in habeas proceedings.  *Bracy*, 520 U.S. at 904 ("[a] habeas petitioner, unlike the usual civil litigant in federal court [and, for that matter, unlike a criminal defendant], is not entitled to discovery as a matter of ordinary course"); *Harris*, 394 U.S. at 300 (discovery must be narrowly tailored and based on a showing of good cause).  Such limitations are even more critical in these wartime habeas proceedings.  *See Hamdi*, 542 U.S. at 534 (advising courts to tailor such proceedings "to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict").

For all of these reasons, the Government respectfully requests that the Court reconsider the automatic-discovery provisions of ¶ I.E.1. and, at a minimum, require that *all* requests for discovery fall under ¶ I.E.2.

---

[16]  Similarly, the Government could likely never be able to limit its case for justifying a detention in a fashion that avoided potential interference with any ongoing criminal investigation of a Petitioner that was linked in any way to issues that might be even merely mentioned in a factual return.

**C.** **Reconsideration of the CMO's Treatment of Classified Information is Necessary Because it Will Impose Extraordinary Burdens on the Government's Military and Intelligence Agencies.**

The CMO's treatment of classified information presents grave national security and separation of powers concerns requiring reconsideration. The CMO requires Respondents to provide Petitioners *themselves* with "an adequate substitute" of every piece of classified information produced under ¶ I.D and ¶ I.E., regardless of whether that information is material or relevant to the disputed issues in the habeas litigation. (The CMO is unclear as to the situation where no "adequate" substitute can be provided.) Further, the CMO mandates that Respondents provide Petitioners' counsel the actual classified information, unless the Government provides the classified information to the Court *in camera* "for a determination as to whether the information should be disclosed and, if not disclosed, whether the government will be permitted to rely on the information to support the detention." CMO ¶ 1.F. These provisions all raise serious concerns.

**1.** **The Government Should Not Be Required to Provide Persons It Has Determined To Be Enemy Combatants With Classified Information or Substitutes for Such Information.**

The Government already provides unprecedented access to classified information to opposing counsel in these civil habeas cases. Thus, in more than 120 cases with factual returns already on file, we have provided counsel for Petitioners with access to classified exculpatory information where it exists. But for exculpatory evidence or proper discovery that happens to be classified and subject to disclosure under the CMO, the Government should not be required to provide the very people it has determined to be enemy combatants with classified information or an "adequate substitute" for such information. Foremost, there is no legal authority requiring the Government to provide an "adequate substitute" of classified discovery information to wartime

enemy combatants.  To the contrary, the Supreme Court has recognized that the Executive

Branch has a compelling interest in the protection of classified national security information.

*See*, *e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988).  Indeed, "under the

separation of powers created by the United States Constitution, the Executive Branch has control

and responsibility over access to classified information."  *People's Mojahedin Org. v. Dep't of

State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003).  Neither of the two cases cited by the Court in

support of the "adequate substitute" requirement—*Boumediene* or *CIA v. Sims*, 471 U.S. 159

(1985)—supports the compelled provision of an "adequate substitute" in this context.  To the

contrary, *Sims* repeatedly stressed the need to "provid[e] intelligence sources with an assurance

of confidentiality that is as absolute as possible," 471 U.S. at 175, and *Boumediene*, addressing

the specific circumstances of the Guantanamo detainees, stated that "the Government has a

legitimate interest in protecting sources and methods of intelligence gathering," and that a habeas

court may not "disregard the dangers that the detention in these cases was intended to prevent,"

128 S. Ct. at 2276.

       Even in the domestic criminal context, there is no legal requirement that a criminal

defendant automatically be provided with an "adequate substitute" of all classified discovery

information.  Under the Classified Information Procedure Act ("CIPA"), which governs the

discovery of classified information in criminal cases, the district court must make a *specific*

finding that the classified information is material to the case before the Government is even

required to consider creating a substitute.  *See* 18 U.S.C.App. III, § 4.  As the D.C. Circuit

explained in *United States v. Mejia*, the Court must therefore make a threshold *ex parte*

assessment on a document-by-document basis, whether the information is "relevant" and "*at

least helpful to the defense of the accused*."  448 F.3d 436, 456 (D.C. Cir. 2006) (emphasis in

original); *see Yunis*, 867 F.2d at 623.  Under this standard, which is far more permissive than that appropriate in this wartime habeas context, when a criminal defendant seeks classified discovery information within the scope of Federal Rule of Criminal Procedure 16, the Government is not required to disclose the information if "[n]othing in the classified documents in fact goes to the innocence of the defendant *vel non*, impeaches any evidence of guilt, or makes more or less probable any fact at issue in establishing any defense to the charges." *Yunis*, 867 F.2d at 624; *United States v. Rahman*, 870 F. Supp. 47, 52 (S.D.N.Y. 1994) ("inculpatory [classified discovery] material which the government does not intend to offer at trial need not be disclosed. Such information cannot conceivably help a defendant, and therefore is both unnecessary and useless to him.").

Moreover, the requirement that the Court make a specific materiality finding in CIPA cases derives from the Constitution itself.  Thus, a showing of materiality is required precisely because the Executive Branch's compelling interest in the protection of national security information must "inform [the court's] construction of CIPA and the classified information privilege, and the same concerns must inform analyses by district courts in passing on the discoverability of classified information." *See Yunis*, 867 F.2d at 623 (citing *Sims*).  Only after the Court makes a threshold finding of materiality may it next consider the various alternative options short full disclosure of the classified information, such as permitting the Government "to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." *See* 18 U.S.C.App. III, § 4; *see United States v. Libby*, 429 F. Supp. 2d 18, 22-23 (D.D.C. 2006) ("Section 4 [of CIPA] only applies after the threshold question of materiality is made in favor of disclosure or the government agrees to disclosure without making a materiality challenge.").

Furthermore, the Government is never required to disclose classified information absent its consent. *See* 18 U.S.C.App. III, § 6.

The CMO thus imposes disclosure obligations that far exceed the domestic criminal requirements of CIPA, a statute that "evidence[s] Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial." *United States v. O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002). The imposition of the requirement to prepare an "adequate substitute" of every piece of classified discovery information—even in the absence of any specific finding of materiality to an individual Petitioner's case—is unwarranted even under CIPA criminal standards, much less under the more "prudent and incremental" standards that govern in this context. *See Hamdi*, 542 U.S. at 539.[17]

The "adequate substitute" requirement also places an unworkable burden on the Government. The CMO requires the Government to provide an "adequate substitute" of every piece of classified discovery information identified by the military and intelligence agencies in scores of cases, all of which will be proceeding at the same time under the schedule established by the CMO. Given the broad scope of classified information that must be disclosed pursuant to ¶ I.D. and ¶ I.E—"all statements," "any documents or objects"—the Government will be required to draft hundreds if not thousands of substitutes, in cases necessarily built largely on classified national security information. As explained in the accompanying declarations, that burden will be overwhelming, will divert limited resources, and will sidetrack the Nation's

---

[17] Further, from a practical perspective, the Court's order will doubtless lead to a deluge of motions and litigation concerning what constitutes "an adequate substitute" of the classified information at issue. Such challenges will thrust upon this Court the role of resolving wordsmithing disputes over summaries of classified documents that, as noted above, may have little material connection to disputed issue of fact in the habeas case. Litigation over such minutiae was likely not what the Supreme Court had in mind when it directed this Court to conduct a "prompt habeas corpus hearing." *Boumediene*, 128 S. Ct. at 2275.

military and intelligence agencies from performing other critical national security duties during a time of war.  *See* England Decl. ¶ 19; Hayden Decl.; Mueller Decl.

> **2.     Automatic Provision of Classified Information to the Court and Consequences of the Failure to Provide Classified Information to Petitioners' Counsel Raises Serious Constitutional Questions**.

For all classified discovery information that Respondents seek to withhold from Petitioners' counsel, the CMO requires Respondents, without exception, to furnish that information to the Court for *in camera* inspection.  *See* CMO ¶ I.F.  The order thus inappropriately mandates that the Executive Branch make wholesale *in camera* disclosure of classified discovery information to the Court, without consideration of any possible alternatives.

The Supreme Court in *Boumediene* expressly "recognize[d] . . . that the Government has a legitimate interest in protecting sources and methods of intelligence gathering," and it therefore directed the "District Court [to] use its discretion to accommodate this interest *to the greatest extent possible*."  *Boumediene*, 128 S. Ct. at 2276 (emphasis added).  In this respect, *Boumediene* is consistent with well-established law, which has recognized that intelligence sources will "close up like a clam" absent absolute assurances of confidentiality.  *See Sims*, 471 U.S. at 172, 175; *Snepp v. United States*, 444 U.S. 507, 512 (1980) ("The continued availability of these foreign sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger the personal safety of foreign agents.").  Indeed, the Supreme Court has emphasized that some particularly sensitive classified information may not be appropriate for review "even by the judge alone, in chambers."  *See United States v. Reynolds*, 345 U.S. 1, 10 (1953) ("Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case. . . .  [T]he court should not jeopardize the security which the privilege is

meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.").  For these reasons, the Court of Appeals has directed district courts to employ a variety of intermediate steps short of full disclosure when confronted with privilege issues related to classified information.  *See*, *e.g.*, *McGehee v. Casey*, 718 F.2d 1137, 1149 (D.C. Cir. 1983).

These concerns are particularly significant in these cases.  In seeking additional time to complete its first 50 factual returns, the Government explained that in some circumstances, there were substantial obstacles even to presenting certain classified information to the Court *in camera* and *ex parte*.  The attached declarations from the Director of the FBI and Director of the Central Intelligence Agency set forth similar concerns with additional detail.  Reconsideration of this automatic-disclosure rule is therefore essential.[18]

### D. The CMO's Treatment of the Presumption, Hearsay, and Other Procedural Concerns Should be Reconsidered.

Respondents also respectfully request that the Court reconsider the CMO and permit the Government to make categorical requests on the issues of the presumption afforded Government evidence and the use of hearsay.  The CMO appears to demand a case-by-case showing, *see* ¶¶ II.B, II.C, but fails to consider the proceedings in each case will require a discussion of common legal questions, common evidence, and common burden on the part of the Government, all of

---

[18] Relatedly, the requirement in ¶ I.F that the Court adjudicate whether Respondents will be permitted to "rely on" information identified under ¶ I.D or ¶ I.E, but not provided to a Petitioner's counsel, makes little sense except where Respondents intend to rely on that information in its case.  Consequently, the provision of the order directing the Merits Judge to decide "whether the government will be permitted to rely on the information to support detention" would be appropriate only in circumstances in which the Government is, in fact, relying upon such information as basis for a Petitioner's detention, and the provision should be clarified in that regard.

which call for a common solution that at a minimum, is the presumptive baseline for litigating these cases (subject to the possibility for objections or exceptions in individual cases).

For example, evidence of the reliability of intelligence information and of the burden imposed by requiring the development of non-hearsay evidence would be common, and the Government would provide to the Court classified declarations that explain in general the inherent safeguards and specialized terminology applicable to such evidence.[19]  Moreover, the burdens placed on the Government and possible interference with efforts to protect national security by these proceedings are common and cumulative and draw upon the same limited national security resources.[20]  Regarding hearsay, *Hamdi* indicates that the use of hearsay may be generally appropriate.  *See Hamdi*, 542 U.S. at 533-34.  To put the Government to a case-by-case (or item-by-item) burden to allow hearsay simply ignores the realities and exigencies of wartime because the evidence may be "buried under the rubble of war."[21]  *Id.* at 532.  Fundamentally,

---

[19]  Similarly, the safeguards inherent in the Government's system of gathering and vetting intelligence data, which justify a presumption of reliability, are common across these proceedings insofar as the intelligence reports the Government relies on have all been prepared by trained analysts as a regular part of the Government's intelligence-gathering functions.

[20]  The burden arising from the lack of a presumption of reliability or the admission of hearsay is greater here because the Court has placed the ultimate burden of proof on the Government.  CMO ¶ II.A.

[21]  Moreover, each piece of hearsay evidence denied admission will require the Government to track down one or more intelligence sources in order to develop non-hearsay evidence on the relevant issue, an effort that will divert resources currently dedicated to protecting national security.  This could never be accomplished.  And the threat of exposing intelligence sources would fatally chill the Government's ability to mount a meaningful defense. The treatment of these issues is in fundamental conflict with *Boumediene*, which taught that while Petitioners may challenge their detention, "it does not follow that a habeas court may disregard the dangers the detention in these cases was intended to prevent."  128 S. Ct. at 2276. The Hobson's choice of risking exposure of intelligence sources and methods of gathering information or compromising the ability to detain an enemy combatant is nowhere contemplated by the Supreme Court.

however, the decision to grant a presumption and admit hearsay ought to be the same in order to maintain consistent baseline procedures and the CMO should be so modified.[22]

Finally, as to evidentiary hearings, the CMO's standard articulated for allowing such hearing, *see* CMO ¶ III.B.1, will likely guarantee an evidentiary hearing in *every* case.  The CMO should be reconsidered or clarified to explain that a mere denial of the facts raised by the Government to justify detention is not sufficient to entitle one to an evidentiary hearing.  *See Hamdi*, 542 U.S. at 534 (suggesting that once the Government establishes a plausible case for detention, the evidence is presumed correct and the detainee must then produce a traverse with "more persuasive" evidence for the proceedings to continue).  Indeed, the CMO's importation of essentially a civil, summary judgment standard is clearly inappropriate in the context of these cases.

### E.      The Simultaneous, Unstaggered Deadlines Contemplated in the Various Provisions of the CMO Make Compliance Impractical.

Separate from the issue of clarification or reconsideration of some of the CMO's substantive provisions, distinct provisions of the CMO have the practical effect of imposing a series of overlapping, unstaggered deadlines that, given the Government's other obligations in these cases and the limited resources available for the handling of classified information, are simply not feasible.  At present, the CMO requires each of the following for already filed 101 factual returns within 14 days of the date of the order (November 6, 2008):  the filing of unclassified factual returns, CMO ¶ I.C, and the provision of exculpatory evidence, *id.* ¶ I.D. Further, automatic discovery must be gathered and produced, including in dozens of cases where

---

[22]   That is not to say that a Petitioner in a case could not say that the specific conditions with respect to specific evidence presented warrant rebutting the presumption or denying use of hearsay evidence, but there is no reason that the baseline procedures cannot be briefed categorically.

Petitioners have *already* made requests, within 14 days of a request, *id.* ¶ I.E.1.  Thus, significant amounts of discovery are due the final week of November and almost daily thereafter.

Furthermore, the Government must prepare adequate substitutes for classified information that can be shared with the Petitioner and prepare motions addressing any classified material it is unwilling to share with a Petitioner's counsel.  In addition to all of this, just during the month of December, the Government is required under CMO to file at least 150 briefs dealing with presumptions of accuracy and authenticity and the admissibility of hearsay (300 briefs, if the Government opposes Petitioners' briefs on the issues).  The Government is also required to submit at least 100 merits briefs for judgment on the record by mid-December.  All of this is on top of any other briefing or hearings arising from other disputes between the parties that may arise in the cases, such as discovery battles over ¶ I.E.2 of the CMO.  In addition to these requirements, the Government must complete preparation of the remaining factual returns.  Even with the significant resources that the Government has dedicated to these important cases (and the additional resources it intends to add in the wake of the CMO), meeting the deadline for these requirements is simply infeasible.

Since the Court issued its July 11, 2008 Order setting a schedule for the production of factual returns on a 50 return-per-month basis, Respondents have expended tremendous resources to meet the Court's ambitious production schedule.  Since the beginning of August 2008, Respondents have filed a total of 120 proposed amended or original factual returns in cases pending before the Judges of this Court, 101 in these coordinated cases, seven in cases before Judge Sullivan, and 13 in cases before Judge Leon.  The CMO contemplates that Respondents, while continuing this 50 return-per-month production schedule, at the same time prepare 100 unclassified versions of the factual returns within a two-week period, and on top of

that, produce unclassified returns for newly-filed returns within 14 days of the date of filing.

With respect, these deadlines are unworkable.

As explained in Declaration of the Deputy Secretary of Defense, the resources required

for production of unclassified versions are the same resources required for production of new

factual returns each month.  See England Decl. ¶ 20.  In light of these significant and competing

resource demands, Respondents simply cannot maintain the pace of producing 50 new returns

per month *and* producing unclassified versions of those returns within 14 days, to say nothing of

the complying with the initial avalanche of producing 100 unclassified returns by November 20,

2008.[23]  *See* Hayden Decl.

Furthermore, the pace at which the Court has ordered that all of these tasks be completed

creates a risk of inadvertent disclosure of classified information.  *See* England ¶ 21; Hayden;

Mueller.  The process of compiling, reviewing, and redacting sensitive national security

information is careful and time-consuming in order to ensure accuracy.  Given the abundance of

classified national security information at issue, the risk of inadvertent disclosure through

hurried process carries significant consequences.  Likewise, an accelerated review process may

disadvantage Petitioners because of the potential for inadvertent redaction of information that is

not classified.  *See Cozen O'Connor v. U.S. Dept. of Treasury*, 570 F. Supp. 2d 749, 768 (E.D.

Pa. 2008) ("A hastily conducted process could result in the inadvertent production of classified

documents or the withholding of previously classified documents that no longer should be

---

[23]  To comply with the additional obligations imposed by the Court, Respondents are
seeking to mobilize substantial further resources of the Department of Justice, the Department of
Defense, and the Central Intelligence Agency above and beyond those already described to this
Court.  However, such resources cannot be secured in time to meet the various unstaggered
additional fourteen-day deadlines imposed by the CMO for cases involving more than 100
Petitioners.

classified.").  Consistent with the Government's compelling interest to "control access to information bearing on national security," the Court must permit the Executive branch to exercise careful review procedures to ensure that classified information is appropriately protected.  *See Egan*, 484 U.S. at 527.

The deadline in the CMO for the production of the first 100 unclassified returns should be pushed to December 12, 2008—a relatively modest extension of three weeks.  This will not prejudice Petitioners and would provide Respondents with a minimum amount of time to complete this significant task.  Additionally, in light of this new burden in creating the returns, the Court should modify the scheduling order so that unclassified returns are due four weeks after the filing of future returns.[24]

Respondents, therefore, propose the following:[25]  The Court should set a schedule for generalized briefing regarding a presumption in favor of the accuracy and authenticity of the Government's evidence and the admissibility of hearsay evidence material and relevant to the legality of Petitioners' detention, in order to establish expeditiously a consistent rule for these cases prior to the start of merits proceedings.  During that time, Respondents will be completing the submission of factual returns as contemplated in Court's prior scheduling orders.  With respect to individual cases, Petitioners should be required at least four weeks from the filing of the unclassified version of the return to submit at least a preliminary traverse.  The Court should

---

[24]  Alternatively, Respondents suggest that the obligation to produce unclassified returns be deferred until after the Government has completed its production of the classified returns (at the existing rate of 50 per month).  Under that approach, cleared counsel in each of these cases could obtain the classified returns as quickly as possible.

[25]  By this proposal, Respondents do not concede or waive any position or rights as to the propriety of any specific aspect of the proposal, such as, *e.g.*, the propriety of discovery in constitutional habeas cases on behalf of wartime detainees.  Respondents have merely attempted to craft a proposal based upon less objectionable concepts contained in the CMO.

then schedule proceedings for 25 cases per month (coordinated among the various Judges of the

Court), each to proceed on a schedule such as:[26]

> (1)  After the filing of the traverse, the parties may have one week to submit any
> proposed discovery, to which the opposing party may respond as to the propriety
> of the proposal within one week.  The Court will consider proposed discovery
> under the standards contained in ¶ I.E.2 of the CMO, and will set a reasonable
> date for completion of any such permitted discovery;

> (2)  Upon the close of any discovery, the Court will hold a status conference to
> address necessary matters and to establish a schedule for merits briefing, which
> would typically provide for two weeks for opening briefs and two weeks for
> response (or  two weeks for an opening brief by the Government, two weeks for a
> response, and one week for the Government's reply).

## II.   CERTIFICATION OF THE ORDER TO THE D.C. CIRCUIT IS APPROPRIATE IN THE ALTERNATIVE AND MAY ITSELF PRODUCE THE MOST PROMPT RESOLUTION OF THESE CASES IN THE LONG RUN.

Alternatively, if this Court determines that reconsideration and clarification is not

appropriate, the Government respectfully requests certification of the CMO under 28 U.S.C.

§ 1292(b).  Interlocutory appeal is warranted when the Court finds "that such order involves a

controlling question of law as to which there is substantial ground for difference of opinion and

that an immediate appeal from the order may materially advance the ultimate termination of the

litigation."  28 U.S.C. § 1292(b).  These three factors should be applied flexibly and viewed

together, *see* Wright, Miller & Cooper, FED. PRAC. & PRO. § 3930 at 422 (3d ed. 1999), for

---

[26]  Should the Court adopt a broader interpretation of the exculpatory evidence
production obligation than that consistent with Respondents' reading *supra* Part I.A, the Court
should build in an extra eight weeks to the schedule of each case to permit additional searches
for information reasonable for such time period.  In addition, the Government should be
permitted to amend its factual return during that time to account for additional "inculpatory"
information located during the searches.  For reasons described in the declaration of Deputy
Secretary England, the Government thus far has accomplished the expeditious filing of factual
returns, pursuant to the Supreme Court's guidance in *Boumediene*, by reasonably limiting the
world of intelligence and other information from which it develops the return.  The imposition of
a broad exculpatory evidence search broadens the scope of information that should be fair game
for inclusion in factual returns if the information is to be made available to Petitioners.

Section 1292(b) represents the "contemporary view that interlocutory appeals involving important and controlling questions of law are a useful means of expediting litigation." *Tidewater Oil Co. v. United States*, 409 U.S. 151, 179 (1972). Here, the standard for interlocutory review is readily met.

> **A.      The CMO Contains Controlling Questions of Law.**

The *Boumediene* Court itself recognized that these habeas cases "lack any precise historical parallel" in that no court had ever previously "held that noncitizens detained by our Government in territory over which another country maintains de jure sovereignty have any rights under our Constitution," 128 S. Ct. at 2262. The *Boumediene* Court also expressly declined to opine on "the content of the law that governs" adjudication of these cases. *See id.* at 2277. As previously explained, there are general guideposts in *Boumediene* and *Hamdi*, but both cases left critical details unsettled.

The procedural framework established in the CMO sets forth controlling questions of law given that the CMO's baseline procedures "materially affect the course of litigation"; thus, clarification by the Court of Appeals would "result[] in savings of the court's or the parties' resources." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002). Indeed, the procedural determinations made in the CMO significantly impact the action and are thus controlling. *See In re The Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (a "controlling question of law" includes procedural determination affecting the conduct of an action); *Judicial Watch*, 233 F. Supp. 2d at 19 (a question of law can be "controlling" if it determines the outcome "or even the future course of the litigation"). Whether and to what extent exculpatory evidence is required to be provided by the Government; whether the Government is required to provide automatic discovery to Petitioners without any showing of good cause,

materiality, or relevancy or materiality; and whether or the production of classified information or substitutes is required are core questions that should be resolved now.  Likewise, whether a presumption may be afforded the Government's evidence, whether the Government may rely upon hearsay evidence, and when evidentiary hearings must be provided are controlling legal issues that may be dispositive of many cases.  The governing CMO provisions are particularly appropriate for certification because, absent clarification or reconsideration, they will not only be tremendously burdensome but will require the arguably inappropriate disclosure of sensitive classified information.  The Government should not be faced with the choice of providing sensitive classified information unnecessarily or continuing its detention of persons determined to be enemy combatants.  Indeed, even the impracticable schedule set by the Court unquestionably materially affects the course of the litigation and presents a controlling question of law, that is, whether the Government is entitled to a meaningful opportunity to be heard in these cases.

The D.C. Circuit follows the collateral order doctrine when deciding to grant an interlocutory appeal.  *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1026 (D.C. Cir. 1997).  That doctrine permits appeal if an order:  "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) would be effectively unreviewable on appeal from a final judgment."  *United States v. Rostenkowski*, 59 F.3d 1291, 1296 (D.C. Cir. 1995) (citation omitted).  The CMO's treatment of classified information and its automatic discovery requirements present such questions, as does its possible requirement to expand searches for exculpatory evidence.

Certification is particularly appropriate given the amounts of classified information at issue.  In the unprecedented context of theses cases, in which thousands of classified documents may be subject to the Court's automatic disclosure and substitution requirements, post-judgment

appellate review will not be an adequate remedy for the irreparable harm imposed on the Government by inappropriate initial disclosure.  And this Court has recognized that interlocutory appeals are generally appropriate to address—even outside the national-security context—the assertedly inappropriate disclosure of even a single allegedly privileged document.  *See United States v. Philip Morris Inc.*, 314 F.3d 612, 619 (D.C. Cir. 2003).

For all of these reasons, this Court should certify the CMO for an immediate interlocutory appeal.

**B.      Substantial Ground for Difference of Opinion Exists With Respect to the Issues Raised in the Court's Orders.**

"A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits."  *See APCC Servs.*, 281 F. Supp. 2d at 104 (citations omitted).  Here, at least four factors establish this factor is met.  First, the Supreme Court itself has recognized the lack of any historical parallel in these cases.  *Boumediene*, 128 S. Ct. at 2262.  Second, in addressing what constitutional habeas review requires, the Court appears to have imported standards from criminal, statutory habeas, and civil proceedings.  Third, various judges of this Court have already adopted markedly different procedures to govern these Guantanamo habeas cases.  And fourth, important aspects of the Court's CMO conflict with the "prudent and incremental" process mandated by the Supreme Court's decision in *Hamdi*, especially insofar as the automatic discovery provisions are concerned.

**C.      An Interlocutory Appeal Will Materially Advance The Litigation.**

Given the novel nature of these habeas cases, "an immediate appeal would conserve judicial resources and spare the parties from possibly needless expense if it should turn out that

this Court's rulings are reversed." *APCC Servs.*, 281 F. Supp. 2d at 109.  In addition, given the large number of Guantanamo habeas cases before this Court and the considerable resources that must be brought to litigate these cases on the merits, interlocutory review is even more appropriate.  *See In re Vitamin Antitrust Litig.*, 2000 WL 33142129, at *2 (D.D.C. 2000) (Hogan, J.).  Given the absence of authority in this jurisdiction regarding these issues, it is likely that the core procedural framework questions addressed in the CMO will be subject to eventual litigation in the D.C. Circuit, and it thus makes sense to resolve the substantial grounds for difference of opinion now.  Wright, Miller & Cooper, FED. PRAC. & PRO. § 3930 at 422 (3d ed. 1999) (where "proceedings that threaten to endure for several years depend on an initial question of jurisdiction . . . or the like," certification may be justified); *see also APCC Servs.*, 281 F. Supp. 2d at 109 ("it would be far better for all concerned, including [Petitioners], to have these matters resolved now, as opposed to sometime in the distant future").

The Government would seek highly expedited review upon certification.  Were certification accepted by the D.C. Circuit, the Government would propose that it file its opening brief on the merits two weeks from the date of the D.C. Circuit's order accepting certification, that Petitioners have two weeks to file a consolidated response, and that the Government have one week to file a reply brief.  The Government would also seek argument at the earliest date available to the Court of Appeals.  During the course of such an expedited appeal, the habeas cases could proceed in the significant respects outlined below.

III.   **A LIMITED STAY OF CERTAIN OBLIGATIONS UNDER THE CMO PENDING RESOLUTION OF THE INSTANT MOTION AND ANY APPEAL IS WARRANTED.**

For the reasons explained above, various of the CMO's provisions could result in the arguably inappropriate disclosure of classified information.  That alone warrants a stay pending

appeal or reconsideration. *See, e.g., United States v. Griffin*, 440 F.3d 1138, 1142 (9th Cir. 2006)

(where privilege assertion is at issue on appeal, the party claiming privilege will suffer "the very

harm that he seeks to avoid" if his assertion of privilege is correct but not reviewed on appeal);

*see also Center for Nat'l Security Studies v. Dep't. of Justice*, 217 F. Supp. 2d 58, 58 (D.D.C.

2002) (granting stay pending appeal where disclosure under FOIA would moot an appeal), *aff'd*

*in part, rev'd in part*, 331 F.3d 918 (D.C. Cir. 2003).

Here, of course, the cumulative effect of the disclosure at issue is dramatic.  At issue is

extremely sensitive information related to intelligence sources and methods.  At a minimum, a

limited stay is necessary of the obligations to provide:  any automatic discovery, classified

evidence, substitutes to Petitioners, and exculpatory evidence beyond what has already been

provided.  Respondent proposes to continue filing factual returns pursuant to the Court's

scheduling order, and to produce unclassified returns on the proposed schedule herein, and

believes that Petitioners can continue to file traverses.  Moreover, without conceding that any

discovery is appropriate, the Government believes that individualized discovery determinations as

contemplated under ¶ I.E.2, of the CMO could proceed once Petitioners file their traverses.

Should the Court grant a limited stay pending certified appeal, the Government would nonetheless

remain committed to preparing these cases for final resolution on the merits as quickly as

possible.

## CONCLUSION

The Government desires the fair and expeditious resolution of these cases, has devoted

unprecedented resources to the task of preparing the cases for disposition, and is preparing to

devote additional resources based on the Court's CMO.  However, as a practical matter, the

Government cannot provide unprecedented broad disclosure of largely classified information in a

matter of a few days or weeks, nor provide substitutes for such classified information to persons determined to be enemy combatants, nor can it responsibly brief the merits of 101 petitions simultaneously in cases where factual returns have already been filed as well as the petitions for which returns are to be filed shortly.  Thus, Respondents respectfully request that the Court clarify and reconsider the CMO as set forth above.

Taking the long view, however, and given the substantial dispute concerning the fundamental legal framework of these cases, the most prudent and expeditious course may be certification of the CMO for expedited consideration by the Court of Appeals at this time.  The only possible alternative—litigation of hundreds of habeas cases to a resolution on the merits only to have the D.C. Circuit find reversible error months from now and only after volumes of classified information have been unnecessarily disclosed—is entirely unwarranted.  Thus, absent clarification and reconsideration along the lines set forth above, Respondents respectfully request that the Court certify the CMO pursuant to 28 U.S.C. § 1292(b) and stay the obligations pertaining to automatic discovery (I.E.1) and treatment of classified information (I.F), as well as the provisions pertaining to exculpatory evidence if construed to require additional searches by the Government (I.D.1), pending resolution of a highly expedited appeal.


Dated: November 18, 2008          Respectfully submitted,

                                  GREGORY G. KATSAS
                                  Assistant Attorney General

                                  JOHN C. O'QUINN
                                  Deputy Assistant Attorney General

                                   _/s/ Andrew I. Warden_____
                                  JOSEPH H. HUNT (D.C. Bar No. 431134)
                                  VINCENT M. GARVEY (D.C. Bar No. 127191)
                                  TERRY M. HENRY

ALEXANDER K. HAAS
ANDREW I. WARDEN (IN Bar 23840-49)
PAUL E. AHERN
ROBERT J. PRINCE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 616-5084
Attorneys for Respondents