# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| IN RE: ) | Misc. No. 08-442 (TFH) |
| ) | |
| GUANTANAMO BAY ) | |
| DETAINEE LITIGATION ) | Civil Action Nos. |
| ) | |
| ) | 02-CV-0828, 04-CV-1164, 04-CV-1194, 04-CV-1254, |
| ) | 04-CV-2022, 04-CV-2046, 05-CV-0023, 05-CV-0247, |
| MEMORANDUM OF POINTS ) | 05-CV-0270, 05-CV-0280, 05-CV-0329, 05-CV-0359, |
| AND AUTHORITIES RELATES ) | 05-CV-0392, 05-CV-0492, 05-CV-0520, 05-CV-0526, |
| TO MOTION OF PETITIONERS ) | 05-CV-0634, 05-CV-0748, 05-CV-0763, 05-CV-0764, |
| FILED ON 12/29/2008 ) | 05-CV-0877, 05-CV-0883, 05-CV-0889, 05-CV-0892, |
| ) | 05-CV-0993, 05-CV-0998, 05-CV-1124, 05-CV-1189, |
| ) | 05-CV-1220, 05-CV-1244, 05-CV-1347, 05-CV-1353, |
| ) | 05-CV-1429, 05-CV-1457, 05-CV-1487, 05-CV-1490, |
| ) | 05-CV-1497, 05-CV-1504, 05-CV-1506, 05-CV-1555, |
| ) | 05-CV-1592, 05-CV-1601, 05-CV-1607, 05-CV-1623, |
| ) | 05-CV-1638, 05-CV-1645, 05-CV-1646, 05-CV-1678, |
| ) | 05-CV-1971, 05-CV-1983, 05-CV-2104, 05-CV-2185, |
| ) | 05-CV-2186, 05-CV-2199, 05-CV-2249, 05-CV-2367, |
| ) | 05-CV-2378, 05-CV-2379, 05-CV-2380, 05-CV-2384, |
| ) | 05-CV-2385, 05-CV-2386, 05-CV-2387, 05-CV-2479, |
| ) | 06-CV-1668, 06-CV-1684, 06-CV-1690, 06-CV-1758, |
| ) | 06-CV-1761, 06-CV-1767, 07-CV-1710, 07-CV-2338, |
| ) | 08-CV-0987, 08-CV-1101, 08-CV-1104, 08-CV-1153, |
| ) | 08-CV-1221, 08-CV-1224, 08-CV-1228, 08-CV-1232, |
| ) | 08-CV-1233, 08-CV-1235, 08-CV-1236, 08-CV-1238, |
| ) | 08-CV-1360, 08-CV-1440, 08-CV-1789, 08-CV-1805, |
| ) | 08-CV-1828, 08-CV-1923, 08-CV-2019 |
| _____ | |

**PRESS APPLICANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO GOVERNMENT'S MOTION TO CONFIRM
<u>DESIGNATION OF UNCLASSIFIED FACTUAL RETURNS AS "PROTECTED"</u>**

The Associated Press, The New York Times Company, and USA Today (collectively,

"Press Applicants") hereby respectfully submit this Memorandum of Points and Authorities in

opposition to the motion of the United States government (the "Government") to withhold from

the public, for an indefinite period, the unclassified versions of the factual returns produced in these proceedings, in their entirety.

## INTRODUCTION

Both the First Amendment and the common law afford the press and public a qualified right to inspect the pleadings filed by the Government in these habeas proceedings.  To withhold court records from the public, the Government must bear the burden of demonstrating a compelling need to do so, and must demonstrate that any secrecy imposed by sealing court records is narrowly tailored in both scope and time.  The Government's request for wholesale sealing of all of the unclassified factual returns in all of theses cases, for an open-ended period of time, falls far short of meeting this burden.

These cases are of intense interest to U.S. citizens and others around the world, who seek to understand the bases being advanced for the continued confinement of foreign citizens at Guantanamo, and equally seek to monitor these habeas proceedings to assure that justice is done.  None of this is possible if the Government is permitted to keep its pleadings secret indefinitely as it now seeks to do.  Nor does the Government's rationale for continued secrecy make sense.  It claims the unclassified versions of the returns provided to petitioners cannot be shown to the public because some inadvertently overlooked facts may be significant when all the petitions are reviewed.  But the proposal to make *further* redacted versions public in the future will only highlight for the detainees – alleged terrorists intent on doing harm – the very facts the Government does not want the public to know.  What purpose does this serve, beyond delaying disclosure to the public?

The Government's motion should be denied on the record before the Court.  Continued sealing should not be allowed unless and until the Government makes a particularized factual

showing of a compelling reason to withhold specific information, and only that information should be redacted and withheld.

## FACTUAL BACKGROUND

Petitioners in these habeas proceedings challenge the legality of their indefinite detention at the U.S. Naval Base at Guantanamo Bay, Cuba as enemy combatants. As this Court has noted, some of these men have already been held by the Government—virtually incommunicado—for more than six years. Mem. Op. dated Sept. 19, 2008, Dkt. No. 466 ("Mem. Op."), at 5. The legality of these detentions has been the subject of public debate and legal proceedings, in one form or another, for just as long. *See, e.g.*, Scott Higham, et al., *Guantanamo – A Holding Cell In War On Terror*, WASH. POST, May 2, 2004, at A1; Bob Drogin, *No Leaders of Al Qaeda Found at Guantanamo*, L.A. TIMES, Aug. 18, 2002, at 1.

**The September 11, 2008 Protective Order**

The U.S. Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008), ruled that Guantanamo detainees are entitled to challenge the legality of their detentions through habeas corpus. Following the ruling, the District Court in July 2008 designated Judge Thomas F. Hogan to coordinate the habeas proceedings involving Guantanamo detainees. Mem. Op. at 2. Pursuant to this designation, Judge Hogan entered a Protective Order dated September 11, 2008 that governs, *inter alia*, the handling of classified information. September 11, 2008 Protective Order, Dkt. No. 409 (hereinafter, "Protective Order"). The Protective Order recognized that classified information would be produced or filed in these cases, and establishes procedures for the Court and the parties to handle it. Although the Government is permitted to file a document containing classified information under seal, the Protective Order also provides that shortly thereafter the Government must file a version of the sealed document "appropriate for filing on the public

record." Protective Order ¶ 48a. The Government has long known this procedure would be necessary for any factual returns it is required to file in response to the petitions.[1]

The Protective Order also establishes a procedure by which information that is *not* classified may receive special handling as "protected information and/or documents." *Id*. ¶ 10. Under the Protective Order,

> "[P]rotected information and/or documents," "protected information," and "protected documents" mean any document or information the Court deems, either *sua sponte* or upon designation pursuant to paragraph 34 of this Protective Order, not suitable for public filing.

*Id*. Information that has been designated as "protected information" may initially be filed under seal, and it may not be disclosed or distributed to anyone other than petitioners' counsel who have agreed to be bound by the terms of the Protective Order. *Id*. ¶ 35. To remain under seal, however, the Court must deem such information "protected," *see id*. ¶¶ 10, 34, so the Government now seeks an order keeping the redacted versions of its pleadings secret from the public, for an indefinite period of additional time, Gov't Mot. at 1-2.[2]

**The Unclassified Factual Returns**

The redacted returns that are the subject of the Government's motion contain "the factual basis upon which it is detaining" each of the petitioners. November 6, 2008 Case Management

---

[1] "Classified information" is defined as, *inter alia*, "information that was classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order." September 11 Protective Order ¶ 9a.

[2] As the Protective Order makes clear, the Government may not unilaterally designate information as "protected." Instead, the Government must file a motion requesting the Court deem the information "protected." September 11 Protective Order ¶ 34.

4

Order, Dkt. No. 940, at 2.[3]  These returns already have been redacted to remove any classified information.  *See* Gov't Mot. at 4 n.8.  The Government nonetheless has temporarily sealed them by designating the returns as "protected information" under the Protective Order, and now asks that the public be prevented from inspecting them indefinitely because the possibility exists that errors were made "in redaction in the large number of unclassified returns being filed."  *Id*. at 4.  The Government states that "[c]lassification review of all factual returns by Respondents is continuing to the end that *declassified* returns suitable for public disclosure will be prepared and served."  *Id*. (emphasis added).[4]  The Government gives no date by which it will complete this further review, and asks for an open-ended order keeping the unclassified returns under seal.

While the Government does not object to each petitioner having access to the unclassified factual return pertaining to him, *id*. at 2, it does object to disclosing to the public *any* information in *any* of the unclassified returns.  The Government's stated reason for seeking this "blanket" secrecy is the "risk of inadvertent disclosure of classified information" and the potential "danger [that] resides in the accumulation of classified material that has not been properly redacted from

---

[3] Pursuant to various scheduling orders, the Government was ordered to file a factual return as to each petitioner.  *E.g.*, November 6, 2008 Order, Dkt. No. 940.  The Government also was ordered to file unclassified versions of each of these returns.  *Id*.  The Government represents that, as of December 29, 2008, it has filed numerous factual returns in these consolidated cases and that it has either produced to petitioners' counsel or will produce to counsel in January 2009 the unclassified versions of the factual returns filed to date.  *See* Gov't Mot. at 3.  The unclassified returns have not been filed with the Court, however, and by its motion, the Government requests an Order providing that they need not be filed.

[4] In the Government's terminology (*id*. at 4 n.8):

> An "unclassified" return is one in which all classified information has been redacted.  These have been prepared as a preliminary measure to provide information to the detainees as quickly as possible.  A "declassified" return is one in which formerly classified information has been determined by authorized declassification officials to no longer require security classification.  The government is working toward preparation of returns declassified to the fullest extent possible, but that requires multiple, close reviews.

5

the unclassified returns." *Id*. at 3, 7.  Under the Government's approach, the Guantanamo detainees will have access to the redacted returns; only the public will be kept in the dark about the Government's claims.  Then, at some future date, the Government will provide the public with more limited versions of the returns—revised returns that will *highlight* for each detainee by omission the very information the Government does not want our enemies to know.  The approach makes little sense, and the Government's motion fails to meet its burden to justify the open-ended secrecy that it requests.

ARGUMENT
I.

### THE PUBLIC AND PRESS HAVE A QUALIFIED RIGHT TO INSPECT THE FACTUAL RETURNS

**A.     The Returns Are Subject to The Right of Public Access to Court Records**

The press and public have a qualified right of access to judicial records that is protected by the First Amendment and at common law.  The existence of a First Amendment access right requires an analysis of both the constitutional policies advanced by access and the historical experience.  *E.g.*, *Press-Enterprise v. Superior Court*, 478 U.S. 1, 7-15 (1986) ("*Press-Enterprise II*").  No lengthy analysis is required here because courts consistently have held that the First Amendment right of access extends to court pleadings such as the factual returns in these habeas proceedings.  *See Lugosch v. Pyramid Co.*, 435 F.3d 110, 126-27 (2d Cir. 2006) (recognizing first amendment right of access to motions); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (recognizing first amendment right to documents filed for plea hearings); *In re Application of New York Times Co. for Access to Certain Sealed Court Records*, 2008 WL 4900605, at *3 (D.D.C. Nov. 17, 2008) (courts "start[] with the general proposition that 'the First Amendment guarantees the press and the public a general right of access'" to court records) (quoting *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991)).

6

The constitutional right has also been held to apply to documents relied upon by the court in a proceeding that is itself subject to the First Amendment access right. *E.g.*, *In re New York Times Co. (Biaggi)*, 828 F.2d 110, 114-16 (2d Cir. 1987). The returns are subject to the constitutional right for this reason, too, because they constitute a summary of the evidence that the Government contends is sufficient for it to declare petitioners to be "enemy combatants," Declaration of the Hon. Gordon England, Ex. 1 to Dkt. No. 1004, at ¶ 2, and this evidence is offered in proceedings that are themselves subject to the right of access, *see Osband v. Ayers*, 2007 WL 3096113, at *1-3 (E.D. Cal. Oct. 22, 2007) (recognizing that "'strong presumption' in favor of public access to court proceedings" under the First Amendment applied to habeas proceeding) (citation omitted). As the D.C. Court of Appeals explained in *Washington Post v. Robinson*, "[t]he first amendment guarantees the press and the public a general right to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." 935 F.2d at 287.

The public's right to inspect court records is equally enshrined in the common law. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("the courts of this country recognize a general right to inspect and copy . . . judicial records and documents"); *In re Nat'l Broad. Co.*, 653 F.2d 609, 612 (D.C. Cir. 1981) ("existence of the common law right to inspect and copy judicial records is indisputable"); *Parhat v. Gates*, 532 F.3d 834, 836 (D.C. Cir. 2008) (recognizing public's right of access to documents filed in Detainee Treatment Act proceeding). As the D.C. Circuit has observed, the common law access right "is not some arcane relic of ancient English law," but rather "is fundamental to a democratic state." *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).

Like the First Amendment access right, the common law right of access to judicial records exists to ensure that courts "have a measure of accountability" and to promote "confidence in the administration of justice"—goals that cannot be accomplished "without access to testimony and documents that are used in the performance of Article III functions." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995); *accord United States v. Hubbard*, 650 F.2d 293, 314-15 (D.C. Cir. 1981).  The vital role that openness plays in ensuring public respect for the results produced by an adjudicative process is perhaps best demonstrated by considering the converse:

> Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.

*Gannett Co. v. DePasquale*, 443 U.S. 368, 429 (1979) (Blackmun, J., concurring in part and dissenting in part) (citation omitted).

Just as with the First Amendment right, there can be no serious dispute that the factual returns at issue here fall within the scope of the common law access right.  What subjects a document to the common law right "is the role it plays in the adjudicatory process."  *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997).  Access to pleadings and substantive motions is protected because such documents are relevant and useful to the performance of the judicial function, and they often substitute for argument in open court that would itself be subject to a right of access.  *E.g.*, *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1278 (D.C. Cir. 1991) (common law right applied to summary judgment motion); *Lugosch*, 435 F.3d at 120-21 (common law and First Amendment rights of access applied to summary judgment motion); *Bank of Am. Nat'l Trust & Savs. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343-44 (3d Cir. 1986) (common law right of access applied to motions filed with the court); *Rushford v. New*

8

*Yorker Magazine, Inc.*, 846 F.2d 249, 252-53 (4th Cir. 1988) (common law right applied to summary judgment motion); *In re Cont'l Ill. Secs. Litig.*, 732 F.2d 1302, 1308-09 (7th Cir. 1984) (common law and First Amendment right of access applied to documents submitted in support of motions).

The factual returns indisputably play a vital role in the adjudicatory process and are relevant to the performance of the judicial function. *See* 28 U.S.C. § 2243 (providing for production of "return certifying the true cause of the detention" to enable the court to "hear and determine the facts, and dispose of the matter as law and justice require"). As the Government has acknowledged elsewhere in these proceedings, "the central purpose of *habeas* is to test the legality of Executive detention" and the factual returns contain the Government's "explanation of the bases for a petitioner's detention" and "supporting evidence proffered by the Government" to support "the legality of the detention." Respondents' Mot. for Leave to File Amended Factual Return, Dkt. No. 782, at 6. Courts thus have previously recognized that the common law right of access extends to documents filed in habeas proceedings. *See Ashworth v. Bagley*, 351 F. Supp. 2d 786, 792 (S.D. Ohio 2005) (finding that common law right of access existed with respect to habeas proceeding and outweighed petitioner's interest in sealing competency reports); *Ramirez v. Attorney Gen. of the State of New York*, 1999 WL 1059966, at *4 (S.D.N.Y. Nov. 22, 1999) (denying request to seal record in habeas proceeding, noting that "a judge must carefully and skeptically review sealing requests to ensure that there really is an extraordinary circumstance or compelling need").

In short, the public and the press indisputably have a qualified right to inspect the factual returns that is protected by *both* the First Amendment and the common law. These rights of access protect "the citizen's desire to keep a watchful eye on the workings of public agencies."

9

*Nixon*, 435 U.S. at 597-598.  As Chief Justice Burger noted in *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), public access enhances "the performance of all involved;" protects judges and prosecutors from imputations of dishonesty; educates the public; and provides an outlet for community concern, hostility and emotion.  *Id.* at 569-73.  Not only do open proceedings enhance the likelihood of justice, they also "'satisfy the appearance of justice.'"  *Id*. at 571-72 (citation omitted).  "People in an open society do not demand infallibility from their institutions," Chief Justice Burger observed, "but it is difficult for them to accept what they are prohibited from observing."  *Id*. at 572.  All of these ends are advanced by "publicity," the most powerful check on government in a democracy: "'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.'"  *Id*. at 569 (quoting 1 J. Bentham, *Rationale of Judicial Evidence* (1827)).

Concurring with the Chief Justice in *Richmond Newspapers*, Justice Brennan similarly stressed the "structural role" that the First Amendment "play[s] in securing and fostering our republican system of self-government."  *Id*. at 587.  "Implicit in this structural role," Brennan noted, "is not only 'the principle that debate on public issues should be uninhibited, robust and wide-open,' but also the antecedent assumption that valuable public debate – as well as other civic behavior – must be informed."  *Id*. (citation omitted).  This need for a citizenry informed about the actions of the government, Brennan concluded, is the wellspring of the access right.  *Id.* at 588.

Access to information is particularly important on issues relating to national defense and our international actions, where "the absence of the governmental checks and balances present in other areas of our national life" makes an informed citizenry "the only effective restraint upon executive policy and power."  *New York Times v. United States*, 403 U.S. 713, 728 (1971)

10

(Stewart, J., concurring).  As Justice Black noted, "[t]he guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic."  *Id.* at 719 (Black, J., concurring).  Equally as important is the public's right of access to court records that may be used to justify a decision to deprive an individual's liberty.  *Cf. Press-Enterprise II*, 478 U.S. at 12 (discussing constitutional presumption of openness to preliminary hearing at which a magistrate determines whether probable cause exists); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 694-700 (6th Cir. 2002) (constitutional presumption of access to quasi-judicial deportation hearing); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) (constitutional access right must extend to proceedings "which pertain to the release or incarceration of prisoners and the conditions of their confinement").

**B.     Strict Standards Must Be Met To Overcome the Right of Public Access**

While the right of access to court records is not absolute, a party seeking to limit the public's right to inspect court records must establish a compelling need for secrecy and demonstrate that any restriction on access is narrowly drawn – two things absent from the Government's Motion.  *See Robinson*, 935 F.2d at 287; *see also Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*"); *Press-Enterprise II*, 478 U.S. at 13-14; *Lugosch*, 435 F.3d at 123-24.

While different verbal formulations have been used by various courts to define the showing that must be made, any party seeking to limit the First Amendment right of access by sealing court records must demonstrate four things:

> **1.  The existence of a substantial probability of prejudice to a compelling interest.**  One seeking to seal court records must demonstrate a substantial probability that public access is likely to harm a compelling governmental interest.  *See, e.g.*, *Richmond Newspapers*, *Inc. v. Virginia*, 448 U.S. at 581; *Press-Enterprise I*, 464 U.S. at 510; *Press-Enterprise II*, 478 U.S. at 13-14; *ABC v. Stewart,* 360 F.3d 90, 100 (2d Cir. 2004); *United States v. Doe*, 63

11

F.3d 121, 128 (2d Cir. 1995). In *Press-Enterprise I*, the Supreme Court stressed that a denial of access is permissible only when "essential to preserve higher values." 464 U.S. at 510. A compelling interest is required because "[a]ny step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

**2. The absence of any alternatives to sealing that will adequately protect the threatened interest.** One seeking to seal records must further demonstrate that no alternative to secrecy can adequately protect the threatened interest. As the Second Circuit explained in *In re Application of The Herald Company*, 734 F.2d 93, 100 (2d Cir. 1984), a "trial judge must consider alternatives and reach a reasoned conclusion that closure is a preferable course to follow to safeguard the interests at issue." *See also, e.g.*, *Press-Enterprise II*, 478 U.S. at 13-14; *United States v. Brooklier*, 685 F.2d 1162, 1167 (9th Cir. 1982).

**3. The proposed restriction on access is narrowly tailored, to limit secrecy in time and scope.** Any sealing imposed must be no broader than necessary to protect the threatened interest. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 13-14; *Johnson*, 951 F.2d at 1278; *In re Application of New York Times Co. for Access to Certain Sealed Court Records*, 2008 WL 4900605, at *5. If a more narrowly tailored means of protecting the interest exists, such as making documents available in redacted form, it must be employed to limit the impact on the public's access rights. *See Press-Enterprise I*, 464 U.S. at 510.

**4. The restriction on access will meaningfully protect the threatened interest.** Because constitutional rights may not be infringed for an idle purpose, any order limiting access must be effective in protecting the threatened interest for which closure is imposed. *See Press-Enterprise II*, 478 U.S. at 14 (party seeking secrecy must demonstrate "that closure would prevent" harm sought to be avoided); *In re Application of The Herald Co.*, 734 F.2d at 101 (closure order cannot stand if "the information sought to be kept confidential has already been given sufficient public exposure"); *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143, 1146 (9th Cir. 1983) ("[T]here must be 'a substantial probability that closure will be effective in protecting against the perceived harm.'") (citation omitted).

Similar showings must be made before the common law access right may be vitiated. *See In re Application of New York Times Co. for Access to Certain Sealed Court Records*, 2008 WL 4900605, at *6 n.12. The D.C. Circuit has articulated six factors to consider in assessing a limitation of the common law right of access to judicial records that are closely aligned with the constitutional concerns:

> (1) the need for public access to the documents at issue; (2) the extent to which the public had access to the documents prior to the sealing order; (3) the fact that a party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced.

*Johnson*, 951 F.2d at 1277 n.14 (citing *Hubbard*, 650 F.2d at 317-22). *See also Lugosch*, 435 F.3d at 120 (discussing relation of constitutional and common law access rights).

Because the factual returns filed by the Government are protected under both the First Amendment and the common law, these pleadings may be sealed, if at all, only on findings of fact demonstrating that these standards have been met. *Robinson*, 935 F.2d at 289.

## II.
## THE GOVERNMENT FAILS TO MEET ITS BURDEN TO JUSTIFY THE BROAD AND OPEN-ENDED SEALING IT REQUESTS

The Government's request for wholesale, indefinite sealing fails to makes the factual showings required for this relief. This Court cannot abdicate its important fact-finding role by allowing the Government to "unilaterally . . .determine whether information is protected." *Parhat*, 532 F.3d at 836 (internal quotation marks omitted) (quoting *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007), *vacated on other grounds*, 128 S. Ct. 2960 (2008)).[5]

---

[5] Petitioners suggest that the parties may be able to reach agreement among themselves concerning specific proposed designations of "protected" material "if the Court were to order the government to meet and confer in a meaningful fashion with respect to particular proposed designations." Pets.' Opp. at 7. The right of access, however, belongs to the public, not just the parties. The Court itself must be given sufficient *specific* information, such that it may make an *independent* determination that information may properly be sealed. *Parhat*, 532 F.3d at 853. *See also San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1101 (9th Cir. 1999) ("The right of access to court documents belongs to the public, and the Plaintiffs were in no position to bargain that right away.").

13

A.  **The Government Fails to Establish A Compelling Need For Secrecy
That Will Be Meaningfully Protected By Sealing The Unclassified Returns**

Respondents assert that they are "required to invoke the procedures established by the Protective Order to protect information that is otherwise on the verge of being improperly disclosed to the public," Gov't Mot. at 6, but make no logical showing that the proposed restriction on access will effectively protect against the threat of prejudice they advance. The Government avers that "the pace at which redaction of the returns . . . is being performed creates a *risk* of inadvertent disclosure of classified information," *id.* at 7 (emphasis added), and that " if all unclassified returns were to be publicly disseminated, the totality of the national security information thereby disclosed would pose a threat to the security of the United States," *id*. at 8.

On these grounds, the Government asks this Court to keep all of the unclassified returns from the public completely. At some future date, the Government says it will have further revised versions of the pleadings that it would be willing to share with the public. At that point, however, disclosure will highlight for each petitioner precisely what information concerned the Government. Under these circumstances, the rationale for continuing to keep the public in the dark about the Government's position in these cases makes no sense. It will *highlight* for alleged terrorists the areas of particular concern to the Government, while keeping the public from knowing anything about the Government's rationale for holding the detainees.

National security unquestionably constitutes a "compelling interest" that can justify sealing judicial records, but "[t]he word 'security' is a broad, vague generality." *New York Times*, 403 U.S. at 719. Concerns about security must therefore be "leavened with common sense so as not forever to trump the rights of citizens under the constitution." *Doe v. Gonzalez*, 439 F.3d 415, 423 (2d Cir. 2006). The Government should not be permitted to impose blanket secrecy on the type of broad but non-specific security concerns advanced here. Rather, it should

14

be required to demonstrate, through a factual showing, that disclosure of specific information presents a national security risk, and that its requested limitation on access is no broader than necessary to protect effectively against that risk.  *Parhat*, 532 F.3d at 853 (recognizing that the court must be given sufficient *specific* information, such that it may make an *independent* determination that information is "protected").  *See United States v. Rosen*, 487 F. Supp. 2d 703, 716 (E.D. Va. 2007) (government "must make a specific showing of harm to national security" to defeat right of access and "*ipse dixit* that information is damaging to national security is not sufficient").

The Government's motion fails to make this showing.  It again "relies solely on spare, generic assertions of the need to protect information" and "does not 'give the court a basis for withholding'" that is specific to any particular factual return it seeks to conceal from public inspection.  *Parhat*, 532 F.3d at 852-53 (quoting *Bismullah*, 501 F.3d at 188).  By failing to provide "an explanation tailored to the specific information at issue," the Government has left the Court with "no way to determine whether it warrants protection – other than to accept the government's own designation.  This [the Court] cannot do." *Id*. at 853.  In such a situation, as Judge Tatel has warned, an "uncritical deference" to "vague, poorly explained arguments for withholding broad categories of information" can quickly eviscerate "the principles of openness in government."  *Center for Nat'l Sec. Studies v. U.S. DOJ*, 331 F.3d 918, 937 (D.C. Cir. 2003) (Tatel, J., dissenting).

Particularly given the illogical result of the continued secrecy it requests, the Government should be held strictly to its burden to justify continuing secrecy, bearing in mind that the "dominant purpose of the first amendment was to prohibit the wide spread practice of governmental suppression of embarrassing information."  *New York Times*, 403 U.S. at 723-24

15

(Douglas, J. concurring).  There already is substantial speculation that the Government has declined to disclose information about the detainees because many are held on the basis of "flimsy or fabricated evidence, old personal scores or bounty payments."  Tom Lasseter, *Day 1: America's prison for terrorists often held the wrong men*, MCCLATCHY NEWSPAPERS, posted on Jun. 15, 2008, http://www.mcclatchydc.com/259/v-print/story/38773.html.  Such speculation will only continue unless the right of access is enforced and these proceedings are fully transparent.

On the present record, the motion should be denied.  At a minimum, the Government should be required to supplement its motion with the missing evidentiary support required to limit the public access right.

**B.     The Government's Proposed Order is Not Narrowly Tailored**

The Government compounds the problem by seeking wholesale sealing for an indefinite period into the future.  It states that "a review of the returns is continuing "to the end that declassified returns suitable for public disclosure will be prepared and served," but its motion seeks completely open-ended secrecy.  Gov't Mot. at 4.  This is not a narrowly tailored restriction on access, of the kind the law requires.  If any basis exists for delaying further the release of the unclassified pleadings, the Government should be required to complete its review and make the redacted returns public by a date certain.[6]

A restriction on access must be "no broader than is necessary to protect *those specific interests identified as in need of protection*."  *Johnson*, 951 F.2d at 1278 (emphasis added).  The Government's open-ended request to maintain all of the factual returns in secret for the indefinite

---

[6] The Protective Order contemplates such a result.  Specifically, it provides that when the Government files a document containing classified information under seal, the Government "*as soon as practicable following the original filing date* . . . shall file in the CM/ECF system a version of the pleading or document appropriate for filing on the public record . . . ."  Protective Order ¶ 48a. (emphasis added).

16

future plainly fails under this standard. The Government's only basis for seeking to seal the unclassified returns is its contention that some of them might possibly contain information that could be classified but inadvertently was not redacted,[7] and that disclosure of any such disparate pieces of information, in their totality, might threaten national security. *See* Gov't Mot. at 2. Even if true, the Government can counter this risk by properly redacting the returns, and should have done so already. The Government has been under a specific order to file unclassified, redacted returns since November 6, 2008[8] and has known since well before then that it would have to file in the public record redacted versions of the classified factual returns it filed in response to the petitions, *see* Note 6 *supra*.

At a minimum, the Government's motion should not be granted without a prompt deadline by which redacted versions of the petitions will be publicly filed. Such a deadline is needed to minimize the on-going restriction on the public's access right, particularly given the overriding significance of these proceedings and the length of time that already has passed. As the Court observed in a related context in these proceedings, "the government is now on notice of the time needed 'to accomplish the development and finalization of amended and original factual returns in the pending habeas cases'" and "cannot claim as a basis for failing to meet

---

[7] Press Applicants do not now challenge the redactions of classified information from returns they have not yet seen, but note that the propriety of the redactions of information claimed to be "classified" is itself subject to judicial review. *See, e.g.*, *Stillman v. CIA*, 319 F.3d 546, 548-49 (D.C. Cir. 2003) (courts have independent duty to review classification claim used to censor former CIA employee); *Krikorian v. Dep't of State*, 984 F.2d 461, 466-67 (D.C. Cir. 1993) (court has the authority in FOIA case to review *in camera* the propriety of a claimed national security exemption); *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 76-77 (D.C. Cir. 1987) (same); *McGehee v. Casey*, 718 F.2d 1137, 1147-48 (D.C. Cir. 1983) (same). Press Applicants do not waive their right to seek review of the scope of redaction if appropriate.

[8] November 6, 2008 Order, Dkt. No. 940, at 2.

deadlines . . . that it 'simply did not appreciate the full extent of the challenges posed.'" Mem. Op. at 6.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Government's motion requesting that the Court deem the unclassified factual returns "protected information" under the September 11 Protective Order.

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By:             /s/ Jeanette M. Bead
    David A. Schulz, DC Bar No. 459197
    Jeanette M. Bead, DC Bar No. 480539

1050 Seventeenth Street, NW
Suite 800
Washington, DC 20036-5514
Phone (202) 508-1100
Fax (202) 861-9888

Counsel for Press Applicants

*Of Counsel*:

David E. McCraw
The New York Times Company
620 Eighth Avenue
New York, NY 10018

David H. Tomlin
Associated Press
450 West 33rd Street
New York, NY 10001

Barbara L. Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, Virginia 22101