UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| **IN RE:** ) | |
| ) | Misc. No. 08-0444 (TFH) |
| **PETITIONERS SEEKING** ) | |
| **HABEAS CORPUS RELIEF** ) | Civil Action Nos. |
| **IN RELATION TO PRIOR** ) | 02-cv-1130, 04-cv-1135, 04-cv-1144, 04-cv-1194, |
| **DETENTIONS AT** ) | 04-cv-1227, 04-cv-1254, 05-cv-0023, 05-cv-0345, |
| **GUANTANAMO BAY** ) | 05-cv-0490, 05-cv-0520, 05-cv-0584, 05-cv-0586, |
| ) | 05-cv-0621, 05-cv-0640, 05-cv-0665, 05-cv-0714, |
| ) | 05-cv-0723, 05-cv-0764, 05-cv-0878, *05-cv-0883*,[*] |
| ) | 05-cv-0887, 05-cv-0888, 05-cv-0891, 05-cv-0998, |
| ) | 05-cv-1001, 05-cv-1008, 05-cv-1009, 05-cv-1124, |
| ) | 05-cv-1237, 05-cv-1242, 05-cv-1243, 05-cv-1246, |
| ) | 05-cv-1311, 05-cv-1493, 05-cv-1505, 05-cv-1509, |
| ) | 05-cv-1635, 05-cv-1667, 05-cv-1668, 05-cv-1714, |
| ) | 05-cv-1779, 05-cv-1806, 05-cv-1864, 05-cv-1894, |
| ) | 05-cv-2029, 05-cv-2104, 05-cv-2197, 05-cv-2216, |
| ) | 05-cv-2336, 05-cv-2367, 05-cv-2369, 05-cv-2384, |
| ) | 05-cv-2385, 05-cv-2386, 05-cv-2452, 05-cv-2458, |
| ) | 05-cv-2466, 05-cv-2479, 06-cv-1675, 06-cv-1677, |
| ) | 06-cv-1678, 06-cv-1679, 06-cv-1681, 06-cv-1683, |
| ) | 06-cv-1685, 06-cv-1687, 06-cv-1763, 06-cv-1768, |
| ) | 06-cv-1769, 08-cv-1185, 08-cv-1223, 08-cv-1229, |
| ) | 08-cv-1231, 08-cv-1628 |
| ) | |

**PETITIONERS' CONSOLIDATED REPLY BRIEF REGARDING JURISDICTION
OVER HABEAS PETITIONS OF PETITIONERS TRANSFERRED FROM
GUANTANAMO BAY**

Respondents advance two main arguments in their brief in response to this Court's order

requesting guidance on the standards for continued jurisdiction over habeas petitions of men

transferred from Guantanamo. Dkt. 88 ("Gov't Br."). First, Respondents claim that the

Suspension Clause does not protect the right to challenge anything but immediate imprisonment

at Guantánamo. Second, they claim that any harm occurring in circumstances outside the

exclusive control of the United States government cannot satisfy the intertwined causality and

---

[*]     Petitioner in 05-883 is still at Guantánamo, as Respondents note in their opening brief.

redressability requirements for Article III standing. Both positions caricature the applicable law. Neither is supportable.

## I.      The Suspension Clause Does Not Limit Available Remedies to Release from Imprisonment

The government claims that because "[i]t is only the core, constitutionally required elements of habeas that remain after Congress' repeal of statutory habeas for Guantanamo detainees," Gov't Br. at 4, the entire "'collateral consequences' jurisprudence developed in construing the 'in custody' requirement of the federal habeas statute," *id.*, should be discarded as a guide to the scope of the right to habeas corpus recognized by the Supreme Court in *Boumediene*.

Petitioners do not accept that the habeas statute is inoperative here. *See* Pet'rs' Br. (Dkt. 89) at 2 n.2. These petitions were properly filed under 28 U.S.C. § 2241. *Boumediene* expressly held that § 7 of the MCA was unconstitutional. *See Boumediene v. Bush*, 128 S. Ct. 2229, 2274 (2008).   As a result of *Boumediene*, the jurisdictional repeal of MCA §7 is simply void. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void"). The Court must therefore "disregard" the unconstitutional provision, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995), and proceed under the pre-existing statutory authority. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1872) (disregarding an unconstitutional statute that divested the court of jurisdiction and reinstating a judgment obtained under prior statutory scheme); *accord Armstrong v. United States*, 80 U.S. (13 Wall.) 154 (1872) (same); Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the

jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction"). *See also Boumediene v. Bush*, 476 F.3d 981, 1011 (D.C. Cir. 2007) (Rogers, J., dissenting) (stating that the habeas repeal was unconstitutional, and that the proper outcome was to hold that "on remand the district courts shall follow the return and traverse procedures of 28 U.S.C. § 2241, *et seq.*"); *Boumediene*, 128 S. Ct. at 2266 (stating that "[t]he differences between the DTA and *the habeas statute that would govern in MCA §7's absence, 28 U.S.C. § 2241*, are likewise telling") (emphasis added). This Court's jurisdiction in habeas cases comes from § 2241, not from "constitutional habeas." As Chief Justice Marshall explained, "the power to award the writ [of habeas corpus] by any of the courts of the United States, must be given by written law." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 94 (1807). Disregarding the unconstitutional amendment by § 7 of the MCA, that "written law" is § 2241.

Even assuming arguendo that the habeas statute were inapplicable, and even if the "core, constitutionally required elements of habeas" reach *only to imprisonment*, as the government would have it,[1] the Court would still clearly have jurisdiction over detainees held in proxy detention in foreign prisons at the behest of the United States. *See* Pet'rs' Br., Part I; *Abu Ali v.*

---

[1]      The government suggests that this follows because "*Boumediene* made explicit that its [*sic*] decision 'did not hold' that constitutional habeas proceedings for wartime status determinations must duplicate statutory proceedings under § 2241 and modern habeas practice," (Gov't Br. at 4 (quoting 128 S. Ct. at 2267, 2274)). But nothing in *Boumediene* diminishes the obvious conclusion that the jurisdiction-stripping provision of MCA is void. The Court said only the following: "Although we do not hold that an adequate substitute must duplicate § 2241 in all respects, it suffices that the Government has not established that the detainees' access to the statutory review provisions [of the Detainee Treatment Act of 2005] at issue is an adequate substitute for the writ of habeas corpus. MCA § 7 thus effects an unconstitutional suspension of the writ." 128 S. Ct. at 2274. The Court was merely explaining that, even though the DTA is unconstitutional, the Court would not specifically catalogue the ways in which some hypothetical future statute would potentially constitute an adequate substitute for the writ. Indeed, the *Boumediene* Court evinced its understanding that § 2241 would govern as a result of its holding. *See, e.g.*, 128 S. Ct. at 2276 (noting that, following remand, consolidation before a district judge "is a legitimate objective that might be advanced even without an amendment to § 2241"); *id.* at 2269-70 (considering *Hamdi*'s analysis of § 2241).

*Ashcroft*, 350 F. Supp. 2d 28, 46 (D.D.C. 2004) (petitioner, alleged to be held in Saudi prison at behest of United States, need not be in "actual physical custody of a United States official").

The government's brief implies that restraints on liberty short of imprisonment at Guantánamo (such as the restraints imposed by the United States as a condition of repatriation, *see* Pet'rs' Br., Part II) would not fit within this "core" of habeas that is supposedly all that is protected by the Suspension Clause. The government cites not a shred of historical authority for this position. *See* Gov't Br. at 4-5. And nothing in *Boumediene* so much as suggests this conclusion—certainly not the series of unhelpful quotations from *Boumediene* repeating the phrase "in custody" that the government cites. *See* Gov't Br. at 5; *cf.* Pet'rs' Br. at 14 (describing various conditions of supervised release that Supreme Court construes as forms of "custody").[2]

Had the government delved into the historical record, it would have found that at common law, the notion of "custody" was in fact interpreted very broadly: foreign sailors wrongly impressed into naval service,[3] abused wives and children,[4] inmates of private asylums

---

[2] Nonetheless, *cf. Boumediene*, 128 S. Ct. at 2266 ("release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted."); *id.* at 2267 (writ "'ought to be granted to every man that is committed or detained in prison or otherwise restrained of his liberty'" (quoting 19th century treatise)); *id.* ("common-law habeas corpus was, above all, an adaptable remedy"); *id.* ("cases of bail and impressment" included in scope of common-law writ).

[3] *See* Paul D. Halladay & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 Va. L. Rev. 575, 605 n. 72 (2008) ("Hundreds of foreign seamen, caught up by press gangs in English, Caribbean, or even foreign ports, successfully used habeas corpus to gain release from naval service in the second half of the eighteenth century.").

[4] *Id.* at 612 n. 97 ("in the eighteenth century … ever-larger numbers of writs tested detentions in which there was no allegation of [criminal] wrong[doing by the petitioners], such as those involving abused wives and impressed sailors"); *Id.* at 666 (1781 Judicature Act "amounted to an invitation for the Court to continue to use habeas corpus, as King's Bench had in England, to settle spousal and child custody disputes"); *see also id.* at 662 (critics of extension of writ to India voiced concern that "[b]y sending habeas corpus to release Indian wives from their husbands' custody—as English courts did for English wives—the honor of Indian husbands

alleged to be insane,[5] and former slaves challenging their status against private parties[6] all took advantage of the writ to seek relief. In many of these cases, injury was caused by petitioner's legal status mediated by the action of private parties. Nonetheless, these were not seen as forms of custody "short" of imprisonment, but equal to it. In deciding these cases, the common law courts stated time and again that any restraint of the petitioner's liberty could be a grounds for issuance of the writ. *See, e.g.*, *Shanley v. Harvey*, 2 Eden. 127, 28 Eng. Rep. 845 (1762) (former slave "may have a Habeas Corpus if restrained of his liberty"); *R v. Penelope Smith*, 27 Eng. Rep. 787 (1734)[7] (in child custody case, court ordered minor to decide own custody between aunt and father, explaining "the intent of an habeas corpus is to provide against any restraint of the party's liberty").

The most common examples of modern cases construing the "in custody" requirement more broadly than actual imprisonment involve petitioners on various forms of supervised release, including bail or release on recognizance.[8] The common law similarly recognized that

---

and the integrity of the harem [would be] violated."); *Lister's Case*, 88 Eng. Rep. 17 (K.B. 1721) (applying habeas to a husband's unlawful detention of his wife).

[5]     *King v. Turlington*, 97 Eng. Rep. 741 (K.B. 1761) (releasing woman from a "private mad-house").

[6]     *Somersett's Case*, 20 State Trials 1 (1772) (Massachusetts slave in custody on private vessel in English waters ordered freed from custody of ship's captain); *see also In re Thomas*, Nat'l Archives, Microfilm No. M434, Roll 1, Frames 259-67 (D.D.C. 1833) (freeing slave).

[7]     The printed report in the English Reports shows the year incorrectly as 1736; the archival records show 1734.

[8]     *See* Pet'rs' Br. at 3, 14 (citing *Jones v. Cunningham*, 371 U.S. 236, 241-43 (1963) (parole conditions including address registration requirements, periodic reporting requirements, and restrictions on travel); *United States v. Trotter*, 270 F.3d 1150 (7th Cir. 2001) (possibility of shortening period of supervised release sufficient to support jurisdiction); *Barry* v. *Bergen County Prob. Dep't*, 128 F.3d 152, 159 (3d Cir. 1997) (community service conditions as form of custody); *Hensley v. Mun. Ct.*, 411 U.S. 345, 349 (1973) (release on recognizance pending execution of sentence)).

habeas could lie for petitioners who were released from imprisonment under conditions that restrained their liberty. Bailed prisoners, for example, were still considered to be in custody, and could be released from the conditions of their bail in habeas, as could petitioners released on mainprise (who were not technically considered to be "in custody").[9] In many instances, common law habeas courts would make an initial order to bail; subsequently, the habeas corpus petitioner would come into court later for a further order for discharge from bail.[10] The distinction between an order of release on bail and an order for full discharge was thus a sharply drawn one, and "release" on bail was considered a form of custody for purposes of habeas.

Common law courts of equity also had the power to inquire into disabilities not rising to the level of a "restraint on liberty," such as the various collateral consequences described in Pet'rs' Br., Part III. The government's argument to the contrary ignores the historical availability of coram nobis, a writ of error which at common law could be issued out of chancery courts in collateral proceedings. (Chancery courts were courts of equity, separate from the court issuing the original wrongful conviction—just as a habeas court conducts a separate proceeding collateral to the challenged one). *See United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954). The power to grant common law writs was conveyed to the federal courts by the same section of the

_____

Petitioners incorrectly described *Hensley* as involving "pre-trial release" in their opening brief. Counsel apologize for the error.

[9]    *See* Halladay & White, 94 Va. L. Rev. at 618 n.118 ("A prisoner on bail remained technically a prisoner since he was in the custody of those who served as bail on his behalf. A prisoner released on mainprise was likewise supported by persons who gave sureties on his behalf but in the view of law, the prisoner was not held in their custody. *See* 9 William Holdsworth, A History of English Law 105–06 (3d ed. 1944); *see also* 4 William Holdsworth, A History of English Law 525–28 (3d ed. 1922–1923).").

[10]    *See* Halladay & White, 94 Va. L. Rev. at 626 n.145 (describing numerous habeas cases in which petitioners were "bailed" and then subsequently fully "discharged"). Interestingly, this distinction can be observed in a number of cases involving alleged foreign spies, "alien enemies" and prisoners of war. *See, e.g.*, *id.* at 606 nn. 75, 76.

1789 Judiciary Act that codified habeas corpus.[11] The use of the writ of coram nobis in the early republic, both "with and without statutory authority," paralleled the scope of the English cases broadly construing custody under habeas corpus, with the writ being used, "for example, to inquire as to the imprisonment of a slave not subject to imprisonment, insanity of a defendant, [or] a conviction on a guilty plea through the coercion of fear of mob violence," *Morgan*, 346 U.S. at 508, though it gradually fell into disuse in light of the availability of alternatives, including habeas corpus, *see, e.g*, *United States v. Smith*, 331 U.S. 469, 475 n.4 (1947). Indeed, modern federal courts have treated coram nobis writs as habeas petitions, *see United States ex rel. Laughlin v. United States*, 474 F.2d 444, 450-51 (D.C. Cir. 1972), or treated habeas petitions as motions for a writ of coram nobis, *see Bogish v. Tees*, 211 F.2d 69 (3d Cir. 1954). Regardless of form, the writ of coram nobis clearly was able to provide remedies extending beyond relief from custody,[12] and provides ample support for the notion that collateral proceedings under common law were available to remedy "collateral consequences" of the sort described in Part III of Petitioners opening brief.

\* \* \*

Of course, all of the foregoing accepts the same fundamental misconception that afflicted the government's losing briefs to the Supreme Court: that the Suspension Clause protects

---

[11] Act of Sep. 24, 1789, ch. 20, § 14, 1 Stat. 73, 81-82 ("SEC. 14. *And be it further enacted,* That all the before-mentioned courts of the United States, shall have power to issue writs of *scire facias, habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law.").

[12] *See Owens v. Boyd*, 235 F.3d 356, 360 (7th Cir. 2000) ("writs in the nature of coram nobis are limited to former prisoners who seek to escape the collateral civil consequences of wrongful conviction"); *United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988) (coram nobis "generally invoked only by those [federal] defendants who cannot fulfill § 2255's custody requirement"); *United States v. Tyler*, 413 F. Supp. 1403, 1405 (M.D. Fla. 1976) (coram nobis is "attack upon a conviction by a defendant no longer in any form of custody")

nothing more than the writ as it existed at common law. The Supreme Court has consistently rejected that position, and instead has held that "*at the absolute minimum* the Suspension Clause protects the writ 'as it existed in 1789.'" *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996)) (emphasis added); *see also Felker*, 518 U.S. at 663-64 (1996) ("we assume, for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789."); *Swain v. Pressley*, 430 U.S. 372, 381 (1977) ("we do not rest our decision on either of the broad propositions advanced by the Government," including "that the constitutional provision merely prohibits suspension of the writ as it was being used when the Constitution was adopted").

The *Boumediene* Court, in basing its decision on general principles rather than the historical record, acknowledged that there were reasons to doubt "that the historical record is complete and that the common law, if properly understood, yields a definite answer to the questions before us. … We decline, therefore, to infer too much, one way or the other, from the lack of historical evidence on point." 128 S. Ct. at 2251. Instead, the Court, looking to "objective factors and practical concerns, not formalism," *id*. at 2258, "conclude[d] that at least three factors are relevant in determining the reach of the suspension clause: (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the petitioner's entitlement to the writ." *Id*. at 2259. None of those factors are altered appreciably when a petitioner is transferred from Guantánamo. Nor does the more general concern that the writ be vital enough "to maintain the delicate balance of governance" by allowing that "'every person restrained of his liberty [be] entitled to an inquiry into the lawfulness of such restraint'" indicate that the claims of Petitioners should vanish once

they leave Guantánamo. *Id*. at 2247, 2246 (quoting 1 ELLIOT'S DEBATES 328 (Jul 26, 1788)). To the extent that "[t]he separation-of-powers doctrine, and the history that influenced its design, … must inform the reach and purpose of the Suspension Clause," *id*. at 2247, they support jurisdiction over Petitioners' claims.[13]

Moreover, there is every reason to look to the caselaw construing the habeas statute for a sense of these constitutional minimums. The gloss on the words of the habeas statute provided by two centuries of caselaw should be taken as a gloss on the scope of the writ as protected by the Suspension Clause as well. The habeas statute itself has remained virtually unchanged since the beginning of our Republic. As the Supreme Court has recognized, the current habeas statute "descends directly" from the language of Section 14 of the Judiciary Act of 1789. *INS v. St. Cyr*, 533 U.S. 289, 305 n.25 (2001). The language of Section 2241 is the same in all material respects as the habeas provisions enacted in 1789. Those provisions of the Judiciary Act have long been considered a reflection of what the Framers intended to protect through the Suspension Clause. Because the Judiciary Act was enacted by many of the same individuals who framed the Constitution, it has been characterized as "a contemporaneous exposition of the constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 420 (1821).[14] As the interpretation of the original

---

[13]     In several places the *Boumediene* Court tacitly acknowledges the existence of viable claims for relief ranging beyond release from imprisonment. *See, e.g., Boumediene*, 128 S. Ct. at 2271 ("when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release.").

[14]     *See also Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807) (The Judiciary Act "was passed by the first congress of the United States, sitting under a constitution which had declared 'that the privilege of the writ of habeas corpus should not be suspended, unless when, in cases of rebellion or invasion, the public safety might require it.' Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity…"); *Capital Traction Co. v. Hof*, 174 U.S. 1, 9-10 (1899) ("The judiciary act of September 24, 1789, c. 20,

words of the 1789 statute has evolved, so should we interpret the scope of the privilege protected by the Suspension Clause. Viewed in this light it should be unsurprising that the historical cases, the general principles settled upon by the *Boumediene* Court, and the current-day reading of the habeas statute all arrive at the same conclusion: Petitioners may maintain their claims despite being transferred from imprisonment at Guantánamo.

## II.   General Standing Principles Support Continued Jurisdiction

The government claims that none of the transferred Petitioners can demonstrate any of the elements of initial standing to sue: injury-in-fact, causation, or redressability. *See* Gov't Br. at 6. To begin with, this inquiry (drawn from conventional standing cases rather than mootness cases in habeas) is incorrect. As Petitioners noted in their opening brief, the Supreme Court in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000), specifically held that in cases involving cessation of challenged conduct, there was a higher threshold to establish initial standing to file a case than would be required to maintain a case once the initial threshold had been met. Pet'rs' Br. at 19 n.16 (citing *Laidlaw*, 528 U.S. at 190). In habeas cases the initial threshold is the "in custody" requirement. If a petitioner is in custody at the time of filing, the initial threshold has been met. If transferred Petitioners remain in physical custody (e.g. in proxy detention) or under some other restraint on liberty, they continue to meet that initial threshold, and their cases are not moot. If they are not in custody in any sense, then the

---

drawn by Senator (afterwards Chief Justice) Ellsworth, and passed – within six months after the organization of the government under the constitution, and on the day before the first ten amendments were proposed to the legislatures of the states – by the first congress, in which were many eminent men who had been members of the convention which formed the constitution, has always been considered as a contemporaneous exposition of the highest authority."); *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) ("That act [the Judiciary Act], which has continued in force ever since … was passed by the first congress assembled under the constitution, many of whose members had taken part in framing that instrument, and is contemporaneous and weighty evidence of its true meaning.").

collateral consequences inquiry begins. Where habeas petitioners have challenged criminal convictions, the Courts have presumed collateral consequences rather than inquired into the evidence of their existence; a similar standard should apply to Petitioners here. Pet'rs' Br. at 17-20. Other courts have accepted strong stigmatic injuries as sufficient to avoid mootness, and again, by any stretch of the imagination these Petitioners should qualify. Pet'rs' Br. at 21-23.

Even taken on their own terms, the government's claims are extreme. As to injury-in-fact, the government offers Judge Kessler's opinion in *Al Joudi v. Bush* for the idea that "potential" future travel restrictions and monitoring are in all cases too speculative an injury to underlie continued standing. Gov't Br. at 8-9. But the holding in *Al Joudi* was not that travel restriction could *never* underlie standing; instead, the Court found no evidence that petitioners were actually suffering from travel restrictions, monitoring, etc. at the present time. *See Al Joudi v. Bush*, Civil Action No. 05-301, 2008 U.S. Dist. LEXIS 23374 at *3 (D.D.C. Mar. 26, 2008) ("Petitioners offer no direct evidence of consequences they themselves presently suffer as a result of their prior detention, nor do they offer any competent evidence of consequences they will suffer in the future"; "*potential* future monitoring [and] travel restrictions" were too speculative to constitute injury-in-fact (emphasis added)). In the instant cases, whether or not there is sufficient evidence to establish that petitioners are suffering injury is a matter for the Merits Judges to decide.[15]

The government next attacks causation, claiming that Petitioners complain of "repercussions [that] flow from the independent acts and judgments of private parties or foreign sovereigns." Gov't Br. at 6. Quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992), the government claims that when standing "'depends on the unfettered choices made by

---

[15]   Some transferred Petitioners have already adduced evidence of proxy detention; others have produced evidence of travel restrictions imposed by the United States, *see* Pet'rs' Br. at 9-10.

independent actors not before the court and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" plaintiffs assume the burden to show causation and redressability. Gov't Br. at 6-7. As an initial matter, whenever there is proxy detention or a restraint on liberty dictated by the United States as a condition of repatriation, the restraints on liberty complained of are not "unfettered choices" made by "foreign sovereigns," nor are they outside of the ability of the Court to "predict" or "control." Rather, they are directed by the United States government, and thus redressable. It appears every transferee sent home with his "enemy combatant" label intact can be "predicted" to suffer travel restrictions imposed by the United States, and an order invalidating Petitioners' enemy combatant status and directing the United States government to take steps to absolve their home governments of the obligation to enforce their repatriation agreements would certainly contribute to redress of their injuries.[16]

Individual claims of restraints on liberty and collateral consequences and the evidence supporting them are a matter for the Merits Judges to sort through. But the applicable standard cannot be that the United States government must have absolute control over the actions that injure Petitioners. The language chosen in *Lujan* indicates the converse: that where control is entirely in the hands of some outside party, whose "unfettered," "independent" choices cannot be influenced by *anything* the Court might compel of the parties before it, then standing will not lie. Otherwise ordinary causation analysis will apply.

---

[16]     Such an order is clearly within the power of the court, given the broad remedial powers provided under habeas (*see* 28 U.S.C. § 2243 (power to dispose case "as law and justice require"); *United States v. Handa*, 122 F.3d 690, 691 (9th Cir. 1997) ("broad and flexible power")). Courts have found the validity of executive agreements to be justiciable. *See, e.g.*, *Rossi v. Brown*, 467 F. Supp. 960, 968 (D.D.C. 1979) (question whether federal antidiscrimination law mandated invalidation of executive agreement justiciable), *rev'd on other grounds*, 642 F.2d 553 (D.C. Cir. 1980), *rev'd sub nom. Weinberger v. Rossi*, 456 U.S. 25 (1982) (affirming district court).

The Government correctly equates causation with redressability. Gov't Br. at 7. As the
Supreme Court has explained, "a plaintiff satisfies the redressability requirement when he shows
that a favorable decision will relieve a discrete injury to himself. He need not show that a
favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15
(1982) (emphasis in original); *see also Meese v. Keene*, 481 U.S. 465, 476 (1987) (finding
standing where requested injunction "would at least partially redress" plaintiff's injury). As the
Supreme Court put it in *Massachusetts v. EPA*, 549 U.S. 497, 523-25 (2007):

> EPA does not believe that any realistic possibility exists that the relief petitioners
> seek would mitigate global climate change and remedy their injuries. That is
> especially so because predicted increases in greenhouse gas emissions from
> developing nations, particularly China and India, are likely to offset any marginal
> domestic decrease. [EPA's] argument rests on the erroneous assumption that a
> small incremental step, because it is incremental, can never be attacked in a
> federal judicial forum. … While it may be true that regulating motor-vehicle
> emissions will not by itself *reverse* global warming, it by no means follows that
> we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or
> *reduce* it. … A reduction in domestic emissions would slow the pace of global
> emissions increases, no matter what happens elsewhere.

Viewed in this light, even if the "independent acts and judgments of private parties or foreign
sovereigns" might hypothetically also threaten Petitioners with injury, the fact that our
government's actions enlarge the risk of those injuries is sufficient to support standing.[17]

The government argues that the *Al Joudi* Court rejected the "alleged potential collateral
consequences [because they] were 'totally dependent on the actions of a non-party sovereign
authority beyond the control of this Court.'" Gov't Br. at 8 (quoting *Al Joudi*, 2008 U.S. Dist.

---

[17]     Courts routinely engage in evaluations of the risk of injury for standing purposes; the fact
that an asserted injury is expressed in terms of probability of future harm does not render it
"speculative." *See, e.g., Lyons*, 461 U.S. at 101-02 (plaintiffs must demonstrate that they "have
sustained or are immediately in danger of sustaining some direct injury as a result of the
challenged official conduct."); *Massachusetts v. EPA*, 549 U.S. at 521 ("EPA's steadfast refusal
to regulate greenhouse gas emissions presents a risk of harm to Massachusetts … There is,
moreover, a 'substantial likelihood that the judicial relief requested' will prompt EPA to take
steps to reduce that risk." (citing *Lujan* and quoting *Duke Power*)).

LEXIS 23374 at *3 (dicta)). If this were actually the law, no threat of mediated injury would ever be recognized. In *Meese v. Keene*, 481 U.S. 465 (1987), the Supreme Court upheld the standing of a plaintiff (Barry Keene, a film exhibitor and state senator) who argued that he was injured because people who might otherwise vote for him in future political elections would be less likely to do so because certain movies he wanted to show were required by law to be labeled as "political propaganda." The Court found the potential damage to Keene's reputation and electoral prospects was sufficiently to convey standing. Although the "independent" actions of the "private parties" (potential voters) were outside the Court's *direct* control, the Court held that removal of the "political propaganda" label "would at least partially redress" this injury. 481 U.S. at 476.

Of course, much turns on the nature of the continuing restrictions on liberty or other collateral consequences alleged by individual Petitioners. In *Al Joudi*, as noted above, Petitioners adduced no evidence of present restrictions on liberty, instead alleging "potential future monitoring," "potential prosecution," and so forth. *Al Joudi*, 2008 U.S. Dist. LEXIS 23374 at *3. In such circumstances, it would be utterly implausible to assert that the United States has *imposed* some restriction (say, on international travel) as a condition of repatriation—it would defy common sense for any such restriction to not be operative immediately. The "potential," "future," "speculative" harms asserted in *Al Joudi* are not obviously redressable in the same way that, say, the restrictions imposed on Adel Hassan Hamad (and on the government of Sudan) by the terms of our government's repatriation conditions are. *See* Pet'rs' Br. at 9-10.

In *Meese v. Keene*, the asserted injury was to Keene's professional and reputational interests: the Supreme Court found that he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career." 481 U.S. at 475. These are

exactly the sort of stigmatic and economic injuries the government dismisses as inadequate.[18] *See*

Gov't Br. at 7 ("non-statutory consequences that flow from a conviction such as loss of

employment prospects" insufficient); *id*. at 9 ("any moral stigma, damage to reputation, [or] loss

of employment prospects … are not legally cognizable injuries remediable through habeas.").

The caselaw disagrees. *See, e.g*., *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518

(9th Cir. 1989) (because of government surveillance, "support for the [plaintiff] churches has

declined"; they "have suffered harm analogous to the "reputational" or "professional" harm that

was present in [*Meese v.*] *Keene*. ... Clearly, this [type of] injury to the churches can "fairly be

traced" to the INS' conduct."); *Riggs v. City of Albuquerque*, 916 F.2d 582, 585 (10th Cir. 1990)

("the effect of [government misconduct here] goes beyond subjective fear to include injury to

[plaintiffs'] personal, political, and professional reputations."); *Clark v. Library of Cong*., 750

F.2d 89, 93 (D.C. Cir. 1984) (worker had standing to sue his government employer for triggering

---

[18]     Respondents cite *St. Pierre v. United States*, 319 U.S. 41, 43 (1943) (per curiam) for the
notion that "the moral stigma of a judgment which no longer affects legal rights does not present
a case or controversy."  Gov't Br. at 7. Obviously that statement is incompatible with the many
stigmatic injury cases cited in Petitioners' opening brief, *see* Pet'rs' Br. at 21-22, and in
*Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977), the Supreme Court stated as much: "this
Court has long since departed from the rule announced in *St. Pierre*." Indeed, within three years,
the Supreme Court had noted that an alien in similar circumstances could suffer immigration
consequences as a result of his conviction, and naturalization consequences as a result of what
that conviction implied about his "'good moral character.'" *Fiswick v. United States*, 329 U.S.
211, 222 (1946); *cf*. Pet'rs' Br. at 15-16 (outlining immigration consequences of "enemy
combatant" determination).
        The government's other supposed authority for the notion that stigmatic injury is
insufficient to underlie standing actually supports Petitioners' position. In *McBryde v. Committee
to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. of the United
States*, 264 F.3d 52 (D.C. Cir. 2001) (cited by Gov't Br. at 7 n.2), the Court of Appeals for the
D.C. Circuit acknowledged that "injury to reputation can … suffice for purposes of constitutional
standing" (citing *Meese v. Keene*). In evaluating the claims of a censured judge who challenged
both his reprimand and a pair of suspensions that had expired, the Court found that to the extent
the "suspensions may have continuing reputational effects *on top of* the defendants' express
reprimand, they are not enough." *Id*. at 58 (emphasis added). The Court then went on to conclude
that "the injury to Judge McBryde's reputation preserves the public reprimand from mootness
and affords standing." *Id*. at 58.

an FBI investigation into the worker's political associations where the investigation had cost him employment opportunities).[19]

That such stigmatic injuries should occur to men formerly held at Guantánamo will come as no shock to anyone blessed with common sense. *See* Pet'rs' Br. at 20 (listing aspersions). The government spends a great deal of effort attempting to distinguish the presumption of collateral consequences that applies in habeas cases challenging criminal convictions, insisting that the key factor is not the taint of criminality but rather the fact that a conviction typically carries "collateral consequences" by operation of law. *See* Gov't Br. at 6, 9. That position cannot explain why federal courts have applied the *Sibron* presumption to misdemeanors, despite the fact that ordinary misdemeanor convictions typically carry no civil disabilities. *Hirabayashi v. United States*, 828 F.2d 591, 605 (9th Cir. 1987) ("The government contends that 'ordinary misdemeanors have no 'collateral consequences' and therefore are not subject to post-conviction attack absent some special legal disability.' … we find no support for such a per se rule and conclude that the case is not moot." (coram nobis action)); *Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005) (argument that habeas petitioner who served a two-day sentence "is no longer suffering any significant collateral consequences as a result of his misdemeanor criminal conviction" was "foreclosed"; "any criminal conviction" triggers *Sibron* presumption), *cert. denied*, 547 U.S. 1128 (2006).

---

[19]     *See also Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975) (high school student had standing to seek expungement of an FBI file linking her with "subversive material" because of the mere potential that the file would harm her future educational and employment opportunities); *Airline Pilots' Assoc. Int'l v. DOT*, 446 F.2d 236, 240-42 (FAA administrative determination that planned highrise buildings posed air hazard, which had no impact in law other than "moral suasion," was justiciable on grounds of stigmatic impact); *Jabara v. Kelley*, 476 F. Supp. 561, 568 (E.D. Mich. 1979) (attorney had standing to sue to enjoin unlawful FBI and NSA surveillance because the investigation had deterred others from associating with him and caused "injury to his reputation and legal business."), *vacated on other grounds sub nom. Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982).

Petitioners have already demonstrated that, until invalidated, their "enemy combatant" designations (and the false underlying factual allegations on which those designations are based) will very likely carry consequences owing to operation of United States law. *See* Pet'rs' Br. at 15-16 (describing immigration consequences); *cf.* Gov't Br. at 9 (petitioners "cannot allege that they currently suffer civil disabilities imposed by operation of federal or state law because they are aliens outside the United States."). But the government's insistence that any disability owing to Petitioner's status or detention at Guantanamo must occur by operation of law misses the nature of the causality inquiry. Injury need not occur with the degree of certitude dictated by a law of physics any more than it need occur by "operation of law."

Instead, it simply needs to be "concrete and particularized," not "conjectural or hypothetical," *Lujan*, 504 U.S. at 560, and "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984).[20] Surely many of these Petitioners will be able to demonstrate to their Merits Judges severe consequences that have resulted from the stigma of our government's designation. *See* Pet'rs' Br. at 22-23 (quoting results of U.C. Berkeley study). Beyond this, restrictions on liberty of the sort which are seemingly universal (at least for all transferees who are still designated enemy combatants, *see* Pet'rs' Br. at 13) and mandated by our government are the exact equivalent for present purposes of civil disabilities resulting from the fact of a conviction by "operation of law." Moreover, they are redressable: the

---

[20]     The Court's cautionary exegesis of these standards in *Allen*, 468 U.S. at 751, is worth noting: "These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise. …The absence of precise definitions, however, … hardly leaves courts at sea in applying the law of standing. … Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases. Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?"

"agreements" the United States demands as a condition of repatriation are within the power of this court to order void.[21]

The same obviously applies to Petitioners who claim they are held in proxy detention. The government ends its brief by claiming that "any continued detention, prosecution or imprisonment[ of transferred petitioners] is a matter within the sole discretion of … foreign authorities." Gov't Br. at 11. As to continued *detention*, the *Abu Ali* court disagreed. The number of detainees who have been subject to *prosecution* upon return is extraordinarily small. (Instead,

---

[21]     There is no reason to believe that judicial invalidation of such an "agreement" (which is clearly within the Court's power, *see supra* note 16) would have no effect on the behavior of the foreign country. It would be naïve to believe that these nations would necessarily enforce the restrictions on their own even in the absence of an agreement extracted by our government, especially given the well-documented resistance of many nations to such conditions. (*See* Bonner, *Freed Guantánamo Detainee Arrives in Britain*, *infra*.)

In *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 (D.C. Cir. 1980), cited by Respondents (Gov't Br. at 7) for the notion that injuries depending on "the independent response" of another government are not redressable, the Court considered a request to declare invalid an executive agreement between the United States and the United Kingdom. The Court found that even if it invalidated the agreement, plaintiffs had failed to plead (nor produce any evidence) that the Senate would not simply ratify it as a treaty. Moreover, plaintiffs' counsel *conceded* at oral argument that the British government would not under any circumstances agree to provisions other than the ones in the challenged agreement. *Id.* at 263 ("they're not willing to agree to any modification.").

Those circumstances are quite different from the typical situation involving Guantánamo detainees. Indeed, the *New York Times* reported today that that the British government's resistance to repatriation conditions insisted on by our government delayed the repatriation of the latest detainee sent home from Guantánamo, UK resident Binyam Mohamed, by eighteen months, an impasse only broken by the extraction of promises from the detainee himself: "The British government began concentrated efforts for Mr. Mohamed's return in August 2007, but it was rebuffed by the Bush administration. One stumbling block was the restrictions to be put on him when he was released. The British government said it could not impose the conditions wanted by the United States, which included electronic surveillance and an official control order, because they violated British and European human rights laws. Mr. Mohamed has agreed to voluntary restrictions, including a lifetime prohibition on travel to the United States, according to people who have seen the restrictions. Those people spoke on condition of anonymity, and they gave no more details about the restrictions because the terms of Mr. Mohamed's release had not been publicly disclosed." Raymond Bonner, *Freed Guantánamo Detainee Arrives in Britain*, N.Y. Times (Feb. 23, 2009). While the evidence on these questions is a matter for the Merits Judges to consider, there is already an extensive record indicating that in most cases these conditions are imposed on foreign governments.

restrictions on liberty imposed by the United States as conditions of transfer and the collateral consequences following from the stigma of our government's detention of Petitioners at Guantánamo are largely what Petitioners complain of.) Ultimately, this final argument of the government intentionally confuses the point. Petitioners are challenging the United States' actions. We are not asking the Court to stand in judgment of other country's actions, any more than we are asking the Court to magically alter the behavior of foreign countries (or third parties)—rather, as with the chilling effect cases, we are asking the Court to change actions of *our* government that have foreseeable effects on the actions of others. The law of standing demands nothing more.

*   *   *

The government's passing allusion to the Act of State doctrine, Gov't Br. at 11 (citing *Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), is easily discarded. The Act of State doctrine requires a defendant to prove that there exists an official sovereign act that the court will be required to sit in judgment of and declare invalid in order to provide the requested relief. The fleeting reference made in the brief is insufficient to establish the necessary first element; defendants "must show a 'statute, decree, order or resolution' authorizing the challenged act as an official act." *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)). As to the "declare invalid" element, the caselaw states that the relief requested must "require" the court to "render null and void" the official act. *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l.*, 493 U.S. 400, 407 (1990). Merely impugning an official act will not suffice. *Id*. at 407-410. The government will not be able to meet these heavy burdens of proof before the Merits Judges.

**CONCLUSION**

The government claims that Petitioners have "already secured the remedy that this Court could provide." Gov't Br. at 3. That pretends that a judicial invalidation of Petitioners' "enemy combatant" designations, a finding that they were unlawfully held, and a declaration that the restrictions imposed upon them at our government's insistence were void would have no foreseeable impact in the real world. The government's position has nothing to do with the law of standing (as the numberless cases where convictions are successfully challenged after the resulting sentences had expired demonstrate) or the law of habeas corpus (as the three centuries of caselaw we cite demonstrate). Instead, it has everything to do with attempting to preserve the façade of infallibility carefully created by the executive branch, which continues to insist that everyone detained at Guantanamo deserved to be there. It is this Court's role in our constitutional system to put those claims to the test.

Dated: February 23, 2009

Respectfully submitted,

_____/s/ sdk_____

Shayana D. Kadidal (D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Tel: (212) 614-6438
Fax: (212) 614-6499
kadidal@ccrjustice.org

*On behalf of Petitioners* [**]

---

[**] Reserving objections to the requirement to file a single consolidated brief. Moreover, Petitioners have only attempted to answer the question of law posed by the Court's Order of Jan. 12, 2009 (Dkt. 79), and, obviously, have not briefed this issue as if there were a pending motion to dismiss or motion for summary judgment.