# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| IN RE: ) | **Misc. No. 08-442 (TFH)** |
| **GUANTANAMO BAY** ) | |
| **DETAINEE LITIGATION** ) | |
| ) | **02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1194,** |
| ) | **04-cv-1254, 04-cv-1937, 04-cv-2022, 04-cv-2035,** |
| ) | **04-cv-2046, 04-cv-2215, 05-cv-0023, 05-cv-0247,** |
| ) | **05-cv-0270, 05-cv-0280, 05-cv-0329, 05-cv-0359,** |
| ) | **05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526,** |
| ) | **05-cv-0569, 05-cv-0634, 05-cv-0748, 05-cv-0763,** |
| ) | **05-cv-0764, 05-cv-0877, 05-cv-0883, 05-cv-0889,** |
| ) | **05-cv-0892, 05-cv-0993, 05-cv-0994, 05-cv-0998,** |
| ) | **05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124,** |
| ) | **05-cv-1220, 05-cv-1244, 05-cv-1347, 05-cv-1353,** |
| ) | **05-cv-1429, 05-cv-1457, 05-cv-1458, 05-cv-1487,** |
| ) | **05-cv-1490, 05-cv-1497, 05-cv-1504, 05-cv-1505,** |
| ) | **05-cv-1506, 05-cv-1509, 05-cv-1555, 05-cv-1592,** |
| ) | **05-cv-1601, 05-cv-1602, 05-cv-1607, 05-cv-1623,** |
| ) | **05-cv-1638, 05-cv-1639, 05-cv-1645, 05-cv-1646,** |
| ) | **05-cv-1678, 05-cv-1704, 05-cv-1971, 05-cv-1983,** |
| ) | **05-cv-2010, 05-cv-2088, 05-cv-2104, 05-cv-2185,** |
| ) | **05-cv-2186, 05-cv-2199, 05-cv-2249, 05-cv-2349,** |
| ) | **05-cv-2367, 05-cv-2370, 05-cv-2371, 05-cv-2378,** |
| ) | **05-cv-2379, 05-cv-2380, 05-cv-2381, 05-cv-2384,** |
| ) | **05-cv-2385, 05-cv-2386, 05-cv-2387, 05-cv-2444,** |
| ) | **05-cv-2479, 06-cv-0618, 06-cv-1668, 06-cv-1684,** |
| ) | **06-cv-1690, 06-cv-1758, 06-cv-1759, 06-cv-1761,** |
| ) | **06-cv-1765, 06-cv-1766, 06-cv-1767, 07-cv-1710,** |
| ) | **07-cv-2337, 07-cv-2338, 08-cv-0987, 08-cv-1085,** |
| ) | **08-cv-1101, 08-cv-1104, 08-cv-1153, 08-cv-1185,** |
| ) | **08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224,** |
| ) | **08-cv-1227, 08-cv-1228, 08-cv-1229, 08-cv-1230,** |
| ) | **08-cv-1231, 08-cv-1232, 08-cv-1233, 08-cv-1235,** |
| ) | **08-cv-1236, 08-cv-1237, 08-cv-1238, 08-cv-1310,** |
| ) | **08-cv-1360, 08-cv-1440, 08-cv-1733, 08-cv-1805,** |
| ) | **08-cv-2083, 08-cv-1828, 08-cv-1923, 08-cv-2019,** |
| ) | **09-cv-0031** |
| ) | |

## THE GOVERNMENT'S MOTION TO AMEND
## SEPTEMBER 11, 2008 PROTECTIVE ORDER AND
## COUNSEL ACCESS PROCEDURES AND JANUARY 9, 2009 AMENDED
## TS/SCI PROTECTIVE ORDER AND COUNSEL ACCESS PROCEDURES

## PRELIMINARY STATEMENT

Paragraph 29 of the Protective Order and Procedures for Counsel Access to

Detainees at the United States Navel Base in Guantanamo Bay, Cuba provides that

"Petitioners' counsel shall not disclose to a petitioner-detainee classified information not

provided by that petitioner-detainee."  No. 08-mc-0442, Sept. 11, 2008 (Dkt. No. 409)

("Protective Order" and "Counsel Access Procedures" respectively), Protective Order ¶

29.  Similarly, Paragraph 31 of the Counsel Access Procedures provides that "Counsel

may not divulge classified information not learned from the detainee to the detainee."

Counsel Access Procedures ¶ 31.[1]  As recently interpreted by the Court, these provisions

allow petitioners' counsel to disclose sensitive national security information—statements

made by petitioners to United States Government agents—to their respective clients,

notwithstanding the objection of the Executive.  *See* Order, No. 08-442, Jan. 15, 2009

(Dkt. No. 1521).  That is, counsel may compile such statements from classified materials

into a new document, and then disclose that document to their respective clients so long

as the compilation document underwent review by the Privilege Review Team.[2]  *See id.*

Thus, for certain classified information, these provisions effectively substitute the

judgment of the Privilege Review Team for the classification decisions of the national

---

[1] The Protective Order replaced the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first entered on November 8, 2004.  344 F. Supp. 2d 174 (D.D.C. 2004) ("2004 Protective Order").  The Court had previously supplemented the 2004 Protective Order on November 10, 2004 with the Order Addressing Designation Procedures for Protected Information, and on December 13, 2004 with the Order Supplementing and Amending Filing Procedures Contained in the November 8, 2004, Amended Protective Order.

[2] The Privilege Review Team is a group of Department of Defense attorneys and intelligence or law enforcement personnel not otherwise taking part in proceedings involving the detainee.  *See* Counsel Access Procedures ¶ 6.

security agencies that own the information at issue.  With this motion, respondents

respectfully request that the Court amend Paragraph 29 of the Protective Order and

Paragraph 31 of the Counsel Access Procedures to ensure that only properly disclosable

information, approved by the national security agencies, is released to petitioners.[3]

Specifically, as detailed below, respondents request that the Court amend the Protective

---

[3]  In accordance with Local Rule 7(m), respondents contacted petitioners' counsel in the above-captioned cases to ascertain their positions with respect to this motion. Respondents initially communicated with petitioners' counsel regarding this motion via email on March 6, 2009, and invited petitioners' counsel to designate a smaller group of representatives with whom respondents could meet and confer regarding this motion. Petitioners' counsel did designate counsel to discuss the requested relief with respondents, and the group met on March 11, 2009 to discuss this motion.  On that day, respondents met with counsel for petitioners in 05-2386 (ISNs 34 and 893) and 05-2398 (ISNs 250 and 289), who indicated that their clients would consent to the motion. Respondents also conducted a telephone conference with counsel representing petitioners in 05-1124 (ISN 560), 05-1601 (ISN 1119), and 05-2367 (ISNs 4, 832, 1103, 1104) who indicated that they would oppose the motion.  Petitioners' counsel in the following cases responded via email, also indicating that they would object to the requested relief: 04-1164 (ISN 189), 04-1194 (ISNs 45, 167, 235, 242, 256, 553, 564, 569, 578, 680, 688, 837, 839), 04-1254 (ISNs 27, 31, 32, 37, 41, 69, 117, 156, 165, 508, 522, 577, 681), 04-2022 (ISN 1094), 04-2046 (ISN 533), 04-2215 (ISN 239), 05-23 (ISN 841),  05-247 (ISN 537), 05-270 (ISNs 190, 369), 05-280 (ISNs 33, 440, 511, 554, 576), 05-329 (ISN 197), 05-392 (ISN 310), 05-492 (ISN 757), 05-526 (ISNs 307, 312), 05-569 (ISN 760), 05-634 (ISN 459), 05-748 (ISNs 43, 91, 251), 05-763 (ISN 1452), 05-764 (ISN 244), 05-883 (ISN 975), 05-877 (928), 05-892 (ISN 327), 05-993 (ISN 1008), 05-998 (ISN 653), 05-999 (ISN 152), 05-1189 (ISN 695), 05-1220 (ISN 709), 05-1244 (ISN 535), 05-1312 (ISN 128), 05-1347 (ISN 311), 05-1353 (ISN 288), 05-1429 (ISNs 255, 509), 05-1487 (ISN 433), 05-1490 (ISN 329), 05-1504 (ISN 238), 05-1506 (ISN 694), 05-1509 (ISNs 278, 285, 295, 320, 328), 05-1555 (ISN 36), 05-1592 (ISN 1456), 05-1602 (ISN 102), 05-1607 (ISNs 1460, 1461), 05-1623 (ISN 753), 05-1645 (ISN 1015), 05-1646 (ISN 550), 05-1971 (ISN 63), 05-1983 (ISN 708), 05-2088 (ISN 163), 05-2104 (ISN 690), 05-2185 (ISN 40), 05-2186 (ISN 840), 05-2199 (ISN 686), 05-2249 (ISN 195), 05-2370 (ISNs 201, 219), 05-2371 (ISN 768), 05-2378 (ISN 654), 05-2379 (ISN 88), 05-2380 (ISN 1017), 05-2384 (ISN 200), 05-2385 (ISN 5, 1045), 05-2386 (ISNs 30, 35, 46, 49, 89, 148, 170, 223, 238, 257, 290, 326, 330, 441, 452, 498, 519, 684, 685, 687, 689, 722, 744, 894, 1453, 1457), 06-1677 (ISN 453), 06-1678 (ISN 316), 06-1679 (ISN 1002), 06-1684 (ISN 679), 06-1690 (ISN 10020), 06-1761 (ISN 263), 06-1767 (ISNs 324, 691), 06-1668 (ISN 249), 08-987 (ISN 317), 08-1153 (ISN 567), 08-1207 (ISN 10015), 08-1223 (ISN 1052), 08-1224 (ISN 782), 08-1233 (ISN 566), 08-1235 (ISN 321), 08-1236 (ISN 309), 08-1237 (ISN 574), 08-1238 (ISN 838), 08-1310 (ISNs 281, 584), 08-1360 (ISN 10016), 08-1828 (ISN 6), 08-2019 (ISNs 461, 575), and 08-2083 (ISN 10018).

Order and the Counsel Access Procedures to allow petitioners' counsel to share with a detainee only classified information counsel learn from that detainee during the course of communications with the detainee via legal mail or legal visits.  The proposed amendments would affect the operation of Paragraph 29 and Paragraph 31 only in one respect—rather than permitting the Privilege Review Team to disclose to a petitioner classified statements provided by that petitioner to United States Government agents, the proposed amendments would allow disclosure of such statements only if they were taken from declassified materials or if appropriate national security agencies approved the disclosure.

Because the Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented Information (No. 08-mc-0442, Jan. 9, 2009 (Dkt. No. 1496) ("TS/SCI Protective Order" and "TS/SCI Counsel Access Procedures" respectively)) contain analogous provisions—TS/SCI Protective Order Paragraph 30 and TS/SCI Counsel Access Procedures 34—respondents respectfully request that the Court amend those provisions in the same manner.  Further, as both protective orders contain analogous sections addressing protected information— Protective Order Paragraph 39 and TS/SCI Protective Order Paragraph 4—respondents ask that the Court likewise amend those provisions to reflect that counsel may only share protected information with petitioners if they learn that information during the course of communications with petitioners, or if appropriate national security agencies approved the disclosure.  The contours of the requested amendments are detailed in Exhibit A, attached hereto.  Exhibit A also contains a comparison of the current provisions of the

Protective Order and Counsel Access Procedures and the TS/SCI Protective Order and

TS/SCI Counsel Access Procedures (collectively, "the Protective Orders") with the

proposed amended provisions.

These modest but important adjustments of the Protective Orders are supported by

classified and public declarations from the Department of Defense, the Criminal

Investigation Task Force, and the Central Intelligence Agency (whose declaration is

submitted *in camera* and *ex parte*).  As explained more fully in the declarations, the

regime established by the Court's January 15 Order risks unauthorized disclosure of

sensitive classified and law enforcement information to Guantanamo Bay detainees.  The

proposed amendments would address these national security risks as well as the

separation of powers issues raised by the current judicial construction permitting the

disclosure of sensitive national security information—over the Executive's objection—to

persons detained as enemy combatants.  The proposed amendments would, therefore,

restore responsibility for evaluating such disclosures to the national security agencies—

those best equipped to judge the dangers such disclosures may pose.  Indeed, the

Constitution itself assigns this role to the agencies; the Supreme Court has held that,

flowing from the President's role as Commander in Chief, the Executive is vested with

the "authority to classify and control access to information bearing on national security."

*Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (citing U.S. Const. art. II, § 2).

Therefore, "it is the responsibility of [the Executive], not that of the judiciary, to weigh

the variety of complex and subtle factors in determining whether disclosure of

information may lead to an unacceptable risk." *CIA v. Sims*, 471 U.S. 159, 180 (1985).

The proposed amendments would thus not only protect against potential risks to national

security, they would also align the allocation of responsibilities under the Protective

Orders with each Branch's constitutionally prescribed role.

Instead of the process called for by the Court's January 15, 2009 Order, the more

appropriate course of action is to allow the Government's declassification process to run

its course.  The Government is cognizant of the comments from many Judges of this

Court that petitioners should have some form of access to the statements they provided to

United States Government agents.  The Court's January 15, 2009 Order, however,

attempts to accomplish this goal in a fashion that risks unauthorized disclosure of

classified information.  To avoid this problematic result, the Government has devoted—

and continues to devote—substantial resources to declassifying and clearing for release

the materials containing such statements.  Thus, as soon as practicable, declassified or

cleared materials will be available to petitioners.  Especially in light of this ongoing

declassification process, this Court should replace the problematic portions of the

Protective Orders that allow for disclosure of classified and protected information absent

the authorization of the Executive Branch.  Such an amendment would also address the

serious constitutional and security issues posed by the current form of these provisions.

## FACTUAL BACKGROUND

On September 11, 2008, this Court entered the Protective Order providing, *inter

alia*, that "[p]etitioners' counsel shall not disclose to a petitioner-detainee classified

information not provided by that petitioner-detainee."  Protective Order ¶ 29.  The

Counsel Access Procedures, also entered by the Court on September 11, 2008, echoed

this provision, stating that "Counsel may not divulge classified information not learned

from the detainee to the detainee."  Counsel Access Procedures ¶ 31.  The Court

established a similar rule for protected information.  *See* Protective Order ¶ 39

("Petitioners' counsel shall not disclose protected information not provided by a

petitioner-detainee to that petitioner-detainee without prior concurrence of

government counsel or express permission of the Court.").

The Court also set forth procedures in the Protective Order to be used "[s]hould a

petitioner's counsel desire to disclose classified information not provided by a petitioner-

detainee to that petitioner-detainee."  *Id.*  In that situation, petitioner's counsel must

submit a request to the Privilege Review Team.  *See* Protective Order ¶ 29.  The Privilege

Review Team, in turn, must "forward a petitioner's counsel's . . . request to the

appropriate government agency authorized to declassify the classified information."  *Id.*

The Protective Order contemplates that the government agency with relevant authority

will render a determination regarding declassification of that material, and directs the

Privilege Review Team to convey that determination to petitioner's counsel once a

determination has been made.  *See id.*  The above-described procedure must be followed

with respect to all classified information petitioners' counsel seek to disclose to their

respective clients, unless the classified information at issue was "provided by" the client

to whom that information would be disclosed.  *Id.*

Subsequently, the Court entered a protective order governing cases involving Top

Secret/Sensitive Compartmented Information.  *See* TS/SCI Protective Order and TS/SCI

Counsel Access Procedures.  The TS/SCI Protective Order and TS/SCI Counsel Access

Procedures contain provisions analogous to those in the Protective Order and Counsel

Access Procedures discussed above, governing when counsel may disclose classified or

protected information to a detainee.  *See* TS/SCI Protective Order ¶¶ 30, 40; TS/SCI

Counsel Access Procedures ¶ 34.

The Court recently interpreted these provisions of the Protective Order and Counsel Access Procedures in *Alsawam v. Bush*, No. 05-1244. *See* Order, No. 08-442, Jan. 15, 2009 (Dkt. No. 1521); *see also Anam v. Bush*, 04-CV-1194 (HHK) (Dkt. No. 359) (entering *Alsawam* Order in eleven pending Guantanamo Bay habeas cases). The issue was before the Court on petitioner's counsel's motion seeking the Court's authorization to review with a petitioner his classified statements appearing in exhibits to the classified factual return. *See* Mot. for Authorization to Review Pet'r's Statements with Pet'r and Req. for Expedited Consideration, No. 05-1244, Jan. 6, 2009 (Dkt. No. 100). Petitioner's counsel had extracted those statements from the classified source documents, and had collected them in a new document. *See id.* The Court granted the motion, holding that the Protective Order would allow petitioner's counsel to "review with the petitioner statements in the exhibits to the Classified Factual Return for that petitioner that the Privilege Team determines were made by that petitioner to agents of the United States government." *See* Order, No. 08-442, Jan. 15, 2009 (Dkt. No. 1521) at 1. To allow for this disclosure to petitioner, petitioner's counsel would collect petitioner's statements in a new document, and submit that new document to the Privilege Review Team. *See id.* The Privilege Review Team would then be required to examine the new document to ensure that it contained no information other than petitioner's statements, petitioner's name, and the dates on which the statements were made; if the review confirmed that this was the only information contained in the document, petitioner's counsel would be permitted to disclose that document to the petitioner. *See id.* The Court acknowledged, however, that this document, compiled from classified materials, would remain classified and must be "marked, transported, handled, and maintained as classified material." *Id.* at 2.

Citing separation of powers and national security concerns and noting that subsequent declassification of the information at issue in petitioner's motion had mooted the issue, respondents asked the Court to vacate the January 15, 2009 Order.  *See* Resp'ts' Mot. to Vacate Jan. 15, 2009 Order and Emergency Req. for a Stay of Order, No. 08-442, Jan. 29, 2009 (Dkt. No. 1563).  Respondents explained that the national security agencies authorized to declassify the exhibits containing petitioner's statements had completed the declassification process, and that the declassified documents contained no significant redactions of petitioner's statements.  *See id.* at 4.  Petitioner's statements from such documents could be shared with petitioner without raising the separation of powers and national security issues inherent in the use of petitioner's classified statements extracted from classified documents.

On January 30, 2009, the Court denied respondents' motion to vacate, but clarified its January 15, 2009 Order.  *See* Order, No. 08-442, Jan. 30, 2009 (Dkt. No. 1569).  The Court held if, and only if, "(i) the government has completed its declassification review of petitioner's classified statements . . . and (ii) there is sufficient time for the appropriate Merit Judge to adjudicate on whether petitioner can review his classified statements," a document created by petitioner's counsel containing petitioner's classified statements could be disclosed to that petitioner only if that document underwent a review process created by the Court.  *Id.* at 2-3.  The review process would require petitioner's counsel to submit the document to the Privilege Review Team.  *See id.*  Then, Privilege Review Team would compare that document with the declassified material.  *See id.*  Where the Privilege Review Team determined a document contained material that had not been declassified, the Privilege Review Team would identify such material for redaction.  *See id.*  Counsel for petitioner would then be permitted to present

any materials the Privilege Review Team identified for redaction to the appropriate

Merits Judge "for a particularized determination if [that classified statement made by

petitioner] should be released for review with petitioner." *Id.*  The Court explained that it

was so clarifying its previous Order because the Court "recognize[d] the potential

national security and separation of powers concerns with disclosing classified

information to a detainee." *Id.* at 2.  Applying the January 30, 2009 Order to the case

before it, the Court declined to invoke the new review procedures set forth in the order

because, *inter alia*, there was not sufficient time for petitioner's counsel to have the

declassified documents reviewed before an upcoming visit to Guantanamo Bay.  By

doing so, the Court held that the January 15, 2009 Order controls unless the two criteria

in the January 30, 2009 order are satisfied.  Consequently, petitioner's counsel in

*Alsawam* was permitted to disclose to the petitioner the classified statements that

petitioner's counsel had collected into a new document pursuant to the January 15, 2009

Order.

    All the while, the Government has continued to move forward with the

declassification process mentioned above, with the classification authorities responsible

for information at issue in this litigation committing significant resources to this effort.

For example, within the Department of Defense ("DoD") alone, the Declassification

Review Team consists of over eighty DoD personnel, including subject matter experts

from various DoD organizations.  *See* Declaration of James R. Clapper Jr. ("Clapper

Decl."), attached as Exhibit B, at ¶ 7; Declaration of David M. Thomas, Jr., Rear

Admiral, United States Navy Commander, Joint Task Force – Guantanamo ("Thomas

Decl."), attached to the Notice of Filing Declaration Supporting Redactions from

Declassified Factual Returns, 02-cv-828 (Dkt. No. 471), at ¶ 3.  This Declassification

Review Team works fulltime to address declassification issues, and has reviewed thousands of documents for declassification. *See* Clapper Decl. at ¶ 7. After addressing any DoD equities in the documents they review, the DoD team considers whether information in those documents requires review by other United States Government agencies. *See* Thomas Decl. at ¶ 8. If the team determines such additional review is required, the documents are forwarded to those organizations for their review prior to the documents' release. *See id.* Through these ongoing efforts, the team has already declassified over 3,000 DoD documents, and cleared 8,000 documents for release at their current classification. *See* Clapper Decl. at ¶ 7.

The Government is undertaking similar efforts to clear for disclosure protected materials containing petitioners' statements. *See* Declaration of Major Heath Wells ("Wells Decl."), attached as Exhibit C, at ¶ 9. For example, the DoD Criminal Investigation Task Force ("CITF") has personnel assigned fulltime to the Declassification Review Team, to assist in the clearance of protected materials produced by CITF. *See id.* Thus far, 860 CITF documents have been cleared through this process. *See id.*

## ARGUMENT

This Court retains "the power to modify a previously entered [protective] order." *EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1047 (1998). Such modification is "committed to the [court's] sound discretion." *Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 2 (D.D.C. 2005) (quoting *Alexander v. Fed. Bureau of Investigation*, 186 F.R.D. 99, 100 (D.D.C. 1998). Indeed, courts treat protective orders as "flexible devices." *United States ex rel. Pogue v. Diabetes Treatment Ctrs.*, Civil No. 99-3298, 2004 U.S. Dist. LEXIS 18548, at *4 (D.D.C. May 17, 2004); *see also Infineon*

*Techs. AG*, 247 F.R.D. at 2 ("protective orders are not permanent and may be modified");
*In re Vitamins Antitrust Litig.*, Misc. No. 99-197, 2001 U.S. Dist. LEXIS 25068, at *38
(D.D.C. Mar. 19, 2001) ("[a] district court has broad discretion to modify a protective
order").

A party requesting amendment of a protective order must make a showing of
good cause for the modification.  *See Infineon Techs. AG*, 247 F.R.D. at 2.  A mere
"continuing objection" to a provision of the protective order does not constitute good
cause; rather, "'good cause' implies changed circumstances or new situations."  *Id.*

Here, the recent interpretation of the Protective Order and Counsel Access
Procedures compels Respondents to seek the requested relief.  As explained in
Respondents' Opposition to Petitioner's Motion for Authorization to Review Petitioner's
Statements with Petitioner and Request for Expedited Consideration, the language of the
Protective Order and Counsel Access Procedures did not suggest that petitioners' counsel
would be permitted to share with petitioners classified information not learned from their
respective clients.  *See* Resp'ts' Opp'n to Pet'r's Mot. for Authorization to Review
Pet'r's Statements with Pet'r and Req. for Expedited Consideration, No. 05-1244, Jan.
14, 2009 (Dkt. No. 105).

Consistent with respondents' understanding of the Protective Order, Paragraph 31
of the Counsel Access Procedures plainly states that "Counsel may not divulge classified
information not *learned from the detainee* to the detainee," barring disclosure of
information counsel gather from different sources, like classified Government
intelligence reports.  Counsel Access Procedures ¶ 31 (emphasis added).  Other
provisions of the Counsel Access Procedures make clear that information "learned from
the detainee" is information acquired through counsel-detainee communications.  *See,*

*e.g.,* Counsel Access Procedures ¶ 12(f) (refers to information "learned from a detainee" when establishing procedures for mail correspondence between counsel and detainee); *id.* at ¶ 19 (refers to "information learned from a detainee" in the context of establishing the procedure by which counsel seek classification determinations of communications from a detainee).  Indeed, Paragraph 31 appears in Section I of the Counsel Access Procedures: "Counsel's Handling and Dissemination of Information From Detainees."  This Section, including Paragraph 31, addresses communications *between a detainee and his counsel*, using the terms "communications" and "information learned from a detainee" interchangeably. *See id.* at ¶ 28 ("[C]ounsel may disseminate the unclassified contents of a *detainee's communications* for purposes reasonably related to their representation[.]"); *id.* at ¶ 29 ("Counsel shall treat all *information learned from a detainee, including any oral or written communications with a detainee*, as classified information . . ."); *id.* at ¶ 30 ("Counsel shall disclose to DoJ or Commander, JTF-Guantanamo any *information learned from a detainee* involving future events that threaten the national security . . .") (emphasis added).  Thus, the Counsel Access Procedures, in their entirety, confirm respondents' understanding of these provisions.

Moreover, the litigation history of the Protective Order supports this understanding.  The Protective Order and Counsel Access Procedures were entered in the coordinated Guantanamo Bay habeas cases in 2004 by Senior Judge Green after the parties had negotiated at length, certain issues were litigated, and Judge Green considered a proposed protective order and counsel access procedures and made her own revisions to them.  Throughout the course of that litigation, the parties and the Court did not brief or contemplate the issue of allowing detainees to have access to their own classified statements through submissions of derivative documents to the DoD Privilege Review

Team for review.  *See, e.g.*, *In re Guantanamo Detainee Cases*, 04-CV-1137 (RMC)

(Dkt. No. 47), attached as Exhibit D, at 3-4 (addressing proposed protective order and

access procedures).  Further, Judge Kollar-Kotelly's decision in *Al-Odah v. Bush*, 346 F.

Supp. 2d 1, 14 (D.D.C. 2004), that established the basic framework for the Protective

Order prohibited counsel from sharing with a detainee any classified information learned

from sources other than the detainee.  In the four years since the issuance of that opinion

and the Protective Order, the Government has always understood the relevant provisions

of the Protective Order to prohibit petitioner's counsel from providing to a detainee

classified information, including petitioner's own statements, that counsel obtain in the

first instance from classified intelligence reports.  Indeed, the intent of Paragraph 29 of

the Protective Order was to allow counsel to discuss classified information with a

petitioner that the petitioner provided to counsel in the first instance during the course of

direct communications (*e.g.*, counsel visits, letters).  Because Guantanamo Bay detainees

themselves possess classified information, the Protective Order created an exception to

the general rule that detainees are not allowed to access classified information by

authorizing counsel and the detainees to communicate about classified information so

long as that information was "provided by that petitioner-detainee" in the first instance.

*See* Protective Order ¶ 29.  This provision was intended to cover only information within

the possession of the detainee, not to serve as *sub silentio* authorization to declassify

every detainee statement in classified or protected government documents.

In light of the Court's recent opinions construing the meaning of the Protective

Order in a fashion inconsistent with the Government's longstanding interpretation, the

Government now moves to amend the Protective Order.  The interpretation of Paragraph

29 of the Protective Order and Paragraph 31 of the Counsel Access Procedures to allow

such disclosure—specifically, the disclosure of classified statements made by petitioners to United States Government agents—raises national security and separation of powers issues. Amending the Protective Orders to permit counsel to disclose to a petitioner only classified or protected information that counsel learns from that petitioner during the course of counsel communications would avert the national security risks and avoid the separation of powers issues inherent in the current construction of Paragraphs 29 and 31.

I.     **The proposed amendments would address national security risks created by the current provisions of the Protective Order and Counsel Access Procedures.**

It is undisputed that the information at issue here is classified national security information, so designated pursuant to Executive Order 12958, as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). That Executive Order makes clear that information protected thereunder "is maintained in confidence in order to protect our citizens, our democratic institutions, our homeland security, and our interactions with foreign nations." Exec. Order 12958, Introduction. Indeed, information may only be classified under this Executive Order if the original classification authority—here, the national security agencies—"determine[d] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism." *Id.* at § 1.1(a)(4).

Protected information under the Protective Orders, while not classified, is not suitable for disclosure for similar reasons—"to protect the security of the United States and other significant interests." Protective Order at 2. For example, CITF documents typically marked "Law Enforcement Sensitive" and designated as protected information under the Protective Order contain information which, if released, could jeopardize

pending law enforcement or judicial proceedings and create a risk to national security.
*See* Wells Decl. at ¶¶ 4, 6.

It goes without saying that disclosure of such information to persons detained as enemy combatants raises serious national security concerns.  That the classified or protected information at issue involves petitioners' statements renders the dangers of improper disclosure no less serious.  As explained in the attached declaration of James R. Clapper, the Undersecretary of Defense for Intelligence, the classified intelligence reports documenting detainee statements following an interview with that detainee contain a wealth of information which could be aggregated and analyzed by interests hostile to the United States to develop or further hostile actions against the United States and its allies. *See* Clapper Decl. at ¶ 8.  For example, there may be significance, from an intelligence perspective, to the very decision to document a particular statement—that certain details are included in the record of a particular interview, but others are omitted.  *See id.*  That a particular detail is recorded could be sufficient to signal that there is unique intelligence value in a statement the detainee may have thought trivial.  *See id.*  So too with the way an intelligence report is written.  *See id.*  Only the original classification authority with the relevant intelligence expertise can detect all of the potential risks posed by the disclosure of classified information.

Equally, if not more, serious national security harms would result from the unauthorized release of information obtained by the Central Intelligence Agency.   In light of the sensitivity of the classified information supporting the reasons for this harm, further explanation cannot be provided on the public record or to petitioners' counsel. Accordingly, the Court is respectfully directed to the Declaration of Wendy Hilton, filed *ex parte* and *in camera*.  Suffice it to say the Court's January 15, 2009 Order does not

appropriately protect against disclosure of sensitive classified intelligence information to Guantanamo Bay detainees.

Similarly, the risks inherent in the disclosure of protected information are best assessed by the national security agency that owns the information.  For example, CITF reports documenting detainee interviews often contain information regarding the detainees' prior locations and travels, affiliations and involvement with other suspects, and activities involving terrorist organizations, or similar information about third parties. *See* Wells Decl. at ¶ 4.  Disclosure of such information could jeopardize existing law enforcement investigations or judicial proceedings as the detainees to whom such statements are disclosed could then adjust their subsequent statements or activities to take into account information they know law enforcement personnel have previously focused on.  *See id.* at ¶ 6.  Only CITF personnel would have the requisite knowledge of the ongoing criminal investigations or the significance of the detainee's statements documented by CITF during those investigations to assess the potential harm that might flow from the disclosure of such information.  *See id.* at ¶¶ 7-8.  Thus, as discussed below, Courts have consistently held that the Executive branch—specifically, the agencies with the relevant expertise—must "weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk."  *CIA v. Sims*, 471 U.S. 159, 180 (1985).

**II.    The proposed amendments would restore responsibility for evaluating disclosure of sensitive national security information to agencies with the constitutional authority and expertise required for the undertaking.**

> **A.    The Constitution entrusts the Executive Branch with the classification and protection of sensitive national security information.**

As Commander in Chief, the Executive is responsible for protecting sensitive national security information, and for assessing the risks—like those discussed above— inherent in its disclosure; a Protective Order permitting information to be disclosed notwithstanding the Executive's classification raises serious separation of powers issues. *See* U.S. Const. art. II, § 2, cl. 1; *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[the Executive's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President").  Faced with similar issues, courts addressing the protection of classified information have time and again acknowledged the Executive's authority and expertise in such matters.  *See, e.g, Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts.").  Indeed, in *Egan*, the Supreme Court held that "[f]or reasons . . . too obvious to call for enlarged discussion, . . . the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it."  484 U.S. at 529 (internal quotation omitted).  In so holding, the Supreme Court emphasized that "[c]ertainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such [an outside nonexpert] body determine what constitutes an acceptable margin of error in assessing the potential risk."  *Id.*; *see also Sims*, 471 U.S. at 180 ("it is the responsibility of [the Executive], not

that of the judiciary, to weigh the variety of complex and subtle factors in determining

whether disclosure of information may lead to an unacceptable risk"); *Fitzgibbon*, 911

F.2d at 766 (holding that it was improper for the district court to "perform its own

calculus as to whether or not harm to the national security . . . would result from

disclosure" of national security information).

       This deference to the Executive with respect to the treatment of sensitive national

security information reflects the courts' broad "reluctan[ce] to intrude upon the authority

of the Executive in military and national security affairs." *Egan*, 484 U.S. at 530 (citing

*Orloff* v. *Willoughby*, 345 U.S. 83, 93-94 (1953); *Burns* v. *Wilson*, 346 U.S. 137, 142,

144 (1953); *Gilligan* v. *Morgan*, 413 U.S. 1, 10 (1973), *Schlesinger* v. *Councilman*, 420

U.S. 738, 757-758 (1975); *Chappell* v. *Wallace*, 462 U.S. 296 (1983)).  Following this

tradition, the Supreme Court in *Boumediene v. Bush*, 128 Sup. Ct. 2229 (2008), too,

cautioned that "proper deference must be accorded to the political branches" in these

proceedings.  128 S. Ct. at 2276.  Specifically, the Supreme Court noted that such

deference required that the district court "use its discretion to accommodate [the

Government's interest in protecting sources and methods of intelligence gathering] to the

greatest extent possible."[4]  *Id.*

---

[4] The Court of Appeals' recent decision in *Al Odah v. United States*, No. 05-5117 (D.C. Cir. Mar. 6, 2009), is not to the contrary.  The *Al Odah* decision addressed a separate and distinct question of how courts handling the Guantanamo Bay habeas cases should resolve challenges to the Government's decision to withhold classified information from petitioner's counsel.  The Court of Appeals established a framework involving consideration of the materiality of the withheld information to the habeas case and analysis in appropriate cases of whether alternatives short of unredacted access to the information (*e.g.*, substitutes, summaries) would be appropriate.  The issue presented by the Court's January 15 and 30 Orders is not redaction of information from petitioner's counsel, but disclosure of classified and protected information already in petitioner's counsel's possession (*i.e.*, information in the Government's factual return) to detainees. *Al Odah* did not address the standards or process by which classified information would

The current construction of Paragraph 29 of the Protective Order and Paragraph 31 of the Counsel Access Procedures, permitting disclosure of classified information notwithstanding the Executive's objection, is inconsistent with this tradition of deference and raises serious separation of powers concerns.  Indeed, this Court recognized those issues in its January 30, 2009 Order clarifying its previous interpretation.  *See* Order, No. 08-442, Jan. 30, 2009 (Dkt. No. 1521) at 2 (noting the Court's "recogni[tion of] the potential . . . separation of powers concerns with disclosing classified information to a detainee").  Regrettably, however, the January 30, 2009 Order did not excise these problems from the current interpretation of the Protective Order and Counsel Access Procedures.  Under the current system, a petitioner's counsel can extract that petitioner's statements from classified documents, and compile those selections into a new document.  Counsel can then submit this new document to the Privilege Review Team for a determination regarding whether it contains only the petitioner's statements, the petitioner's name, and the dates on which the statements were made.  *See* Order, No. 08-442, Jan. 15, 2009 (Dkt. No. 1569) at 2.  If the Privilege Review Team determines that the information in the new document is limited to these categories, then the document may be disclosed to the petitioner.  *See id.*  Under the January 30, 2009 Order, if, at the time petitioner's counsel submits the new compilation document to the Privilege Review Team, the Government has produced a declassified version of the underlying materials *and* there is sufficient time for the Merits Judge to adjudicate the issue, the Privilege Review Team is instructed to compare the new document to the declassified materials, and redact any statements in the new document not declassified by the Government—any

---

disclosed to detainees and, indeed, stressed that it was avoiding questions that were not presented.  *See id.* at 16-17 & n.5.

redactions must then be submitted to the Merits Judge for review.  *See* Order, No. 08-442, Jan. 30, 2009 (Dkt. No. 1569) at 2.   The process established by the January 30, 2009 Order, however, applies only in the circumstances where the declassification and timing criteria are established.  If those two criteria are not met, then the problematic provisions of the January 15, 2009 Order control, as was the case in *Alsawam*.

Under the system created by the January 15 and 30 Orders, the Privilege Review Team, subject in certain limited circumstances to the Merits Judge's review, is responsible for determining whether the compilation document may be disclosed to the petitioner.  However, the Privilege Review Team is not a classification authority; rather, it is a creation of the Protective Order and Counsel Access Procedures—a group of Department of Defense attorneys and intelligence or law enforcement personnel not otherwise taking part in proceedings involving the detainee—which is responsible for such tasks as inspecting incoming legal mail addressed to detainees for contraband, and identifying the classification level of information communicated by detainees to counsel based on guidelines provided by the relevant classification authority.  *See* Counsel Access Procedures ¶¶ 6, 12(c), 19, 21.  Therefore, by definition, the Privilege Review Team is not familiar with the context in which the detainees' statements were made, or the pending intelligence, law enforcement investigations or proceedings the disclosure of those statements might hinder.  Indeed, the Executive Branch agencies that control the information used in the Guantanamo Bay habeas cases have never authorized the Privilege Review Team to release that information in any form to the detainees or to conduct a declassification review of the information.  *See* Clapper Decl. at ¶¶ 3, 4, 6; Wells Decl. at ¶ 7; Hilton Decl.

Because the Privilege Review Team lacks authorization to declassify the classified or protected information of other Government agencies, it cannot release such information, even petitioner's own statements, to the petitioner.  Nor should the Court's January 15, 2009 Order override the judgment of the Executive Branch on this issue. *See, e.g.*, *Egan*, 484 U.S. at 530.  However, by the terms of the Court's January 15 Order, the Privilege Review Team is directed to review the compilation document created by petitioner's counsel and release that information to the detainee through classified channels.  *See* Order, No. 08-442, Jan. 15, 2009 (Dkt. No. 1569) at 2 (compilation document must be "marked, transported, handled, and maintained as classified material"). Such a regime conflicts directly with other relevant portions of the Protective Order and, more importantly, the Executive Order governing classified information.  *See* Protective Order ¶ 9 ("All classified documents, and information contained therein, shall remain classified until the documents bear a clear indication that they were declassified by the . . . original classification authority of the document or the information contained therein); Exec. Order 12958 at § 2.1 (b)(1) (persons reproducing, extracting or summarizing classified information must "observe and respect original classification decisions").  So too with any document subject to additional review under the Court's January 30 Order, where the Government has produced a declassified version of the underlying materials and there is sufficient time for the Merits Judge to adjudicate the issue.  That the classified derivative document could enter this review process only after declassification of the source materials does not remedy the problem.  Rather, the very determination of whether the new derivative document sufficiently corresponds to the declassified version of the source materials constitutes a judgment regarding the disclosure of classified information.  Thus, this process, like the process created by the January 15 Order, places

the Privilege Review Team and the Merits Judge—neither original classification

authorities—in the position of determining whether and how classified information

should be disclosed.   It is this very task—"weigh[ing] the variety of complex and subtle

factors in determining whether disclosure of information may lead to an unacceptable

risk"—which courts have repeatedly warned is properly vested in the Executive.  *See CIA*

*v. Sims*, 471 U.S. 159, 180 (1985).  Indeed, where a district court "perform[ed] its own

calculus as to whether or not harm to the national security . . . would result from

disclosure" of classified information, as the Merits Judges will be required to do under

the current construction of the Protective Order and Counsel Access Procedures, the D.C.

Circuit held that the court had improperly encroached upon functions entrusted to the

Executive Branch.  *Fitzgibbon*, 911 F.2d at 766; *see also Al Odah v. United States*, No.

05-5117 at **14-16 (D.C. Cir. Mar. 6, 2009) (ordering that, where petitioners' counsel

with a valid security clearance seeks access to material classified information redacted

from a factual return and counsel's access to that information is "necessary to facilitate

meaningful review," the district court must allow the Government an opportunity to

provide a substitute for that classified information).

      **B.**      **The proposed amendments would eliminate the separation of powers problems created by the current provisions of the Protective Orders.**

      Consistent with the longstanding practice of avoiding difficult constitutional

issues when possible, this Court should change the provisions of the Protective Orders

which implicate such troubling separation of powers issues.  *Cf. Jones v. United States*,

526 U.S. 227, 239 (1999) (holding that, if they can, courts must avoid "grave and

doubtful constitutional questions") (quoting *United States ex rel. Attorney General v.*

*Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)).  Respondents' proposed

amendments would solve the constitutional problems inherent in the current form of these provisions, while working no prejudice to petitioners' access to properly disclosable information.

Under the proposed amendments, petitioners' counsel would be permitted to disclose to a detainee only classified or protected information which counsel learns from that detainee during the course of communications with him.  To disclose any other sensitive national security information to a detainee, petitioners' counsel would be required to submit a written request identifying the classified information they seek to release, and the relevant classification authority would render a determination regarding whether the requested information may properly be disclosed to the petitioner.  This system would prevent the Privilege Review Team or the Merits Judges from having to substitute their own judgment for that of the classification authority regarding "the variety of complex and subtle factors [involved] in determining whether disclosure of information may lead to an unacceptable risk." *Sims*, 471 U.S. at 180.  Rather, this difficult and critical calculus would be left to the expert agencies constitutionally vested with the authority to make those determinations.  *See Egan*, 484 U.S. at 529 ("[c]ertainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such [an outside nonexpert] body determine what constitutes an acceptable margin of error in assessing the potential risk").

At the same time, the proposed amendments would not unduly delay petitioners' receipt of information.[5]  Respondents have been working diligently to complete the

---

[5]  If anything, the process established by the Court's orders is likely to delay petitioners' counsel from receiving unclassified information from the Privilege Review Team.  In addition to reviewing all detainee correspondence and notes across nearly 200 cases involving hundreds of counsel, the Court's orders have added a significant new burden to

declassification of materials containing petitioners' statements to United States

Government agents.  As discussed above, within DoD alone, over eighty personnel are

working fulltime to address declassification issues, and have already reviewed thousands

of documents for declassification.  *See* Clapper Decl. at ¶ 7.  At this point, DoD has

already declassified over 3,000 documents, and continues to work to expeditiously

declassify materials containing petitioners' statements to United States Government

agents.  *See id.*  Classification authorities at other agencies responsible for this

information have undertaken analogous processes.  Personnel from CITF are reviewing

documents as part of the DoD Declassification Review Team.  *See* Wells Decl. at ¶ 9.

Over 860 documents have already been cleared through this ongoing process.  *See id.*

Thus, as soon as practicable, petitioners' counsel will receive declassified or cleared

materials from which they may extract their respective clients' statements and disclose

those statements to their clients.  Amending the Protective Orders as respondents request

would in no way impede this process, but would address the problems currently inherent

therein.

---

the Privilege Review Team's responsibilities that was never contemplated by the
Protective Order.  Respondents have filed approximately 200 factual returns, many of
which total hundreds of pages, containing detainee statements.  Accordingly, if the
Court's orders stand, the Privilege Review Team will doubtless be burdened with scores
of requests to compare derivative compilation documents submitted by counsel.
Considering that the Government already has a declassification process in place, it would
be inefficient and counterproductive to require the Privilege Review Team to continue the
review process required by the Court's orders.

## CONCLUSION

For the reasons discussed above, respondents respectfully request that the Protective Orders be amended as reflected in Exhibit A.

Dated: March 11, 2009                    Respectfully submitted,


                                         MICHAEL F. HERTZ
                                         Acting Assistant Attorney General

                                         TERRY M. HENRY
                                         Assistant Branch Director


                                          */s/ Julia Berman*
                                         ANDREW I. WARDEN
                                         PAUL E. AHERN
                                         JULIA A. BERMAN (D.C. Bar No. 986228)
                                         Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Avenue, N.W.
                                         Washington, D.C. 20530
                                         Tel: (202) 616-8480
                                         Fax: (202) 616-8470
                                         Email: julia.berman@usdoj.gov
                                         Attorneys for Respondents