# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
IN RE:  GUANTANAMO )       Misc. No. 08-442 (TFH)
  BAY DETAINEE )
  LITIGATION )       Civil Action Nos.
)
) 02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1937, 04-cv-2022,
) 04-cv-2035, 04-cv-1254, 04-cv-2046, 04-cv-2215, 05-cv-0023,
) 05-cv-0247, 05-cv-0270, 05-cv-0280, 05-cv-0329, 05-cv-0359,
) 05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526, 05-cv-0569,
) 05-cv-0634, 05-cv-0748, 05-cv-0763, 05-cv-0764, 05-cv-0877,
) 05-cv-0883, 05-cv-0889, 05-cv-0892, 05-cv-0993, 05-cv-0994,
) 05-cv-0998, 05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124,
) 05-cv-1220, 05-cv-1347, 05-cv-1353, 05-cv-1429, 05-cv-1457,
) 05-cv-1458, 05-cv-1490, 05-cv-1497, 05-cv-1504, 05-cv-1505,
) 05-cv-1506, 05-cv-1509, 05-cv-1555, 05-cv-1592, 05-cv-1601,
) 05-cv-1602, 05-cv-1607, 05-cv-1623, 05-cv-1638, 05-cv-1639,
) 05-cv-1645, 05-cv-1646, 05-cv-1678, 05-cv-1704, 05-cv-1971,
) 05-cv-1983, 05-cv-2010, 05-cv-2088, 05-cv-2104, 05-cv-2185,
) 05-cv-2186, 05-cv-2199, 05-cv-2249, 05-cv-2349, 05-cv-2367,
) 05-cv-2370, 05-cv-2371, 05-cv-2378, 05-cv-2379, 05-cv-2380,
) 05-cv-2381, 05-cv-2385, 05-cv-2444, 05-cv-2479, 06-cv-0618,
) 06-cv-1668, 06-cv-1684, 06-cv-1758, 06-cv-1759, 06-cv-1765,
) 06-cv-1766, 06-cv-1767, 07-cv-1710, 07-cv-2337, 07-cv-2338,
) 08-cv-0987, 08-cv-1085, 08-cv-1101, 08-cv-1104, 08-cv-1153,
) 08-cv-1185, 08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224,
) 08-cv-1227, 08-cv-1228, 08-cv-1229, 08-cv-1230, 08-cv-1231,
) 08-cv-1232, 08-cv-1233, 08-cv-1235, 08-cv-1236, 08-cv-1237,
) 08-cv-1238, 08-cv-1310, 08-cv-1360, 08-cv-1440, 08-cv-1733,
) 08-cv-1805, 08-cv-2083, 08-cv-1828, 08-cv-1923, 08-cv-2019,
) 09-cv-0031, 05-cv-0765, 05-cv-0886, 05-cv-1234, 05-cv-2348,
) 06-cv-1725, 08-cv-1222, 09-cv-0745, 05-cv-0879, 05-cv-0891,
) 05-cv-1493, 05-cv-1667, 05-cv-1679, 06-cv-1675, 05-cv-1244,
) 08-cv-0864
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
RESPONDENTS' MOTION FOR RECONSIDERATION OF ORDERS REGARDINNG
DISCOVERY FROM THE GUANTANAMO REVIEW TASK FORCE
AND
MOTION FOR CONSOLIDATED ORDER REGARDING TASK FORCE DISCOVERY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      The Amended Case Management Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      The Guantanamo Review Task Force. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      The Court's Orders Regarding Discovery of Information from the Task Force. . . . . . . 11

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     EACH PETITIONER SHOULD BE GIVEN THE CHOICE OF PROCEEDING
       WITHOUT TASK FORCE DISCOVERY, OR OF RECEIVING EXCULPATORY
       EVIDENCE OR OTHER RESPONSIVE MATERIAL FROM THE DOCUMENTS
       CITED IN THE STAFF'S RECOMMENDATIONS TO THE REVIEW PANEL. . . . . 13

II.    BECAUSE COMPREHENSIVE REVIEWS OF TASK FORCE INFORMATION
       WOULD ENTAIL UNWARRANTED DELAYS AND COMMITMENTS OF
       GOVERNMENT RESOURCES, THEY SHOULD BE REQUIRED, IF AT ALL,
       ONLY IN CAREFULLY CIRCUMSCRIBED SITUATIONS. . . . . . . . . . . . . . . . . . . . 17

      A.    Given the Years-Long Efforts of the JIG and OARDEC To Collect
           Information on the Detainees, the Task Force is Unlikely To
           Possess New and Material Information in Amounts That Would
           Warrant Comprehensive Searches of Task Force Information. . . . . . . . . . . . . . 17

      B.    A Review of All Detainee Information Possessed or Accessible by the
           Task Force, and the Production Therefrom of Documents Subject to
           Respondents' Disclosure and Discovery Obligations, Could Take Four
           to Twelve Months, or More,  To Complete. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.   UNDER SEPARATION OF POWERS PRINCIPLES, THE TASK FORCE
       SHOULD NOT BE REQUIRED TO UNDERTAKE THE BURDEN OF
       IDENTIFYING ALL EXCULPATORY MATERIAL OR OTHER RESPONSIVE
       DOCUMENTS DISCOVERED DURING THE COURSE OF ITS DETAINEE
       REVIEWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## <u>INTRODUCTION</u>

Recently, several Members of the Court have entered orders requiring discovery of materials compiled by the Guantanamo Review Task Force ("Task Force").  The Task Force was established in accordance with the President's Executive Order to close the detention facilities at the Guantanamo Bay Naval Base by January 2010, and his instruction to determine the appropriate disposition of the individuals still held there, whether by transfer, release, or otherwise, consistent with the national security and foreign policy interests of the United States.

In response to the Court's orders, Respondents have given thorough consideration both to the Government's obligations in this litigation, and to the national security interests at stake. Respondents recognize the need for prompt resolution of these *habeas* cases, as required by the Supreme Court in *Boumediene*.  We also recognize the importance of providing the petitioners in these cases a meaningful opportunity to contest the facts relied on by the Respondents to justify their detention.  At the same time, however, due regard must be given to the enormous complexities presented by additional large-scale discovery of classified intelligence information, and the burdens it would place on the resources of the Government's national security apparatus. It is critical, too, that the Task Force be permitted to achieve the ultimate objective of the President's Executive Order, which is an exercise of discretionary executive branch authority designed to achieve a fair and expeditious disposition as to each individual detainee.

In an effort to address and balance all of these concerns, Respondents are today providing the Court with a comprehensive proposal for fair and rational access to additional discovery of information that the Task Force has compiled to perform its functions.  Respondents are also providing the Court with detailed information about the functioning of the Task Force and the information it has gathered, to permit the Court to make an informed assessment of the trade-offs

that such discovery inescapably involves.  First is the reality that compelling such discovery is

inevitably in tension with the desire to move these cases to resolution quickly.  As discussed

below, even with a significant commitment of additional resources, the Government could not

complete, for any substantial number of petitioners, comprehensive reviews of the Task Force's

principal database, and the production of exculpatory information found as a result, until well

into the fall.  Doing so, moreover, would place even greater demands than already imposed by

the discovery in these cases on the intelligence agencies that must clear discoverable information

for production.  And this time and effort would be invested with little promise of a sizeable

return, given the robust efforts that Respondents have already made to gather and produce

exculpatory material, and other discoverable evidence, in these cases.

In addition, for many petitioners, these efforts could be entirely unnecessary.  The Task

Force's staff is proceeding apace to complete its reviews within the time frame directed by the

President, and as of April 29, 1989, approximately 30 detainees had been approved for transfer

as a result of the review.  Thus, the Task Force process may obviate the need to litigate the

merits of *habeas* petitions in many cases.  Where it does so, it both serves justice and reduces the

burden of *habeas* litigation on the Court, petitioners, and Respondents.

Respondents respectfully submit that the Court's orders requiring discovery of

information from the Task Force – entered before the Court was informed of the Task Force's

activities and capabilities – do not achieve a workable balance of these objectives.   Respondents

therefore request that these orders be reconsidered, and withdrawn, in favor of a global proposal

that seeks to advance the interests of the Court and petitioners in reaching fair and expeditious

resolution of these cases, while at the same time ensuring a rational allocation of judicial,

3

executive branch and private resources, and preserving the Task Force's ability to complete its

critical mission.  Recognizing that in some cases petitioners and the Court may consider an

examination of evidence made available to the Task Force essential to the fairness of the

proceedings, while, in other cases, individual petitioners and the Court may view expedition as

more important than discovery from the Task Force, Respondents submit a proposal that would

give each petitioner the choice of proceeding in one of the following ways:

> **(1)    Proceeding Without Awaiting Discovery from the Task Force**
>
> If a petitioner determines that the prospective value of obtaining discovery from
>
> the Task Force does not merit delay in the adjudication of his petition until
>
> information could be made available upon completion of the staff's review of his
>
> case (as described below), then the petitioner may elect to have his case heard
>
> without awaiting any discovery from the Task Force; or
>
> **(2)    Discovery of Information Underlying the Recommendation of the Task
> Force Staff Regarding Disposition of the Detainee.**
>
> A petitioner desiring access to Task Force-related information may elect the
>
> production of such exculpatory evidence, and information falling within the scope
>
> of Respondents' other disclosure and discovery obligations under the amended
>
> Case Management Order, as may be cited in the written recommendation
>
> prepared by Task Force staff for the officials, known as the Review Panel,
>
> authorized to decide the proper disposition of the detainee.

As discussed below, given the pace at which the Task Force's review of the Guantanamo

detainees has proceeded to date, this approach (1) offers the possibility that no discovery of Task

Force information will be necessary in individual cases, because after the Review Panel's

consideration of the staff's recommendation, the detainee may be approved for transfer, or release; (2) offers the possibility that if the Task Force in fact possesses significant pieces of exculpatory information to which Respondents do not have access, they will be disclosed; and (3) ensures that responsive information *on which the Task Force itself will base its decisions* will be available for timely consideration by the Court as it adjudicates a petitioner's claims (assuming the petitioner himself so desires).

As also discussed in greater detail below, requiring comprehensive searches for and production of all exculpatory material in the Task Force's principal database cannot be squared with the Court's interest in expedition, and would significantly burden intelligence agencies that must clear discovered evidence for production.  For these reasons, the Court should hesitate to impose such requirements, and do so only in limited circumstances.  Thus, this third option should be ordered only on the following conditions.  First, as Judge Walton recently ordered in *Gherebi v. Obama*, Nos. 04-1164, 05-883, & 05-891, Order dated April 27, 2009 (Dkt. No. 221) at 5, petitioners seeking and obtaining such discovery cannot insist on rapid resolution of their *habeas* cases, a trade-off recognizing that discovery searches of the Task Force's main database would take a significant amount of time to complete.  Second, Respondents' obligation to produce discovery from the Task Force database should arise only after the Task Force's decision makers (the Review Panel) have determined that they do not intend to transfer, release, or prosecute the detainee.  In light of the burdens and delays associated with this discovery, this requirement ensures that Respondents, the Court, and counsel for the detainee do not expend scarce resources on discovery in a case whose merits may no longer have to be litigated, and at the same time advances the Government's strong interest in sequencing the Court's resolution of

cases with the Task Force's determinations in a manner consistent with the diplomatic objective of repatriating or resettling as many of the Guantanamo detainees approved for transfer or release as possible.

Finally, to the extent the Court's orders require that the Task Force itself identify and pass on potentially exculpatory information, those orders should be reconsidered and withdrawn because they are both unnecessary and unduly interfere with the President's efforts to exercise a wholly discretionary authority. Given its composition and the deadlines under which it is operating, the Task Force has neither the resources nor the time to review information to determine whether it is potentially exculpatory or otherwise responsive under various discovery orders in the habeas case. Equally important, the United States is pursuing a carefully coordinated diplomatic strategy to maximize the prospects for repatriating or resettling detainees whose transfer or release is approved. The Task Force's work – including the order in which it reviews detainees – needs to be synchronized with this diplomatic effort and cannot be altered in accordance with discovery obligations in pending litigation. Thus, in any case in which the Court determines that additional discovery beyond that afforded by Respondents' proposal is necessary, such discovery can and must be conducted by Respondents' *habeas* counsel.

For these reasons, as elaborated below, Respondents' request for reconsideration of the Court's orders regarding discovery of information from the Task Force, and for entry of a consolidated order embodying Respondents' proposal for access to Task Force information, should be granted.

## BACKGROUND

### The Amended Case Management Order

Judge Hogan first entered the consolidated Case Management Order (CMO), to establish a framework for the litigation of these cases, in November 2008 (Dkt. No. 940 in 08–mc-0442). The initial CMO, §§ I.D.1, I.E.1, directed the Government to produce, *inter alia*, "all reasonably available" exculpatory evidence "in its possession"; and any documents or objects referenced, or petitioners' statements relating to information contained, in the Government's factual returns. As the Court is aware, because these automatic disclosure and discovery provisions would have required government-wide searches for responsive information, and line-by-line reviews of classified information contained in responsive documents to clear them for production, Respondents moved for reconsideration of these provisions. *See* The Government's Motion for Clarification and Reconsideration, [etc.] (Dkt. No. 1004 in 08-mc-0442) ("Motion for Reconsideration of CMO"). In so doing, Respondents observed that such government-wide searches were not justified in light of the consolidated assemblages of detainee information that had already been made available to the *habeas* litigation team by DOD's Joint Intelligence Group of Joint Task Force-Guantanamo (the JIG), and the Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) – information on which Respondents themselves had almost exclusively relied in preparing their factual returns.

In response to these well-founded submissions, Judge Hogan modified his initial order, first limiting Respondents' obligation to produce exculpatory information to evidence reviewed by attorneys preparing the factual returns, and "any other evidence the government discovers while litigating" these cases. Order dated December 16, 2008 (Dkt. No. 126 in 08-mc-0442)

("Amended CMO"), § I.D.1.  Judge Hogan also limited Respondents' obligation to produce petitioner statements, and other documents and objects, to those "the government relies on to justify detention."  *Id.*, § I.E.1.  In this fashion, Judge Hogan relieved the government of any obligation to engage in the time-consuming (and unwarranted) searches for exculpatory materials and other evidence across multiple agencies.

In accordance with the Amended CMO, the *habeas* litigators assigned to each case conducted systematic searches of the information gathered and reviewed in preparing all factual returns, including detainee information provided by the JIG and OARDEC, and in each case produced information found that tends materially to undermine evidence that Respondents intend to rely upon to support the petitioner's detention.  Moreover, the *habeas* team conducted still further searches within this collection for evidence that would materially undermine the credibility and/or reliability of any of the more than 300 fact witnesses Respondents rely on in these cases.  Respondents have also produced other exculpatory evidence of which the habeas litigators have become aware while litigating these cases, as required by the Amended CMO.[1]

**The Guantanamo Review Task Force**

On January 22, 2009, President Obama issued Executive Order No. 13,492, directing that the detention facilities at the Guantanamo Bay Naval Base be closed within one year, "consistent with the national security and foreign policy interests of the United States and the interests of justice . . . ."  Executive Order No. 13,492, § 3 & preamble, 74 Fed. Reg. 4897 (Jan. 27, 2009).

---

[1]  As required by orders of various Members of the Court in particular cases, Respondents have conducted additional searches for exculpatory information in files compiled by various components of DOD, the CIA, and the FBI, producing any information located that would tend materially to undermine evidence on which Respondents rely, or the credibility of their witnesses.

To that end, the President directed the Attorney General and other senior officials to review the status of each individual detained at Guantanamo Bay and to determine, with respect to each, whether to transfer or release the individual, to prosecute him, or to pursue an alternative lawful disposition. *Id.*, § 4(c), 74 Fed. Reg. at 4898-89.

As part of this review, the Attorney General was also directed to assemble, "to the extent reasonably practicable," "all information in the possession of the Federal Government that pertains to any individual currently detained at Guantanamo and that is relevant to determining the proper disposition of any such individual." *Id.* The Attorney General, in turn, established the Task Force to assemble and examine relevant information and make recommendations regarding the proper disposition of Guantanamo detainees. Declaration of Matthew G. Olsen, dated April 16, 2009 (Dkt. No. 155-2 in 05-cv-1224) ("First Olsen Decl."), ¶¶ 4-6. The Task Force consists of interagency review teams with members drawn from various agencies, including the Department of Defense (DOD), the Department of State, the Department of Justice (DOJ), the Department of Homeland Security, and various elements of the intelligence community. *Id.*, ¶ 7.

Because the government has no pre-existing, consolidated repository of all information concerning Guantanamo Bay detainees, the Task Force initiated an effort, which is now nearing completion, to gather for its members' use the disparate information that various national-security, law-enforcement and intelligence agencies maintain on the detainees. First Olsen Decl., ¶¶ 9, 12. Information contributed by these agencies – DOD, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), DOJ, the National Security Agency (NSA), the National Counter-terrorism Center (NCTC), and the State Department – has been

9

uploaded directly into a database on the Task Force's stand-alone computer network, known as the TF Network. *Id.,* ¶ 11; Second Declaration of Matthew G. Olsen, dated May 12, 2009 (filed herewith) ("Second Olsen Decl."), ¶¶ 6, 8.  The current size of the database stands at 1.8 million pages of material, principally including military and intelligence reporting; records of DOD Combatant Status Review Tribunal (CSRT) and Administrative Review Board (ARB) proceedings concerning individual detainees; finished intelligence reports regarding particular groups of detainees or the Guantanamo detention population as a whole; files maintained on various detainees by DOD's Office of Military Commissions (OMC); information concerning potential destination countries for detainees approved for transfer or release; and DOJ's own database of information compiled in the course of litigating these cases.  *Id.*, ¶ 8.

In addition to the database housed on the TF Network, Task Force staff have access to a number of external agency networks.  For example, all Task Force members have access to the Joint Detainee Information Management System (JDIMS), a dedicated database of detainee information maintained by DOD, and the database previously maintained for OMC. Task Force members also have access to general intelligence databases maintained by a number of the same agencies that contributed information to the TF Network database, in which information concerning the individuals detained at Guantanamo can also be found.  Second Olsen Decl., ¶ 9.

To date, the Task Force has assembled a staff of approximately 56 persons (apart from administrative staff) for purposes of conducting the reviews of individual detainees mandated by the President's Executive Order.  They are grouped into transfer/release teams, responsible for determining which detainees should be recommended for transfer or release; and prosecution teams, responsible for determining which detainees should be recommended for prosecution.

After completing their reviews these teams prepare written recommendations, in consultation with the Executive Director of the Task Force, who submits the recommendations to a Review Panel composed of sub-cabinet level officials authorized to decide the disposition of individual Guantanamo detainees.  Second Olsen Decl., ¶ 10.

The members of the transfer/release teams are drawn from a variety of backgrounds including intelligence analysts, FBI agents, military personnel, representatives from the Departments of Defense, State, and Homeland Security, and attorneys from DOJ.  Second Olsen Decl., ¶ 11.  Transfer/release teams typically evaluate detainees in groups, by country of origin, in light of various country-specific considerations that can be relevant to their disposition.  *Id.,* ¶ 12.  The teams are responsible for culling and reviewing all the information about a detainee available to the Task Force, as expeditiously as possible.  *Id.*  The evaluation focuses on the degree of threat the detainee poses to the national security of the United States, and on potential destination countries where it may be possible to transfer or release the detainee in the event that such disposition is deemed appropriate.  *Id.*  The order in which detainee groups are reviewed is coordinated with the State Department's diplomatic efforts, so as to maximize the number of detainees approved for transfer or release who can be repatriated, or resettled.  *Id.,* ¶¶ 26-27.

The transfer/release teams are instructed to consider the totality of available information regarding a detainee, including its credibility and reliability, and to carefully scrutinize the basis for any conclusions set forth in prior threat assessments, intelligence reporting, and other information related to the detainee.  Second Olsen Decl., ¶ 12.  The focus of the team's evaluation is on the degree of the threat the detainee poses to national security, as well as identifying potential destination countries for transfer or release.  *Id.*  Based on experience to

11

date, it takes approximately three to four weeks for a transfer/release team to assemble a package of approximately 6-10 recommendations for submission to the Review Panel. *Id., ¶* 14. These packages are prepared and submitted to the Review Panel on a rolling basis. As of April 29, 2009, the Task Force staff had completed recommendations and the Review Panel had issued decisions to transfer approximately 30 detainees. *Id.*

The prosecution teams on the Task Force are staffed predominantly by federal prosecutors, but also include several military prosecutors, investigative agents, and intelligence analysts. Second Olsen Decl., ¶ 15. The prosecution teams review detainees who have not been or are unlikely to be approved for transfer or release, in order to determine whether prosecution of each detainee is feasible. *Id.* Given the novel and complex legal and evidentiary issues that prosecution of these detainees would pose, recommendations by the prosecution teams generally take longer to complete than the evaluations conducted by transfer/review teams. *Id.*, ¶¶ 16-17.

**The Court's Orders Regarding Discovery of Information from the Task Force**

In recent weeks, Members of the Court have entered orders in various *habeas* cases requiring Respondents to produce information collected by the Task Force. Some of these orders require that information "collected," "compiled," or "obtained" by the Task Force must be reviewed for exculpatory evidence or other information subject to Respondents' discovery and disclosure obligations under the Amended CMO; or, to the same effect, must be presumed or considered "reasonably available" for purposes of automatic disclosure or discovery under §§ I.D.1 and/or I.E.1 of the CMO, or as otherwise ordered by individual Members of the Court.[2]

---

[2] *See*, *e.g.*, Dokhan v. Obama, 08-987 (JDB), Mar. 4, 2009 (Dkt No. 89); Khan v. Obama, 08-1101 (JDB), Mar. 4, 2009 (Dkt No. 85); Zaid v. Obama, 05-1646 (JDB), Feb 9, 2009 (continued...)

Others appear to require, in effect, that the Task Force pass on to Respondents for review and production any exculpatory material or other discoverable evidence that is "identified" or "discovered" by the Task Force staff as they conduct their reviews.[3]

## DISCUSSION

In light of the President's mandate to the Task Force to assemble all information in the Government's possession that pertains to the detainees, orders requiring Respondents to explore this body of information for evidence bearing on the proper resolution of these cases are understandable, and Respondents do not lightly ask the Court to reconsider those orders. But the unyielding reality of the situation is that comprehensive reviews and production of information that the Task Force has assembled could take four to twelve months, if not more, to complete, delays that are not justified in light of the consolidated assemblage of JIG and OARDEC files that is already accessible by Respondents' counsel. In lieu of these orders, therefore, we

---

[2] (...continued)
(Dkt. No. 146); Hamlily v. Obama, 05-763 (JDB), Feb. 27, 2009 (Sealed Order); Alhami v. Obama, 05-359 (GK), May 11, 2009 (Dkt. No. 189); Razak v. Obama, 05-1601 (GK), May 11, 2009 (Dkt. No. 209); Abdah v. Obama, 04-1254 (HHK), April 8, 2009 (Dkt. No. 477); Alsawam v. Obama 05-1244 (CKK), April 6, 2009 (Dkt. No. 158); Alsawam v. United States, 05-1244 (CKK), April 17 (Dkt. No. 156) Al Odah v. United States, 02-828 (CKK), April 7, 2009 (Dkt. No. 531); Omnibus Order (05-520, 05-526, 05-993, 05-1220, 05-1429, 05-1607, 05-1983) (RMU), April 23, 2009 (Dkt. No. 144 in 05-1983); Amended Omnibus Order (06-1767, 08, 1237, 08-1805, 08-1828) (RMU), April 23, 2009 (Dkt. No. 145 in 05-1983).

[3] *See, e.g.*, Al Halmandy v. Obama, 05-2385 (ESH), April 27, 2009 (Dkt. No. 238) (ISN 900); Ameziane v. Obama, 05-392 (ESH), April 30, 2009 (Dkt. No. 198); Al Halmandy v. Obama, 05-2385 (ESH), April 30, 2009 (Dkt. No. 242) (ISN 570) and Al Halmandy v. Obama, 05-2385 (ESH), April 30, 2009 (Dkt. No. 243) (ISN 078); Al Halmandy v. Obama, 05-2385 (ESH), May 4, 2009 (Dkt. No. 245) (ISN 510); Zuhair v. Bush, 08-864 (EGS), May 1, 2009 (Dkt. No. 179); Omnibus Order, (04-1164, 05-883, 05-891, 05-999, 05-1493, 05-1667, 05-2104, 05-2386, 06-1675, 06-1690, 07-1710, 08-2019) (RBW), April 27, 2009 (Dkt. No. 221 in 04-1164).

respectfully submit that the Court should enter a consolidated order extending to each petitioner

the choice, either of (1) proceeding without any discovery of information from the Task Force;

(2) proceeding with discovery limited, at least in the first instance, to the information cited in the

recommendation regarding his transfer, release, or other disposition that the Task Force staff

prepares for the Review Panel.

Respondents submit that this proposal strikes a fair, appropriate and rational balance

between the competing interests implicated by any discovery of information acquired by the

Task Force.  It takes into account the extensive efforts Respondents have made to produce

pertinent information assembled over a period years by OARDEC and the JIG; the time required

to perform comprehensive searches for and to produce discoverable information from the Task

Force's database(s); and the important benefits of sequencing discovery of Task Force

information with the Task Force's own efforts, which hold out the prospect of eliminating the

need for such laborious efforts in a substantial number of cases.  At the same time, it insulates

the Task Force from demands of litigation that could jeopardize the success of its critical

mission.  Thus, Respondents' proposal balances the need for prompt adjudication of these cases

with due regard for the delays, and the extraordinary, perhaps unnecessary commitment of

additional Government resources, that comprehensive searches of the information the Task Force

has acquired would entail, as well as the importance of preserving the Task Force's autonomy.

I.     **EACH PETITIONER SHOULD BE GIVEN THE CHOICE OF PROCEEDING WITHOUT TASK FORCE DISCOVERY, OR OF RECEIVING EXCULPATORY EVIDENCE OR OTHER RESPONSIVE MATERIAL FROM THE DOCUMENTS CITED IN THE STAFF'S RECOMMENDATIONS TO THE REVIEW PANEL.**

As a preferable alternative to months-long reviews of the TF Network database that

would significantly slow the progress of these cases, individual petitioners could be given the

14

choice of two options.  First, if a petitioner decides that it is not worth waiting until information

can be made available in accordance with Respondents' proposal, then he may elect to have his

case heard without discovery from the Task Force.  Second, a petitioner who desires information

from the Task Force could choose the option of receiving exculpatory evidence, and information

otherwise subject to disclosure under the Amended CMO, that is cited in the Task Force's

written recommendation regarding his release, transfer, or other appropriate disposition.  In a

given case, once the Task Force staff has prepared its recommendation to the Review Panel, the

documents actually relied upon by the staff in making its recommendation could be made

available for review by the *habeas* team attorneys assigned to the detainee's case, and

exculpatory material – if any – and other documents falling within the scope of Respondents'

discovery or disclosure obligations, could then (subject to clearance by the interested agencies,

and to the extent not already made available) be produced.

For detainees who elect this option, this approach would ensure the relatively expeditious

discovery of the information with which the Task Force's decision-makers themselves are

presented.  As of April 29, 2009, the Task Force had already approved the transfer of

approximately 30 detainees.  Second Olsen Decl., ¶ 14.  Moreover, because the number of

documents cited by Task Force review teams in its recommendations will in all likelihood be

much smaller than the number retrieved by broad-based discovery searches of the Task Force's

database, the volume of classified information that will have to be cleared for production, and

therefore the time required to do so, will also be correspondingly reduced.  For these reasons,

responsive, non-duplicative documents cited by the Task Force staff in its recommendations

could in all likelihood be produced in advance of the time that an additional cadre of attorneys

could complete searches of and produce information from the Task Force's database(s) on Respondents' behalf. What is more, expressly sequencing discovery of Task Force information with the completion of the staff's recommendations makes it more likely that Review Panel decisions to release or transfer detainees could be communicated to the Court before adjudication of their petitions on the merits becomes necessary.

Of course, a review limited to evidence cited by Task Force staff in its recommendations to the Review Panel would not be the equivalent of a full-scale search of the TF Network database. The mandate to the Task Force staff is, indeed, to consider the totality of available information regarding each detainee, including the information's credibility and reliability, and accordingly to take exculpatory information into consideration when making their evaluations. Second Olsen Decl., 12. But in some cases, the staff's recommendation may not turn so much on the lawfulness of the petitioner's detention as on considerations of national security and foreign policy that bear on the questions of transfer and release. *Id.*, ¶ 30. For example, a transfer/ release team may determine that a detainee is appropriate for transfer based on an assessment of his potential threat, and not focus on the legal sufficiency of the evidence to support his detention. As a result, exculpatory evidence may not figure prominently, if at all, in the staff's recommendations in some cases.

Nevertheless, the Task Force's mandate to consider the totality of available information, to carefully scrutinize the basis for prior conclusions, and to consider the credibility and reliability of information underlying those conclusions, Second Olsen Decl., ¶ 12, means that review of information provided to the Review Panel offers the prospect of revealing significant new pieces of exculpatory information pertaining to a given detainee, if in fact the Task Force

16

possesses any, providing an additional measure of discovery in such situations.  In all events,

however, Respondents' proposal should ensure that the Court is not put in the position of

deciding a petition unaware of exculpatory or otherwise responsive evidence that has been

brought to the Review Panel's attention.

        In considering this approach, the Court (and petitioners) must also remain mindful that

the Task Force was established for the sole purpose of carrying out a unique and time-sensitive

mission of national security on behalf of the President.  Second Olsen Decl., ¶ 19.  To perform

that mission most effectively, the Task Force staff is reviewing detainees' cases on a rolling

basis in accordance with diplomatic considerations and initiatives (undertaken in accordance

with § 5 of the President's Executive Order) that the State Department has determined will

provide the best opportunity for the appropriate transfer or release of individuals held at

Guantanamo Bay within the time frame the President has directed.  *Id.*¶ 27.  Accordingly, the

imposition of litigation deadlines that supersede the diplomatic timetable around which the Task

Force's reviews are scheduled could severely compromise the prospects for success of its efforts,

in derogation of the President's authority in the realm of national security and foreign affairs.

*See  Center for Arms Control and Non-Proliferation v. Pray*, 531 F.3d 836, 843-44 (D.C. Cir.

2008). Petitioners who are unwilling to await completion of the Task Force's recommendations

to the Review Panel must therefore choose to move forward to a decision on their *habeas* claims

without receiving discovery from the Task Force.

II.     **BECAUSE COMPREHENSIVE REVIEWS OF TASK FORCE INFORMATION WOULD ENTAIL UNWARRANTED DELAYS AND COMMITMENTS OF GOVERNMENT RESOURCES, THEY SHOULD BE REQUIRED, IF AT ALL, ONLY IN CAREFULLY CIRCUMSCRIBED SITUATIONS.**

In light of the advantages that Respondents' proposal offers for the prompt adjudication of these cases with the benefit of the same information presented to the Task Force's decision-makers, Respondents respectfully submit that the Court should reconsider, and withdraw, its orders requiring immediate comprehensive searches of the Task Force's database(s) (*see* nn. 2-3, *supra*).  Given Respondents' prior efforts to produce exculpatory evidence and other responsive documents from the files provided by JIG and OARDEC, comprehensive searches on that scale are unlikely to result in sufficiently appreciable increases in material evidence, not already produced to petitioners in one form or another, that would justify the delays such searches would entail, or the costs they would impose on the resources and operational capabilities of the national security and intelligence agencies involved.  Should the Court nonetheless require such reviews, Respondents contend that they should be carefully circumscribed to avoid unnecessary delay in these *habeas* cases, and unnecessary expenditure of scarce Government resources.

A.     **Given the Years-Long Efforts of the JIG and OARDEC To Collect Information on the Detainees, the Task Force is Unlikely To Possess New and Material Information in Amounts That Would Warrant Comprehensive Searches of Task Force Information.**

As is explained above, apart from the materials provided to the Task Force by the DOJ *habeas team*, the TF Network database principally contains information from DOD, the CIA, the FBI, the NSA, and NCTC.[4/]  Second Olsen Decl., ¶ 6.  Much of this information is likely

---

[4/]     The State Department provided the Task Force with information concerning potential destination countries for detainees that the Review Panel approves for transfer or release.

(continued...)

18

duplicative or cumulative of the materials the DOJ *habeas* team has already reviewed. For example, DOD provided the Task Force with copies of Respondents' factual returns, the JIG and OARDEC files made available to DOJ for the purpose of creating the returns, and information collected by OARDEC in preparation for CSRT and ARB proceedings, of which the most pertinent evidence (including exculpatory evidence) should already have been included in the CSRT and ARB records provided to the *habeas* team. *See* Olsen Decl., ¶ 8; Declaration of Joseph A. Benkart, dated May 7, 2009 (filed herewith) ("Benkart Decl."), ¶¶ 10, 13(c).

Likewise, the FBI provided the Task Force with copies of the materials it compiled for the *habeas* litigation team, and information provided to OARDEC for purposes of CSRT proceedings, records of which OARDEC has since made available to DOJ's *habeas* litigation team. Declaration of Arthur M. Cummings, dated May 1, 2009 (filed herewith) ("Cummings Decl."), ¶ 6(a), (c). The finished intelligence products provided to the Task Force by the Defense Intelligence Agency, *see* Second Olsen Decl., ¶ 8, also would have been made available to OARDEC, and the JIG. Benkert Decl., ¶ 13(c). The NCTC provided certain intelligence information and analyses, but as the NCTC's mission is not to gather new intelligence but to integrate and analyze counter-terrorism intelligence obtained by other agencies, these materials are unlikely to contain new information not previously accessible through the JIG and OARDEC files assembled by the *habeas* team. Second Olsen Decl., ¶ 8; Declaration of John F. Hackett, dated May 7, 2009 ("Hackett Decl."), ¶¶ 13-14. Even in the context of domestic criminal prosecutions where *Brady v. Maryland*, 373 U.S. 83 (1963), applies, once the government has

---

[4]/ (...continued)
Second Olsen Decl., ¶ 8. This is an unlikely source of information that bears meaningfully on the lawfulness of petitioners' detention.

disclosed exculpatory information in its possession, it has no obligation to continue making further cumulative and duplicative disclosures once the "essential facts" are made known. *See United States v. Blackley*, 986 F. Supp. 600, 605-05 (D.D.C. 1997); *see also United States v. Bond*, 512 F.3d 1092, 1096-97 (9th Cir. 2009).

It is true that the TF Network database contains information from sources that have not been made available to Respondents, including OMC (which received information from the FBI, CIA, and DOD), and the NSA. Second Olsen Decl., ¶8 ; Cummings Decl., ¶ 6(b). But for purposes of creating factual returns, producing exculpatory evidence, and meeting Respondents' other discovery obligations under the Amended CMO, the *habeas* litigation team has already obtained and repeatedly combed through the records of petitioners' CSRT and ARB proceedings, compiled over four years' time (and with hundreds of thousands of hours of effort) by OARDEC, and pertinent intelligence information culled on each petitioner from the intelligence community at large, after thousands of hours of effort, by the JIG. Benkert Decl., ¶¶ 4-8. As Respondents explained to Judge Hogan in seeking reconsideration of the initial CMO — and as is still the case today — the detainee information compiled by OARDEC and the JIG is among the most complete and readily available, given the long-term involvement of both offices in searching for, collecting, and evaluating information on the Guantanamo detainees. *See* Benkert Decl., ¶¶ 5, 14. The chances, accordingly, that wide-ranging searches of the TF Network database would significantly enhance the body of material evidence available to petitioners are not nearly so great as to justify the costs in time and resources that those searches would impose.[5]

---

[5] [REDACTED: The information in this footnote is classified and reflects certain information contained in Respondents' *ex parte* submissions to the Court.]

The same is true with respect to the additional agency databases to which the Task Force has access.  For example, DOD provides the Task Force with access to the Joint Detainee Information Management System ("JDIMS"), Second Olsen Decl., ¶ 9, the consolidated database of detainee information maintained by the JIG, from which the files provided to the *habeas* team were culled, *see* Benkert Decl., ¶ 13(b).  Certain personnel on the Task Force staff also have access to databases maintained by the NCTC, which, as noted above, does not itself collect intelligence information.  Also, certain Task Force staff may conduct searches within the FBI's Automated Case Support System (ACS) and Investigative Data Warehouse (IDW) — which, as Respondents pointed out last fall, *see* Motion for Reconsideration of CMO, *supra*, at 9, were encompassed within the scope of the initial CMO, but which Judge Hogan, in the final analysis, did not require Respondents to search, in apparent recognition that broad-based searches of these systems promised only marginal increases in distinct information that did not warrant the investment of time and resources required.  *See* Cummings Decl., ¶¶ 7, 9-14.

Although the Task Force also has access to the database of detainee information once maintained by OMC, and databases belonging to the CIA, Second Olsen Decl., ¶ 9, the logic embodied in Judge Hogan's amended Case Management Order – that the costs, in time and resources, of discovery from such sources outweighs the potential benefits – still applies.  It would be just as time-consuming and resource-intensive, if not more so, to search these additional databases now as it would have been last fall, when Judge Hogan declined to sweep databases beyond the JIG and OARDEC files, within the scope of Respondents' discovery obligations.

**B.     A Review of All Detainee Information Possessed or Accessible by the Task Force, and the Production Therefrom of Documents Subject to Respondents' Disclosure and Discovery Obligations, Could Take Four to Twelve Months, or More, To Complete.**

The Court is properly committed, as are Respondents, to a prompt hearing of the petitioners' cases.  The petitioners are entitled to nothing less.  *Boumediene,* 128 S. Ct. at 2275.  Unfortunately, a requirement that information "collected," "compiled," or "obtained" by the Task Force be reviewed for exculpatory evidence or other information subject to Respondents' discovery obligations, or, equivalently, instructions that information compiled by the Task Force must be considered "reasonably available" for purposes of automatic disclosure or discovery under §§ I.D.1 and/or I.E.1 of the CMO, *see* n. 2, *supra* (and orders cited therein), cannot as a practical matter be reconciled with that important objective.

The Task Force's principal database, the TF Network, contains nearly two million pages of material.  *Supra* at 9; Second Olsen Decl., ¶ 8.  Members of the Task Force staff have access to a number of additional databases of intelligence information maintained by agencies that have contributed information to the Task Force, including the CIA, DOD, the FBI, NSA, and NCTC.  *Id.*, ¶ 9.  Respondents estimate that, even with a commitment of significant additional government resources, a comprehensive search for and production of exculpatory information from just the TF Network database – without also searching the additional agency databases to which the Task Force has access, *and* without also searching for information subject to discovery under §§ I.E.1 and I.E.2 of the Amended CMO – would take four to twelve months to complete.  Declaration of Thomas J. Perrelli, dated May 12, 2009 (filed herewith) ("Perrelli Decl."), ¶ 5.[6]

---

[6]  Mr. Perrelli's declaration is not being filed in cases from which he is recused based on
(continued...)

As a threshold matter, a comprehensive review, even of the TF Network database alone, would require the assignment of 10-20 additional attorneys to the task of searching the TF Network database.  Perrelli Decl., ¶ 7.  In the coming weeks and months, the Justice Department's existing team of approximately 50 *habeas* litigation attorneys must complete responses to hundreds of outstanding discovery requests and orders; file more than 100 briefs on pending or soon-to-be-filed motions; assist in declassifying approximately 50 factual returns and/or petitioners' statements; prepare for and attend dozens of hearings, including roughly 25 merits hearings; and respond to multiple requests regarding counsel access, among others.  *Id.*, ¶ 6.  They could not undertake to review so large a database for exculpatory information pertaining to the cases of 200 individual detainees (including evidence bearing on the credibility of hundreds of additional witnesses), while continuing at the same time to discharge their myriad other responsibilities in these cases.  *Id.*[7]/

Nor can the Task Force be called upon to conduct comprehensive searches of the TF Network database for purposes of conducting discovery in the *habeas* cases.  The Task Force's review teams are already operating under acute time pressure to complete the painstaking effort of sifting through the available intelligence on each detainee so their review may be completed,

---

[6]/ (...continued)
his prior employment with Jenner & Block LLP, which represents some petitioners.  During his time at Jenner & Block, Mr. Perrelli did not work on any matters related to the Guantanamo Detainee Litigation.

[7]/ The Court is familiar by now with Respondents' position that petitioners enjoy no constitutional or statutory right to discovery that requires Respondents to conduct open-ended searches for evidence on a scale contemplated by the Court's orders to perform searches of the TF Network database.  *See, e.g.,* Motion for Reconsideration of CMO, at 8, 12-13.  Although Respondents will not repeat those arguments here, we continue to maintain that discovery of that magnitude is inappropriate in these wartime *habeas* cases.

as the President has directed, in time to close the detention facilities at Guantanamo Bay by
January 2010.  Second Olsen Decl., ¶¶ 19-21.[8]  Diverting the staff from their assigned duties to
the business of conducting discovery searches in over 150 *habeas* cases would seriously threaten
the Task Force's ability to complete the prompt review of the remaining detainees that the
President has found is necessary to the national security and foreign policy interests of the
United States, and for which the Task Force (at the President's direction) was created.  *Id.,* ¶ 2.
Conscripting the Task Force for purposes of discovery thus risks "impermissible interference"
with its "mandate to 'advis[e] the President in the discharge of his constitutional authority . . . to
conduct foreign relations [and] protect national security.'"  *Pray*, 531 F.3d at 843-44 (citation
omitted); *see infra*, at 28-30.

        To conduct searches of the TF Network database as required by the Court's orders would
therefore require nearly a month's preparation at the outset to assemble a team of 10-20
additional attorneys, with appropriate security clearances, who can be reassigned from their
current duties and responsibilities to the task of searching the TF Network database.  Perrelli
Decl., ¶ 8.  Once the necessary team of attorneys is assembled, the process would involve the
assignment of a particular petitioner's case to a search attorney,[9] who would have to spend at

_____

    [8]  The Task Force staff, most of whom are not attorneys, *see supra* at 10, are also
unfamiliar with the prior proceedings in individual *habeas* cases; the particular facts, supporting
evidence, and witnesses that Respondents have chosen to rely upon in the litigation as the basis
for detaining a petitioner; the specific issues of exculpatory evidence, and witness credibility,
that have arisen; and the terms of outstanding orders for discovery.  Second Olsen Decl., ¶¶ 22-
25.

    [9]  As an additional threshold matter, because 10-20 attorneys could not simultaneously
conduct searches on 200 petitioners, the Court, Respondents, and petitioners would have to
arrive at a global formula for sequencing searches of the database, perhaps according to the order
(continued...)

least a day's time reviewing the record of the case, and consulting with the litigating attorneys on the case, to ensure that he or she is sufficiently familiar with the facts and witnesses involved to construct appropriate sets of search terms, and, critically, to recognize potentially exculpatory evidence that the search may turn up. *Id.*, ¶ 9.

Based on prior experience in this litigation, and on test searches of the TF Network database pertaining to several detainees that yielded between several hundred and tens of thousands of "hits" (documents), Respondents estimate that the searching attorney would thereafter need to spend at least several days at the Task Force's facility to run the necessary searches and review the documents retrieved. Perrelli Decl., ¶¶ 7, 9. Further time might have to be spent in consultation with the litigating attorneys to ensure that appropriate determinations are made about the exculpatory nature of particular documents and information. *Id.*, ¶ 9. All told, depending on the factual complexities of a given case, and the number of witnesses Respondents rely on (for whom credibility searches must also be conducted), a search of the Task Force's principal database for exculpatory evidence in a given case could take one to two weeks (5-10 days) of attorney time. To repeat this process for each of approximately 200 petitioners would require 200-400 weeks of attorney time, meaning that the search of the database (assuming 10-20 attorneys could be quickly dedicated to the task full-time) would take 10-40 weeks, or two to nine months, once begun, for all 200 petitioners. *Id.*, ¶ 10.[10]

---

[9] (...continued)
in which the petitioners' cases were filed, with some consideration given to other criteria such as scheduled merits briefing and/or merits hearings.

[10] There are approximately 150 petitions that are currently "active," while approximately 50 additional petitions are currently stayed. It is unclear whether or when the

(continued...)

To this time must be added, moreover, the time required to clear any classified evidence of an exculpatory nature for production to petitioners' counsel.  The great majority of the information contained in the TF Network database is classified, some at very high levels.   First Olsen Decl., ¶ 15.  As the Court appreciates, once exculpatory materials are identified, each document, regardless of whether the information it contains is cumulative, duplicative, or has already been produced in some other form, must nevertheless be forwarded to the agency (or agencies) that originated the classified information contained therein for a determination of whether that information may be disclosed to petitioners' counsel, or must be withheld even from properly cleared counsel and/or the Court.  Perrelli Decl., ¶ 11.  This is a painstaking process of line-by-line review and redaction, necessitated by the Government's responsibility to ensure that "information bearing on national security" is appropriately protected from harmful disclosure, *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988), and which we estimate, based on prior experience in this litigation, can take from one week to 60 days to complete, depending on the amount, sources, and sensitivity of the classified information the document contains. Perrelli Decl., ¶¶ 11-12.  Although responsive documents can be cleared on a rolling basis in parallel with searches of the database, given the volume of cumulative classified information that searches on this order of magnitude could generate, it could take an additional 30-60 days after the searches have been completed before all documents containing exculpatory material could be cleared for production.  *Id.*, ¶ 12.

---

10/  (...continued)
Court will lift the stays on these petitions.

Moreover, even though DOD, CIA, and other intelligence agencies have already devoted scores of attorneys, agents, and intelligence analysts to the clearance of information in the *habeas* litigation, the extraordinarily high volume of classified information that Respondents are required to produce under the numerous discovery orders the Court has issued in this litigation has already taxed the capacities of these teams to comply in a timely fashion with Respondents' current discovery obligations while adequately protecting national security information from improper disclosure. Because these agencies have only a limited number of classification officers with the necessary training and subject matter expertise, the need to clear still larger volumes of documents generated by comprehensive searches of the TF Network database would compel them to divert additional agents and analysts from their intelligence-gathering activities and other operational tasks. *See, e.g.,* Cummings Decl., ¶¶ 15-16; Benkert Decl., ¶¶ 15-16; Declaration of Leon Panetta, Director, Central Intelligence Agency, dated May 12, 2009 (filed *ex parte, in camera*). This is the type of litigation-driven diversion of military and intelligence resources that the Supreme Court warned against in both *Hamdi v. Rumsfeld* and *Boumediene v. Bush*. In *Hamdi*, the Court plurality explained that separation of powers principles require a court to "alleviate [the] uncommon potential [of these cases] to burden the Executive at a time of ongoing military conflict," 542 U.S. 507, 533 (2004) (plurality), and it called upon the Courts to adopt a "factfinding process that is both prudent and incremental." *Id*. at 539. Similarly, in *Boumediene*, the Court directed that "[c]ertain accommodations can be made to reduce the burden *habeas corpus* proceedings will place on the military without impermissibly diluting the protections of the writ." 128 S. Ct. 2229, 2276 (2008).

27

In short, to assemble a team of 10-20 search attorneys, perform the necessary searches in more than 200 petitioners' cases, and to clear for production any new evidence of an exculpatory nature that has not been produced already, would consume an estimated 4-12 months' time. Perrelli Decl., ¶ 5. We emphasize, moreover, that this estimate does not include the time it would take to conduct additional searches for, to clear, and to produce information subject to automatic disclosure under § I.E.1 of the Amended CMO, or to discovery pursuant to the many and widely varying discovery orders that Members of the Court have issued pursuant to § I.E.2 of the Amended CMO, and otherwise. Nor does this estimate take into account the immense amount of time it would take to conduct comprehensive searches for and to produce responsive information from the numerous databases maintained by DOD, the CIA, the FBI, and other agencies to which the Task Force staff has access. If the Court's orders to produce all exculpatory material or other discoverable evidence among the information compiled, collected, or obtained by the Task Force were construed to include these additional databases, the search process could continue well into next year. *See id.*, ¶ 13.

Respondents do not believe the Court intended this result when it directed them to search information compiled by the Task Force for discoverable evidence in these cases. Nor would this outcome be consonant with the desire of all concerned – petitioners, the Court, and Respondents alike – to achieve a prompt resolution of this litigation. In the event that the Court nevertheless determines to require discovery searches of the entire TF Network database, then it should do so only subject to the following conditions. First, as Judge Walton recently ordered in *Gherebi v. Obama*, Nos. 04-1164, 05-883, & 05-891, Order dated April 27, 2009 (Dkt. No. 221) at 5, petitioners seeking and obtaining such discovery should be required move to the back of the

line in terms of the Court's consideration of *habeas* cases. This condition recognizes the trade-off that the additional discovery will take a significant amount of time to complete, and, as a result, the schedule must change. <u>Second</u>, Respondents' obligation to produce discovery from the Task Force database should arise only after the Review Panel has determined that it does not intend to transfer, release, or prosecute the detainee and the detainee's counsel has been provided new exculpatory information, if any, provided to Task Force Review Panel. This requirement ensures that Respondents, the Court and counsel for the detainee do not expend scarce resources on discovery in a case (a) whose merits may no longer have to be litigated or (b) where any pertinent new information can be produced far more quickly and efficiently.

III.    **UNDER SEPARATION OF POWERS PRINCIPLES, THE TASK FORCE SHOULD NOT BE REQUIRED TO UNDERTAKE THE BURDEN OF IDENTIFYING ALL EXCULPATORY MATERIAL OR OTHER RESPONSIVE DOCUMENTS DISCOVERED DURING THE COURSE OF ITS DETAINEE REVIEWS.**

As also summarized above, a number of the Court's Orders concerning Task Force discovery adopt a somewhat different approach: rather than imposing on Respondents an obligation to perform comprehensive searches of information compiled by the Task Force for discoverable information, they appear, in effect, to direct the Task Force itself to pass on to Respondents for review and production any exculpatory material, or other discoverable evidence, that is "identified" or "discovered" by the staff as they conduct their reviews of individual detainees. *See n.* 3, *supra* (and orders cited therein). Respondents respectfully submit that these orders should also be reconsidered, and withdrawn. By placing an obligation directly on the Task Force to scrutinize the documents it reviews for responsiveness in the *habeas* cases, the Court would effectively be dictating which Government lawyers should conduct additional

searches. There is no reason for the Courts take such an unusual step, and doing so would risk serious offense to the Constitution's separation of powers, as it would severely encumber, and potentially frustrate, the Task Force's ability to assist the President in the exercise of a discretionary Article II function.

Although the Task Force staff are instructed as a general matter to take exculpatory information into consideration in making their evaluations. Second Olsen Decl., ¶ 12, there is a world of difference between an instruction to give consideration to information that laypersons (the majority of the persons serving on the Task Force's review teams) might as a general matter regard as exculpatory, and a legal obligation (under penalty of contempt) to disclose all evidence "that tends materially to undermine the information presented to support the government's justification for detaining the petitioner," Amended CMO, § I.D.1, including evidence tending materially to undermine the credibility of fact witnesses. To comply with a requirement to identify all information meeting this definition, a staff member assigned to the review of a particular detainee, being unacquainted with the prior proceedings of individual *habeas* cases, would have spend significant amounts of time reviewing and learning the details of various litigation documents, including the factual return, and consulting with the litigating attorneys, *before* he or she could begin a detainee's review, to learn exactly what "justification" Respondents have advanced in the case for holding the detainee, and what information, in particular, the government has "presented" in support of that justification, including the witnesses (and their statements) on which the government relies. Second Olsen Decl., ¶ 23. The staff person would have to be specifically apprised of the issues concerning exculpatory evidence, and witness credibility, that have arisen in the case. *Id.* What is more, the operative

30

terms of the Court's orders do not merely require the Task Force staff to identify exculpatory information, but also to identify documents falling within the scope of automatic discovery under § I.E.1 of the Amended CMO,[11] necessitating that a staff member familiarize him or herself, at the very least, with the particular statements made by a detainee that Respondents are relying on in the case, and the circumstances under which the statements were obtained. *Id.*

Once the detainee's review began, moreover, each document retrieved would have to be considered not only as it might bear on the Task Force's mission, but also in light of the *habeas* case's requirements. *Id.* Documents the staff may not consider worthy of attention for the Task Force's purposes (because they are cumulative, for example, or deal with issues that have become ancillary to policy considerations informing the staff's evaluation of a particular detainee's situation) would nevertheless have to be scrutinized at length for purposes of the *habeas* litigation, likely necessitating further consultation with litigation counsel to ascertain whether the document falls within the scope of Respondents' disclosure obligations. *Id.,* ¶ 25. Repeating this process hundreds or thousands of times over as the staff complete their reviews of over a hundred remaining detainees[12] could grind the progress of the reviews to a virtual halt.

Time is of the essence of the Task Force's business. As noted above, the Task Force must complete its business within the time frame the President established in the best interest of

---

[11] Order, *Al Halmandy v. Obama*, 05-2385 (ESH), April 27, 2009 (Dkt. No. 238) at 2, 4; Order Regarding Petitioner's Request for Additional Discovery, *Alsawam v. United States*, 05-1244 (CKK), April 17 (Dkt. No. 156), at 6-7.

[12] Practically speaking, the Task Force has already completed reviews of a substantial number of detainees, and reviews of additional detainees are also in progress. Second Olsen Decl., ¶¶ 14, 17. To the extent these reviews have already begun or been completed, it is not now possible for the teams conducting them to identify every potentially exculpatory document they may have retrieved or reviewed.

national security, and must do so in sequence with established diplomatic timetables so as to

maximize the number of detainees approved for transfer or release who can be resettled or

repatriated in other countries.  Second Olsen Decl., ¶¶ 18, 27.  Forcing the Task Force to set

aside these priorities and conduct its business in accordance with the demands of the litigation,

with which it is not equipped to cope, could threaten the immediate prospects for success of

these diplomatic initiatives, and disserve the national interest, as found by the President, in the

prompt and appropriate disposition of the individuals still detained at Guantanamo Bay.  *Id.*,

¶ 18.

Frustrating the Task Force's ability to complete its detainee reviews within the time

frame the President determined to be in the best interests of national security, and to keep pace

with diplomatic initiatives that have been carefully sequenced to achieve the appropriate

repatriation or resettlement of as many detainees as possible, would represent a manifest

encroachment on the President's control over matters of national security and foreign affairs.

*See Loving v. United States*, 517 U.S. 748, 757 (1996) (one branch of government should not

"impair another in the performance of its constitutional duties"); *Nixon v. Administrator of Gen.

Servs.*, 433 U.S. 425, 443 (1977).  Although "[e]ven quite burdensome interactions" between the

judiciary and the Executive do not "necessarily rise to the level of constitutionally forbidden

impairment of the Executive's ability to perform its constitutionally mandated functions,"

*Clinton v. Jones*, 520 U.S. 681, 702 (1997), attempting to dictate which Government lawyers

should discharge discovery obligations, thereby threatening the ability of the Task Force (a

creature of wholly Executive creation) to perform its functions in a timely manner, would raise

serious separation-of-powers concerns.  This is particularly true where the interference would

occur with the President's "exercise of . . . specific and important powers" relating to national security, and foreign relations. *Pray*, 531 F.3d at 843-44. The Court, therefore, should relieve the Task Force of any obligation imposed by its orders to identify exculpatory information, or other discoverable evidence in these cases, as it carries out its responsibilities under the President's Executive Order.

## CONCLUSION

In formulating a response to the Court's legitimate desire for some form of discovery from the Task Force, Respondents have sought to balance the interests of the Court, the petitioners, and the Government in a timely resolution of these cases with the reality that discovery on an expansive scale would only slow the progress of these cases, and could threaten to interfere with the Task Force process itself – an outcome contrary to the interests of all involved. The proposal that Respondents have advanced today will strike the right balance, by allowing these cases to move forward while making the same evidence on which the Task Force's decisions are made available to petitioners, and the Court.

For the foregoing reasons, Respondents' motion for reconsideration of the Court's orders regarding discovery of Task Force information, *see* nn. 2-3, *supra*, should be granted, and the Court should enter a consolidated order, in the form submitted herewith, providing each petitioner the option of receiving non-duplicative exculpatory or other responsive information cited in the Task Force's written recommendation to the Review Panel regarding his transfer, release, or other lawful disposition.

Dated: May 12, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOSEPH H. HUNT (D.C. Bar No. 431134)
Director, Federal Programs Branch


 _/s/ James J. Gilligan_
 _/s/ Terry M. Henry_
TERRY M. HENRY
JAMES J. GILLIGAN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Washington, DC 20044
Phone: (202) 514-3358
Fax:  (202) 616-8470

*Attorneys for Respondents*

34