UNCLASSIFIED//FOR PUBLIC RELEASE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HANI SALEH RASHID ABDULLAH (ISN 841), | |
| Petitioner, | |
| v. | Civ. Action No. 05-0023 (EGS) **UNDER SEAL** |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| Respondents. | |

**MEMORANDUM OPINION**

**I.   Introduction**

Petitioner Hani Saleh Rashid Abdullah ("Petitioner" or "Mr. Abdullah") has been detained without trial or charge at U.S. Naval Base Guantanamo Bay ("Guantanamo") by Respondents since October 2002. Pet'r's Mot. for Immediate Release and, in the Alternative For Interim Relief Pending Release ("Pet'r's First Mot."), ECF No. 381 at 1.[1] In 2020, the Periodic Review Board ("PRB") determined that Mr. Abdullah's detention "is no longer necessary to protect against a significant threat to the security of the United States." *Id.* at 5. In light of this determination, Respondents approved Mr. Abdullah for transfer in

---

[1] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number when available, not the original page number of the filed document.

1

UNCLASSIFIED//FOR PUBLIC RELEASE

2023 and undertook efforts to facilitate the transfer, including arranging for a country to receive him. Resp'ts' Status Reports, ECF Nos. 366; 411. His transfer has not yet occurred, however, and "[n]o specific date for a transfer has been established." Resp'ts' Status Report, ECF No. 417 at 1.

Pending before the Court are two motions in which Mr. Abdullah seeks release from custody: (1) Pet'r's First Mot., ECF No. 381; and (2) Motion for Release on the Ground that the End of the Combat in which He Was Allegedly Involved Has Terminated Any Authority to Detain Him ("Pet'r's Second Mot."), ECF No. 382-2. Upon careful consideration of Petitioner's motions, Respondents' oppositions, and the replies thereto; the applicable law; and for the reasons discussed below, the Court **DENIES** Mr. Abdullah's motions.

## II. Background

### A. Mr. Abdullah's Detention

Mr. Abdullah is a Yemeni national who was arrested in Pakistan in 2002 and then brought to Guantanamo. Pet'r's First Mot., ECF No. 381 at 2-3. According to Mr. Abdullah, he admitted—after being tortured—to having been tricked into attending an al-Qaeda training camp, briefly deploying without having any contact with hostile forces, and shortly after his unit was demobilized, attempting to return home to Yemen. *Id.* at 3. Mr. Abdullah states that he was part of a large group of

2

UNCLASSIFIED//FOR PUBLIC RELEASE

Yemeni fighters that al-Qaeda considered "potentially available to support future operations." *Id.* at 4 (citing PRB Guantanamo Detainee Profile, ISN 841, July 22, 2019). Respondents contend that Mr. Abdullah was "part of or substantially supported al-Qaida or associated forces. . . ." Resp'ts' Opp'n to First Mot., ECF No. 389 at 7 (citing Factual Return, ECF No. 257).[2]

**B. Periodic Review Board**

On March 7, 2011, the President issued Executive Order 13,567 ("EO 13,567") and established the PRB. Periodic Review of Individuals Detained at Guantanamo Bay Naval Station Pursuant to the Authorization for Use of Military Force, 76 Fed. Reg. 13,277 (Mar. 7, 2011). The purpose of the PRB is to "ensure that military detention of individuals now held at [Guantanamo] . . . continues to be carefully evaluated and justified, consistent with the national security and foreign policy interests of the United States and the interests of justice . . . ." *Id.* To do so, the PRB directs the Secretary of Defense ("Secretary") to "coordinate a process of periodic review of continued law of war detention for each detainee" covered by EO 13,567 § 1(a) and, in consultation with the Attorney General, "issue implementing guidelines governing the process, consistent with the [EO's]

---

[2] The Parties use different spellings of al-Qaeda throughout their briefs and exhibits. The Court will use "al-Qaeda" for consistency, unless quoting an alternate spelling.

UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 4 of 51
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 4 of 51

requirements." *Id.* § 3. These process requirements include the opportunity for the government and detained person to present evidence and be heard at a hearing on the person's continued detention. *Id.*

EO 13,567 sets forth the standard for continued detention: "[c]ontinued law of war detention [of a covered detainee] is warranted . . . if it is necessary to protect against a significant threat to the security of the United States." *Id.* § 2; *see also Policy Memorandum, Implementing Guidelines for Periodic Review of Detainees Held at Guantanamo Bay per Executive Order 13567* (Feb. 15, 2019) ("*2019 PRB Implementing Guidelines*"), https://www.prs.mil/Portals/60/Documents/Governance/POLICY%20MEM ORANDUM%20IMPLEMENTING%20GUIDELINES%20FOR%20PERIODIC%20REVIEW%20 OF%20DETAINEES%20HELD%20AT%20GUANTANAMO%20BAY%20.pdf, Attach. 3 at 6. If the PRB determines that the detained person does not meet the standard for continued detention in EO 13,567 § 2, "the Secretaries of State and Defense shall be responsible for ensuring that vigorous efforts are undertaken to identify a suitable transfer location for any such detainee, outside of the United States, consistent with the national security and foreign policy interests of the United States and [statutory commitments regarding non-citizens in danger of torture]." EO 13,567 § 4.

Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 5 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 5 of 51

EO 13,567 provides that "[t]he process established under
this order does not address the legality of any detainee's law
of war detention." *Id.* § 8; *see also* Nat'l Defense Auth. Act for
Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298 (2012)
("2012 NDAA") § 1023(b) ("The procedures submitted under
subsection (a) shall, at a minimum – (1) clarify that the
purpose of the periodic review process is not to determine the
legality of any detainee's law of war detention."). If during
the PRB process "material information calls into question the
legality of detention, the matter will be referred immediately
to the [Secretary] and the Attorney General for appropriate
action." EO 13,567 § 8. EO 13,567 "is not intended to, and does
not, create any right or benefit, substantive or procedural,
enforceable at law or in equity by any party against the United
States, its departments, agencies, or entities, its officers,
employees, or agents, or any other person." *Id.* § 10(c).

While undertaking its review, the PRB must consider factors
related to the detainee's "baseline threat information" and
their "potential threat if transferred or released." *2019 PRB
Implementing Guidelines*, Attach. 3 § 3. In addition to factors
related to the extent of the individual's past involvement with
the Taliban, al-Qaeda, or associated forces, the PRB is to
consider "[i]nformation pertaining to the likelihood that the
detainee intends to or is likely to engage in terrorist

5

Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 6 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 6 of 51

activities upon his transfer or release." *Id.* § 3(b)(1).
Similarly, the guidelines direct the PRB to review
"[i]nformation pertaining to the likelihood that the detainee
will reestablish ties with al-Qa'ida, the Taliban, or associated
forces" and "whether the group the detainee was part of at the
time of capture is now defunct." *Id.* § 3(b)(2); *see also* 2012
NDAA § 1023(b)(4). Other factors related to future threat
include conditions in the "potential destination country," the
"detainee's conduct in custody, including behavior, habits,
traits, rehabilitation efforts, and whether the detainee was
considered a danger to other detainees or other individuals,"
the detainee's "physical and psychological condition," any other
"relevant factors bearing on the threat the detainee's transfer
or release may pose to the United States, its citizens, and/or
its interests," and "information bearing on the national
security and foreign policy interests of the United States or
the interests of justice." *2019 PRB Implementing Guidelines* §
3(b)(3)-(7).

### C. PRB Determination Regarding Mr. Abdullah

On October 29, 2020, the PRB determined that "continued law
of war detention [of Mr. Abdullah] is no longer necessary to
protect against a continuing significant threat to the security
of the United States." Ex. 1 to Resp'ts' Status Report
(Unclassified PRB Summary), ECF No. 367-1. According to the

6

unclassified summary of the PRB's determination, the PRB

considered Mr. Abdullah's

> low level of training and lack of leadership
> position in Al Qaeda or the Taliban, [Mr.
> Abdullah's] candor regarding his activities in
> Afghanistan and with Al Qaeda, and [Mr.
> Abdullah's] efforts to improve himself while
> in detention, to include taking numerous
> courses at Guantanamo. In addition, the
> ability and willingness of [Mr. Abdullah's]
> family to support him in the event of
> transfer, [Mr. Abdullah's] credible plan for
> supporting himself in the event of transfer,
> and significant improvement in [Mr.
> Abdullah's] compliance since his last hearing
> in 2016.

*Id.* The PRB recommended "robust security assurances" of

"monitoring, travel restrictions and integration support" as

conditions for Mr. Abdullah's transfer. *Id.*

Respondents first notified the Court of this determination

in response to the Court's May 23, 2023 order for Respondents to

file a report regarding Abdullah's detention status. Resp'ts'

Status Report & Am. Status Report, ECF Nos. 366; 367. In this

report, Respondents stated that "[e]ven though Respondents have

the legal authority to detain [Mr. Abdullah] under the

Authorization for Use of Military Force, Respondents have

exercised their discretion to approve [Mr. Abdullah] for

transfer through the [PRB] process." Resp'ts' Status Report, ECF

No. 366 at 1. Respondents stated that "efforts to transfer [Mr.

Abdullah] are ongoing, including through recent and active

7

engagement with one or more foreign governments." *Id.* at 2.
Based on these representations, on May 30, 2023, the Court
ordered Respondents to file status reports on Mr. Abdullah's
transfer every 30 days. Minute Order (May 30, 2023). Since then,
Respondents consistently state that they intend for Mr.
Abdullah's transfer to go forward, but that no specific date for
his transfer has been established. Resp'ts' Status Reports, ECF
Nos. 368, 369, 373, 374, 377, 378, 380, 383, 396, 400, 401, 402,
404, 408, 409, 410, 411, 416, 417, 418.

Although Respondents and Mr. Abdullah dispute the steps
taken to facilitate the transfer, Respondents confirm that "an
initial undertaking to transfer [Mr. Abdullah], and others, from
Guantanamo Bay had begun." Resp'ts' Opp'n to First Mot., ECF No.
389 at 9 (citing Notice of Classified Filing, ECF No. 375).[3] Mr.
Abdullah states that:

> [Mr.] Abdullah and the Court were informed
> that a suitable arrangement had been made and
> that [Mr.] Abdullah's transfer was imminent.

---

[3] Respondents represent "details and sensitivities related to the
transfer efforts—including the identification of the
resettlement country that has confirmed its willingness to
accept the group of Yemeni detainees including [Abdullah],
disclosure of which could undermine transfer efforts . . . have
warranted the designation of such information as 'protected
information' under the governing protective order in this case,
*see* ECF [No.] 124 at ¶¶ 34-45, and, thus, the filing of [Mr.
Abdullah's] motion and responsive pleading under seal." 
Resp'ts' Opp'n to First Mot., ECF No. 389 at 9.

8

And then, suddenly, without warning or
explanation, the transfer was put on an
indefinite hold.

Pet'r's First Mot., ECF No. 381 at 2. Mr. Abdullah asserts that

after taking years to identify a suitable country, Respondents

are indefinitely delaying his transfer without explanation. *Id.*

Mr. Abdullah claims that he has repeatedly sought

information from Respondents about why his transfer is delayed

and when it will occur but has only received the "very thin"

explanation of "questions" being raised. *Id.* According to

Respondents, "[i]ntervening circumstances, in particular events

raised certain questions that ultimately

delayed the transfer." Resp'ts' Opp'n to First Mot., ECF No. 389

at 9-10. Respondents state that the "Government continues to

work to resolve those questions so as to move forward with the

transfer when circumstances permit. Respondents emphasize that

there has been no change regarding the underlying understanding

in place with the receiving country." *Id.* at 10.

### D. Procedural Background

On December 21, 2023, Mr. Abdullah filed his First Motion,

raising statutory and constitutional challenges to Respondents'

continued detention of him. Pet'r's First Mot., ECF No. 381. In

that motion, he also requests interim relief, specifically to be

9

transferred to immigrant detention, and he challenges a congressional ban on transfers to Yemen. *Id.* at 18-23. Respondents filed their opposition on January 4, 2024, opposing Mr. Abdullah's motion on all grounds and asserting that Mr. Abdullah "remains lawfully detained because he was part of or substantially supported al-Qaida or associated forces and hostilities against al-Qaida and associated forces remain ongoing." Resp'ts' Opp'n to First Mot., ECF No. 389 at 10. Mr. Abdullah filed his reply on January 11, 2024. Pet'r's First Reply, ECF No. 391.

Mr. Abdullah also sought the Court's leave to permit additional counsel to appear specifically for the purpose of litigating his request for release "on the ground that the combat underlying his detention has ended" ("Motion for Leave"). Pet'r's Mot. for Leave, ECF No. 382 at 1 (attaching Pet'r's Second Mot., ECF No. 382-2). The Court granted Mr. Abdullah's Motion for Leave over Respondent's opposition. Minute Order (Jan. 10, 2024). On December 29, 2023, Respondents filed an opposition to Mr. Abdullah's Second Motion. Resp'ts' Opp'n to Second Mot., ECF No. 393. Mr. Abdullah filed his reply on February 15, 2024. Pet'r's Second Reply, ECF No. 397.

### III. Analysis

The Court will address Mr. Abdullah's arguments as follows. First, it will consider issues related to Respondents' detention

10

UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 11 of 51
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 11 of 51

authority. Within this broad category, the Court will review:
(1) the impact of the determination that Mr. Abdullah poses
little risk of returning to the battlefield on Respondents'
detention authority; (2) whether the hostilities underlying Mr.
Abdullah's detention have ended; and (3) whether—assuming but
not deciding that non-citizens at Guantanamo are protected by
due process—Mr. Abdullah has alleged due process violations.
Second, the Court will consider Mr. Abdullah's argument that
Congress's ban on repatriation to Yemen is unlawful. Third, the
Court will consider whether Mr. Abdullah is entitled to interim
relief pending resolution of these motions and/or his transfer.

### A. Detention Authority

This case raises two main questions about Respondent's
statutory detention authority. First, whether a PRB
determination and Secretary's decision to transfer a detainee
whose continued detention is no longer necessary to prevent
their return to the battlefield has any impact on their
detainability. This is Mr. Abdullah's central argument in his
First Motion. Second, whether the hostilities and/or armed
conflict related to Mr. Abdullah's detention ended when the
United States withdrew from Afghanistan in 2021. Mr. Abdullah
makes this argument in his Second Motion, asserting that the
U.S. withdrawal categorically ended Respondents' detention
authority for *all* law of war detainees who are not "al-Qaeda

11

terrorists." Pet'r's Second Mot., ECF No. 382-2 at 5-7. Mr.
Abdullah styles this as a new argument that this Court and the
Court of Appeals for the District of Columbia Circuit ("D.C.
Circuit") have not yet considered. The Court first discusses the
legal framework that provides Respondents authority to imprison
people at Guantanamo, then it addresses the two statutory
questions, and finally it considers Mr. Abdullah's due process
arguments related to Respondents' detention authority.

### 1. Legal Framework for Detention

Shortly after the September 11, 2001 attacks, Congress
passed the 2001 Authorization for Use of Military Force ("2001
AUMF"). Authorization for Use of Military Force, Pub. L. No.
107-40, § 3(s), 115 Stat. 224, 224 (Sept. 18, 2001). The 2001
AUMF authorized the President to

> use all necessary and appropriate force
> against those nations, organizations, or
> persons he determines planned, authorized,
> committed, or aided in the terrorist attacks
> that occurred on September 11, 2001, or
> harbored such organizations or persons, in
> order to prevent any future acts of
> international terrorism against the United
> States by such nations, organizations or
> persons.

*Id.* Despite the text of the 2001 AUMF lacking express detention
authority, the Supreme Court interpreted it to permit the
President to detain certain individuals:

12

> [The] detention of individuals falling into
> the limited category we are considering, for
> the duration of the particular conflict in
> which they were captured, is so fundamental
> and accepted as incident to war as to be an
> exercise of the necessary and appropriate
> force Congress has authorized the president to
> use.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion)

(internal quotations omitted); *see also id.* ("The purpose of

detention is to prevent captured individuals from returning to

the field of battle and taking up arms once again.").

Congress affirmed the President's detention authority in

the 2012 NDAA. The 2012 NDAA recognizes that the President has

authority to "use all necessary and appropriate force pursuant

to the [2001 AUMF] . . . to detain covered persons (as defined

in sub-section (b)) pending disposition under the law of war."

2012 NDAA § 1021(a). Covered persons include those "who planned,

authorized, committed, or aided the terrorist attacks that

occurred on September 11, 2001, or harbored those responsible

for those attacks" and those "who [were] a part of or

substantially supported al-Qaeda, the Taliban, or associated

forces that are engaged in hostilities against the United States

or its coalition partners . . . ." *Id.* § 1021(b). Disposition

under the law of war may include "[d]etention under the law of

war without trial until the end of the hostilities authorized by

13

the [2001 AUMF]," trial, or transfer to an alternative tribunal or country. *Id.* § 1021(c).

### 2. Mr. Abdullah Fails to Show Risk of Returning to the Battlefield is Relevant

Mr. Abdullah argues that because the government determined that his detention is no longer necessary to protect against a significant threat to U.S. security and made arrangements for his transfer, its authority to detain him has "unraveled." Pet'r's First Mot., ECF No. 381 at 10-15. Respondents counter that a PRB determination is not binding on the Secretary, and that neither the PRB nor Secretary's determinations regarding Mr. Abdullah's future risk impact his detainability. Resp'ts' Opp'n to First Mot., ECF No. 389 at 11-28. They maintain that the only question regarding whether Mr. Abdullah's detention is lawful is whether hostilities against al-Qaeda and associated forces remain ongoing, assuming he was "part of or substantially supported" al-Qaeda or associated forces. *Id.*

The main question in Mr. Abdullah's First Motion is therefore whether a determination that a Guantanamo detainee poses little risk of returning to the battlefield has any impact on Respondents' authority to continue detaining them. The D.C. Circuit has not yet determined this precise issue. In *Al-Hela v. Biden* ("*Al-Hela II*"), the D.C. Circuit, *en banc*, raised this question but remanded it to the District Court to consider in

14

Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 15 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 15 of 51

the first instance. 66 F.4th 217 (D.C. Cir. 2023) (*en banc*).[4]
Specifically, the D.C. Circuit stated that the PRB's "finding
that Mr. al-Hela's detention is no longer necessary to protect
against a significant threat to the United States *could* be
construed as implicitly undermining the contention that Mr. al-
Hela's detention remains justified by the law of war and the
[2001] AUMF." *Id.* at 244 (emphasis in original). It viewed this
as especially "significant given that the 'purpose of [law of
war] detention is to prevent captured individuals from returning
to the field of battle and taking up arms once again.'" *Id.*
(quoting *Hamdi*, 542 U.S. at 518) (alteration in original) (also
citing *c.f. Ali v. Trump*, 959 F.3d 364, 370 (D.C. Cir. 2020)
("[Mr.] Ali's detention still serves the established law-of-war
purpose of preventing captured individuals from returning to the
field of battle and taking up arms once again."). The D.C.
Circuit said that "[w]hether the laws of war place any limits on
the President's detention authority under the [2001] AUMF is an

---

[4] A panel of judges initially considered Mr. Al-Hela's case in
*Al-Hela v. Trump*, 972 F.3d 120 (D.C. Cir. 2020) ("*Al-Hela I*").
In that first case, the D.C. Circuit affirmed the District
Court's rejection of Mr. Al-Hela's habeas petition. *Al-Hela I*,
972 F.3d at 127. It also rejected Mr. Al-Hela's due process
claims and held that non-U.S. citizens detained at Guantanamo
are not entitled to due process protections. *Id.* at 138–43. The
D.C. Circuit then considered this case *en banc* and assumed,
without holding, that due process applied, but that Mr. Al-Hela
did not show due process violations. *Al-Hela II*, 66 F.4th at
220.

15

open question in our circuit and should be addressed by the
District Court in the first instance." *Id.*

The *Al-Hela* District Court has not yet ruled on this issue.
But at least one other District Judge has addressed it in
another case. In *al-Kazimi v. Biden*, Mr. al-Kazimi moved for
immediate release in light of circumstances similar to Mr.
Abdullah's case—that the PRB recommended his transfer, the
Secretary arranged for the transfer

but that for vague reasons

Respondents have delayed the transfer indefinitely. Pet'r's
Notice of Supp. Auth., Attach. 1, ECF No. 407-1 at 2-3 (First
Mem. Op., ECF No. 2131 in No. 05-cv-2386 ("First Opinion")).[5] In
its First Opinion on Mr. al-Kazimi's motion, the District Court
echoed the D.C. Circuit's concern in *Al-Hela II* that continued
detention of people in Mr. al-Kazimi's position may contravene
the logic underlying law of war detention:

> Accordingly, the PRB's determination in this
> case (1) that continued law of war detention
> of [Mr. al-Kazimi] is no longer necessary to
> protect against a continuing significant
> threat to the security of the United States .
> . . and (2) the threat which [Mr. al-Kazimi]
> presents can be adequately mitigated . . . is
> significant given that the purpose of [law of
> war] detention is to prevent captured
> individuals from returning to the field of

---

[5] On June 13, 2024, Mr. Abdullah filed a notice of supplemental
authority and attached the sealed First Opinion holding Mr. al-
Kazimi's motion for immediate release in abeyance in No. 05-cv-
2386. Pet'r's Notice of Suppl. Auth., ECF No. 407.

> battle and taking up arms again. Therefore,
> the PRB's findings undermine the contention
> that the petitioner's detention remains
> justified by the law of war and the [2001]
> AUMF.

*Id.* at 6–7 (internal quotations omitted). The District Court

held Mr. al-Kazimi's motion in abeyance and ordered the

government to provide additional information on why Mr. al-

Kazimi's continued detention was lawful. *Id.* at 8–9 ("In other

words, based on the record before the Court, the respondents

have not provided an explanation for why the continued detention

of petitioner is consistent with the laws of war.").

The government did not, however, provide such information,

and continued to rest only on its argument that the individual's

risk is irrelevant. Resp'ts' Resp. to Court Order, Attach. 1,

ECF No. 412-1 at 3, 8–9 (Second Mem. Op., ECF No. 2140 in No.

05-cv-2386) ("Moreover, despite having multiple opportunities to

do so, the respondents still have failed to provide a rationale

for delaying [Mr. al-Kazimi's] transfer. The respondents'

exercise of such unfettered authority is a source of significant

concern—a fact that is particularly concerning based on the

government's [own] factual findings that further detention is

unnecessary.") (alteration in original) (internal quotations

omitted).[6] Nevertheless, the District Court reluctantly rejected

---

[6] On September 19, 2024, the Court ordered Respondents to file
the sealed opinion in No. 05-cv-2386 on the docket in this case,

17

UNCLASSIFIED//FOR PUBLIC RELEASE

Mr. al-Kazimi's motion because it held that D.C. Circuit precedent required such a result. *Id.* at 10. It acknowledged that the D.C. Circuit stated in *Al-Hela II* that whether the laws of war place any limit on detention authority is an "open question in [this] circuit." *Id.* at 8 (quoting *Al-Hela II*, 66 F.4th at 244). But it concluded that because the dicta in *Al-Hela II* did not expressly reach the merits of this question and overrule what the *al-Kazimi* Court considered to be binding D.C. Circuit precedent, it felt compelled to agree with the government. *Id.* at 10 (internal quotations omitted) ("However, the Circuit in *Al-Hela* [*II*] made perfectly clear that it was not expressing a view on the merits of the matter—*viz.*, that it was not overruling its prior precedents. . . . Hopefully, one day soon it will. But, until that occurs, the Court is obligated to follow controlling circuit precedent [until overruled]."). Mr. al-Kazimi appealed this decision to the D.C. Circuit and his appeal is currently pending. *See* Notice of Appeal, ECF No. 2143 in No. 05-cv-2386; Dkt. in No. 24-5256 (D.C. Cir.).[7]

---

which Respondents filed on September 20, 2024. Resp'ts' Resp. to Court Order, ECF No. 412.

[7] In an opinion made publicly available on December 6, 2024, another judge on this court denied a Guantanamo detainee's Motion for Judgment on the Record and considered the question left open in *Al-Hela II*. *Al-Rammah v. Biden*, No. 05-cv-2380, 2024 WL 5009078 (D.D.C. Dec. 6, 2024). The *al-Rammah* court adopted a similar view of D.C. Circuit precedent to the *al-Kazimi* court's approach and held that "[t]herefore, while the PRB's determination and the subsequent preparations for [Mr.]

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 19 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 19 of 51

The three principal D.C. Circuit cases that the government
asserted foreclosed Mr. al-Kazimi's argument, and the District
Court agreed it was bound to follow are: *Al-Bihani v. Obama*, 590
F.3d 866 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 11 (D.C.
Cir. 2010); and *Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir.
2011). These are the same principal cases upon which Respondents
rely here to maintain that whether an individual poses a risk of
returning to the battlefield is irrelevant to whether they can
continue to be detained under the law of war. Resp'ts' Opp'n to
First Mot., ECF No. 389 at 24-28.[8] These cases can be read to
support Respondents' argument; however, they fall short of
thoroughly addressing the key issue raised here or precluding
the questions left open in *Al-Hela II*.

Before the Court explains why it ultimately rejects Mr.
Abdullah's argument, it first considers whether the D.C.
Circuit's rulings in *Al-Bihani*, *Awad*, and *Almerfedi* foreclose

---

al-Rammah's transfer may be relevant to this Court's assessment
of the legality of [Mr.] al-Rammah's continued detention under
the AUMF, they are not dispositive, and they do not entitle him
to judgment on the record." *Id.*, at *4. Mr. al-Rammah has not
appealed this decision to the D.C. Circuit.
[8] In its attempt to portray this question as well-settled in its
favor, the government goes as far as to say "[t]he risk that a
combatant may return to the battlefield lasts as long as active
hostilities remain ongoing" without citing any authority.
Resp'ts' Opp'n to First Mot., ECF No. 389 at 26-27. It is
because this proposition is not clearly established in law that
it is now before the Court, as the D.C. Circuit recognized in
*Al-Hela II*.

UNCLASSIFIED//FOR PUBLIC RELEASE

such an argument. *Al-Bihani* is the first of these cases and foundation for the D.C. Circuit's subsequent rulings in *Awad* and *Almerfedi*. In *Al-Bihani*, the D.C. Circuit considered several arguments regarding whether Mr. Al-Bihani was lawfully detained. 590 F.3d at 870–75. These included arguments about the degree of involvement Mr. Al-Bihani had with the Taliban and/or al-Qaeda and an argument that "the conflict in which he was detained, an international war between the United States and Taliban-controlled Afghanistan, officially ended . . . [and] absent a determination of future dangerousness, he must be released." *Id.* at 871. In what the D.C. Circuit later referred to as dicta, the Court deciding *Al-Bihani* concluded that law of war principles did not inform its analysis. *Id.* at 871 ("[W]e note that all of [Mr. Al-Bihani's arguments] rely heavily on the premise that the war powers granted by the [2001] AUMF and other statutes are limited by the international laws of war. This premise is mistaken.").

The D.C. Circuit rejected all of Mr. Al-Bihani's arguments and held that Mr. Al-Bihani was lawfully detained under whatever definition applied as someone who was part of or substantially supported the Taliban, al-Qaeda, or associated forces. *Id.* at 872. After concluding that the "government's detention authority [was] established as an initial matter," the Court "turn[ed] to the argument that [Mr.] Al-Bihani must now be released according

20

UNCLASSIFIED//FOR PUBLIC RELEASE

to longstanding law of war principles because the conflict with the Taliban has allegedly ended." *Id.* at 874 (citing *Hamdi*, 542 U.S. at 521). In resolving the issue, the D.C. Circuit considered only whether hostilities with the Taliban, al-Qaeda, and associated forces were ongoing—nowhere did it discuss whether or not Mr. Al-Bihani posed little or no risk of returning to the battlefield and thus whether his detention was no longer necessary. *Id.* at 874-75.[9]

Nevertheless, the D.C. Circuit issued *Awad* six months later and assumed that "*Al-Bihani* foreclose[d] this argument. *Al-Bihani* makes plain that the United States' authority to detain an enemy combatant does not depend on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities." *Awad*, 608 F.3d at 11.[10] The *Almerfedi* Court then relied on *Awad* and *Al-Bihani* to not only reiterate the same legal conclusion, but to

---

[9] As the D.C. Circuit noted in *Al-Hela II*, "seven of the nine members of the *en banc* Court denied the petition for rehearing" in *Al-Bihani*. *Al-Hela II*, 66 F.4th at 244. A majority of that *en banc* panel "explained that the *Al-Bihani* panel's law-of-war discussion was 'not necessary for the disposition of the merits' and was therefore nonbinding dictum. We adhere to that position today." *Id.*

[10] *Awad* went as far as to say "Awad again attempts to insert uncertainty into the court's prior holding where there is none. Whether a detainee would pose a threat to U.S. interests if released is not an issue in habeas corpus proceedings in federal courts concerning aliens detained under the authority conferred by the AUMF." *Awad*, 608 F.3d at 11.

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 22 of 51

extend it further, in a footnote, to circumstances when a detainee has been approved for release. *Almerfedi*, 654 F.3d 1, 4 n.3 (citing *Awad*, 608 F.3d at 11) ("The district court noted that [Mr.] Almerfedi had been approved for transfer from Guantanamo Bay. But whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully.").

Although the D.C. Circuit has interpreted *Al-Bihani* to mean that an individual's future risk is irrelevant to whether they can continue to be detained, there are some significant issues with relying on these cases to foreclose the argument Mr. Abdullah raises here and the *en banc* D.C. Circuit in *Al-Hela II* identified as remaining open. First, the *Al-Bihani* Court made clear it did not consider Respondents' detention authority in light of law of war principles. 590 F.3d at 871. Although the majority of the *en banc* D.C. Circuit that declined to re-hear *Al-Bihani* held that this portion of the panel's decision was non-binding dicta and did not alter the outcome, *Al-Bihani's* presumption could have still impacted its assessment of whether a detainee's individual risk of returning to the battlefield is relevant. *Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010) (denial of re-hearing *en banc*); *Al-Hela II*, 66 F.4th at 244. Here, Respondents state that their detention authority is impacted by the law of war. Resp'ts 'Opp'n to First Mot., ECF

22

UNCLASSIFIED//FOR PUBLIC RELEASE

No. 389 at 11-14 (discussing how *Hamdi* grounded the Executive's detention authority implicit in the 2001 AUMF in the law of war and how Congress affirmed in the 2012 NDAA that the 2001 AUMF permits the government to detain individuals "pending disposition under the law of war."). Second, none of the cases considered the impact of a PRB determination—the D.C. Circuit issued both *Al-Bihani* and *Awad* prior to the PRB's establishment. Third, and most importantly, these cases did not fulsomely consider and reject an argument that law of war detention, as defined in *Hamdi* and incorporated in the 2012 NDAA, could be impacted by the government's own determination that someone poses a low or no risk of returning to the battlefield.

For these reasons, this Court disagrees that D.C. Circuit precedent forecloses Mr. Abdullah's argument or provides a conclusive answer to the question that the D.C. Circuit left unanswered in *Al-Hela II*. Mr. Abdullah's problem here, however, is that he does not reckon with nor attempt to distinguish Respondents' authority. Pet'r's First Mot., ECF No. 381 at 9-15. Mr. Abdullah points to *Al-Hela II* as opening the door to his argument, but he must acknowledge that it does not provide definitive support for his position. *Id.* at 10-12.[11] Mr. Abdullah

---

[11] At times, Mr. Abdullah appears to imply that the D.C. Circuit in *Al-Hela II* reached the merits of the argument that he now presents. Pet'r's First Mot., ECF No. 381 at 11 ("From their November status report, it appears that Respondents are unaware

UNCLASSIFIED//FOR PUBLIC RELEASE

fails to point to any other authority for his assertion that because of the PRB determination and the Secretary's decision to transfer him, he must now be released, *id.;* nor does he distinguish his case from the D.C. Circuit cases on which Respondents and the District Court in *al-Kazimi* rely. Mr. Abdullah's failure to make an appropriate argument that a risk of returning to the battlefield can even be considered by a court when deciding whether the government's detention authority has ended is itself reason to deny Mr. Abdullah's motion. Furthermore, Mr. Abdullah largely fails to point to specific facts in the record to demonstrate whether *he* poses any risk of returning to the battlefield that would be legally relevant.[12] Therefore, Mr. Abdullah has failed to explain how the result he seeks would work in practice. He does not clarify whether his

---

of the Court of Appeals' *en banc* decision, and its implications for the cases it cites and arguments it makes – and offers essentially a rehash of the arguments Respondents made in *Al Hela*, even citing an earlier opinion in that case. The fundamental fact of the matter is that the Court of Appeals reversed and remanded a decision based on the arguments Respondents offer here."). Even though the Court does not hold that the cases Respondents cite are necessarily preclusive, it is also clear that *Al-Hela II* did not reach the merits of this issue and left it to the District Court to first consider.
[12] Mr. Abdullah refers to classified evidence that demonstrates he did not have any interest in the "pre-9/11 Afghan civil war, or that after his unit demobilized, he wanted to 'return' to any fight," but says that he is not relying on that evidence here. Pet'r's First Mot., ECF No. 381 at 3-4 n.3. It would appear that Mr. Abdullah is only relying on the unclassified summary of the PRB's recommendation and Respondents' representations about their transfer efforts.

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 25 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 25 of 51

position is that *every* positive PRB recommendation and
Secretary's decision to transfer someone automatically means the
government's detention authority ends. But assuming not, he
fails to propose any factors or tests a Court could use to
determine the legally significant lack of risk, nor does he
point to any authority for performing such an analysis. For
these reasons, Mr. Abdullah's request for immediate release in
his First Motion is denied.[13]

### 3. Hostilities Remain Ongoing

In his Second Motion, Mr. Abdullah argues that because the
United States withdrew from Afghanistan in 2021, "the end of the
armed combat in which he is alleged to have participated has

---

[13] Mr. Abdullah also challenges Respondents' position that the
Secretary has discretion whether to transfer someone detained at
Guantanamo if the PRB recommends the transfer. Pet'r's First
Mot., ECF No. 381 at 14. His argument, however, is plainly
inconsistent with the text of EO 13,567 and 2012 NDAA. EO 13,567
§ 1(b) ("This order is intended solely to establish, as a
discretionary matter, a process to review on a periodic basis
the executive branch's continued discretionary exercise of
existing detention authority in individual cases). EO 13,567
directs the Secretaries of State and Defense to undertake
"vigorous efforts to identify a suitable transfer location," but
makes clear that the Secretary still retains discretion whether
to make the transfer. *Id.* § 4. Furthermore, Mr. Abdullah does
not cite any authority for how someone might be able to enforce
the Secretary's decision to effectuate a transfer once that
decision has been made, and EO 13,567 makes clear it does not
create any separate cause of action. *Id.* § 10(c). But the fact
that the Secretary has discretion whether to transfer someone
does not, as Respondents contend, foreclose the possibility that
the D.C. Circuit raised in *Al-Hela II* that facts underlying the
Government's transfer decision could impact detainability.
Resp'ts' Opp'n to First Mot., ECF No. 389 at 18-20.

ended the U.S. government's legal authority to detain him."
Pet'r's Second Mot., ECF No. 382-2 at 5, 8. Mr. Abdullah argues
that the 2001 AUMF, as interpreted by the Supreme Court in
*Hamdi*, only permits detention of individuals who were alleged to
have been engaged in or supported armed conflict against the
United States until the end of active hostilities in
Afghanistan. *Id.* at 11-12.[14] Mr. Abdullah asserts that the 2012
NDAA did not expand the government's detention authority beyond
what *Hamdi* recognized and therefore that statute must be
interpreted in accordance with the detention permitted in *Hamdi*.
*Id.* at 13-14. Using that definition of Respondents' detention
authority derived from the 2001 AUMF, Mr. Abdullah asserts that
Respondent cannot continue to detain "law of war detainees"
because the U.S. withdrawal from Afghanistan ended that armed
conflict. *Id.* at 11-16. Accordingly, Mr. Abdullah contends that
Respondent can no longer detain individuals accused of being
part of or substantially supporting al-Qaeda and associated
forces even if hostilities against al-Qaeda and associated

---

[14] Mr. Abdullah acknowledges in a footnote that the conflict does
not need to be confined only to Afghanistan itself, similarly to
how conflict spread to Laos and Cambodia during the Vietnam War.
Pet'r's Second Mot., ECF No. 382-2 at 12 n.22. But Mr. Abdullah
asserts that "Justice O'Connor's substantive point was that,
under accepted principles of the law of war, the U.S. had
detention authority over individuals captured in combat only so
long as U.S. troops remained involved in active combat in the
same war." *Id.*

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 27 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 27 of 51

forces are ongoing because the armed conflict against the
Taliban in Afghanistan has ended. *Id.*; *cf.* Resp'ts' Opp'n to
Second Mot., ECF No. 393 at 17 ("Of course, *Hamdi* cannot
reasonably be understood to rule out detention under the AUMF of
individuals who were part of al-Qaida, but that would be the
consequence of [Mr. Abdullah's] reading of this passage if it
were carried to its logical conclusion."); *id.* n.5 (explaining
how Mr. Abdullah's articulation of the government's detention
authority "excludes al-Qaida altogether from the scope of the
hostilities authorized by the AUMF.").

Respondents counter that Mr. Abdullah's "position ignores
the text of the [2001 AUMF], controlling D.C. Circuit precedent;
and—just as importantly—the facts on the ground." Resp'ts' Opp'n
to Second Mot., ECF No. 393 at 6. They argue that neither
Congress nor the courts have endorsed Mr. Abdullah's proposed
definition of Respondents' detention authority: "active combat
operations" in Afghanistan. *Id.* at 8. According to Respondents,
the key question here is not whether "active combat operations
in Afghanistan continue, but whether hostilities against al-
Qaida and associated forces are ongoing." *Id.* (quotations
omitted). Respondents provide evidence about these continued
hostilities and highlight authority that requires courts to give
substantial deference to the government's determination of
whether hostilities are ongoing *Id.* at 8–9. They also point out

UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 28 of 51
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 28 of 51

that Mr. Abdullah does not dispute that hostilities against al-Qaeda and associated forces are ongoing. *Id.*

Mr. Abdullah acknowledges that this Court—in addition to three other judges on this Court—has rejected similar arguments. *Husayn v. Austin*, No. 08-cv-1360, 2022 WL 2093067, at *4-7 (D.D.C. June 10, 2022); *Qassim v. Biden*, No. 04-cv-1194, 2023 WL 6294155, at *1-2 (D.D.C. Sept. 27, 2023); *Paracha v. Biden*, No. 04-cv-2022, 2022 WL 2952493, at *5-6 (D.D.C. July 26, 2022); *Gul v. Biden*, No. 16-cv-1462, 2021 WL 5206199, at *2-4 (D.D.C. Nov. 9, 2021). But Mr. Abdullah claims to make a new argument regarding the end of hostilities/active combat that these other cases did not consider. Pet'r's Second Mot., ECF No. 382-2 at 5; Pet'r's Resp. to Order, ECF No. 414.

There is no dispute between Mr. Abdullah and Respondents about several relevant propositions: habeas corpus is an essential right, the Executive only has the war and detention powers that Congress grants it, and the government's detention authority ends when the combat/hostilities that Congress authorized end. Respondents do not claim unlimited detention power after the hostilities authorized in the 2001 AUMF have ended, but rather, they disagree with Mr. Abdullah's assertion that those hostilities have ended.

In support of his position, Mr. Abdullah relies on *Hamdi*, the 2012 NDAA, and one D.C. Circuit case, *Al-Alwi v. Trump*, 901

28

UNCLASSIFIED//FOR PUBLIC RELEASE

F.3d 294 (D.C. Cir. 2018). Mr. Abdullah acknowledges that in
*Hamdi*, the Supreme Court recognized that the 2001 AUMF provided
the Government authority to "detain individuals who it alleged
were part of or supporting forces hostile to the United States
or coalition partners in Afghanistan who were engaged in an
armed conflict against the United States there." Pet'r's Second
Mot., ECF No. 382-2 at 11 (internal quotations omitted). But Mr.
Abdullah also highlights portions of the controlling plurality
opinion in which, as he describes it, Justice O'Connor
"carefully defined the scope and duration of that apparent
authority." *Id.* He contends that Justice O'Connor held detention
authority in the 2001 AUMF to be derived from the law of war,
that detention was not meant to be penal and was only to prevent
people from returning to the battlefield during the "ongoing
conflict," and that '"detention may last no longer than active
hostilities."' *Id.* (quoting *Hamdi*, 542 U.S. at 518, 521)
(additional quotations omitted). Mr. Abdullah asserts, without
citing exactly where in *Hamdi*, that Justice O'Connor "made clear
that 'active hostilities' meant 'active combat operations'
involving U.S. troops." *Id.* (not citing to authority). As such,
according to Mr. Abdullah, *Hamdi* authorized detention authority
over individuals like him who "may allegedly have supported
combat operations against U.S. forces in Afghanistan . . . only
because '[a]ctive combat operations against Taliban fighters

29

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 30 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 30 of 51

apparently are ongoing."' *Id.* at 12 (quoting *Hamdi*, 542 U.S. at 521) (alteration in original). Mr. Abdullah asserts that the Court "concluded that the government's detention could continue 'if the record establishes that United States troops are still involved in active combat in Afghanistan."' *Id.* (quoting *Hamdi*, 542 U.S. at 521).

In further support of his position, Mr. Abdullah argues that because Congress did not "expand" the President's authority or scope of the 2001 AUMF in the 2012 NDAA, what he puts forth as the scope of detention authority *Hamdi* recognized is controlling. Pet'r's Second Mot., ECF No. 382-2 at 13.[15] According to Mr. Abdullah, the D.C. Circuit has "followed [this] standard consistently, affirming the government's authority to continue the detentions '[i]f the record establishes that United States troops are still involved in active combat."' *Id.* at 12 (quoting *Al-Alwi*, 901 F.3d at 300) (alteration in original). Mr. Abdullah does not discuss any other D.C. Circuit precedent that would support or contradict his interpretation.

As Respondents explain, there are several issues with Mr. Abdullah's assertions. Respondents agree that *Hamdi* articulated the standard for the Government's detention authority in the

---

[15] The provision of the 2012 NDAA that Mr. Abdullah cites makes clear it does not "limit or expand the authority of the President or the scope of the [2001 AUMF]." Pet'r's Second Mot., ECF No. 382-2 at 13 (quoting 2012 NDAA § 1021(d)).

30

UNCLASSIFIED//FOR PUBLIC RELEASE

2001 AUMF and that Congress affirmed this understanding in the 2012 NDAA. *Id.* at 10 (quoting 2012 NDAA § 10211(a) & (c)(1)) (alterations and emphasis in original) ("That statute 'affirm[ed]' that the President's authority under the 2001 AUMF includes '[d]etention under the law of war without trial until the *end of the hostilities authorized by*' the AUMF."). But Respondents argue that the 2012 NDAA affirmed *Hamdi's* definition of this authority to mean that the government may detain individuals who were '"part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces."' *Id.* (quoting 2012 NDAA § 1021(a) & (b)(2)). Respondents argue that when *Hamdi* discussed active combat against the Taliban in Afghanistan, it was referring to conditions present in Mr. Hamdi's case and sufficient for his detention; it was not articulating the extent of conditions necessary for all detentions under the 2001 AUMF. *Id.* at 16–17.

Respondents correctly note that Mr. Abdullah does not point to statutory language or other authority that supports his proposed "active combat" against the Taliban in Afghanistan standard. *Id.* at 17. As explained above, the 2012 NDAA expressly referred to active hostilities and did not limit this to the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Taliban but also included al-Qaeda and associated forces. 2012
NDAA § 1021 (a)-(c). D.C. Circuit cases including *Al-Alwi* affirm
this interpretation. The text that Mr. Abdullah quotes in *Al-Alwi*, which quotes *Hamdi*, was in the context of affirming the
Government's detention authority even though the nature of
hostilities in Afghanistan had changed. *Al-Alwi*, 901 F.3d at
300. In that same opinion, the D.C. Circuit reiterated that "the
AUMF authorizes detention during active hostilities between the
United States and the Taliban and al Qaeda. Nothing in the text
of the AUMF or [2012 NDAA] suggests that a change in the form of
hostilities, if hostilities between the relevant entities are
ongoing, cuts off AUMF detention." *Id.* (collecting cases).

Indeed, the D.C. Circuit has repeatedly articulated the
scope of detention authorized in the 2001 AUMF in these terms.
*See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014)
("But this court has repeatedly held that under the [2001 AUMF],
individuals may be detained at Guantanamo so long as they are
determined to have been part of Al-Qaeda, the Taliban, or
associated forces, and so long as hostilities are ongoing.");
*Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011) (holding
that the 2001 AUMF "authorizes the Executive Branch to detain
for the duration of hostilities those individuals who are part
of al Qaeda or the Taliban."); *Ali v. Obama*, 736 F.3d 542, 552
(D.C. Cir. 2013) ("[T]he 2001 AUMF does not have a time limit,

UNCLASSIFIED//FOR PUBLIC RELEASE

and the Constitution allows detention of enemy combatants for

the duration of hostilities."); *Al-Alwi*, 901 F.3d at 297 ("Our

baseline, then, is that the AUMF remains in force if hostilities

between the United States and the Taliban and al Qaeda

continue."). Because Mr. Abdullah does not attempt to square his

interpretation of the 2001 AUMF and *Hamdi* with how this Circuit

has consistently interpreted it to date, his argument is

rejected.[16]

---

[16] Mr. Abdullah attaches as an exhibit in support of his argument
an affidavit from "three scholars expert in the international
law of war confirming that 'longstanding,' 'fundamental and
accepted' law-of-war principles do not provide the government
with lawful authority to continue detaining men in Mr.
Abdullah's position." Pet'r's Second Mot., ECF No. 382-2 at 15
(referencing App. C, ECF No. 382-6 ("Law Professors'
Affidavit"). Respondents argue that the Court should not
consider the Law Professors' Affidavit because "this case does
not present an appropriate setting for submission of material
under Federal Rule of Civil Procedure 44.1, and because the
affidavit merely offers unsupported legal conclusions. But . . .
even [if] the Court were to consider the affidavit, it would
offer no assistance to the Court." Resp'ts' Opp'n to Second
Mot., ECF No. 393 at 25. Mr. Abdullah responds that the Court
may consider the Law Professors' Affidavit because courts have
rejected all of Respondents' arguments to exclude it. This Court
does not need to resolve the dispute about whether it may
consider the Law Professors' Affidavit because even if it did,
this would not impact the outcome of this case. The Law
Professors' Affidavit offers the scholars' view on the extent of
detention to be expected under law of war principles, but as
discussed above, this Court rejects Mr. Abdullah's argument
because he does not reconcile his purported more restrictive
standard derived from these law of war principles with D.C.
Circuit authority that cuts against it. This Court must follow
the D.C. Circuit's interpretation of the 2001 AUMF regardless of
whether the Law Professors' Affidavit is a persuasive
perspective on international law of war norms.

UNCLASSIFIED//FOR PUBLIC RELEASE

The Court will briefly address two additional components of Mr. Abdullah's argument regarding how to define the scope of Respondents' detention authority in the 2001 AUMF. First, Mr. Abdullah asserts that the 2012 NDAA does not require all people detained at Guantanamo to be released after the end of "armed conflict" in Afghanistan—that a special category of detainees, alleged "al-Qaeda terrorists," may still be detained pursuant to § 1022. Pet'r's Second Mot., ECF No. 382-2 at 7 (asserting that the 2012 NDAA "drew a clear distinction between those men detained for engaging and terrorist activity and those men, such as Mr. Abdullah, held as 'law-of-war' detainees to keep them from rejoining ongoing combat against U.S. troops."). He presumably draws this distinction to account for any perceived concern that everyone detained under the 2001 AUMF at Guantanamo would need to be released under his proposed standard. But there is at least one other way that the distinction in these sub-sections could be explained. Section 1022 of the 2012 NDAA, "Military Custody for Foreign Al-Qaeda Terrorists," provides that the Executive "shall" continue to detain people covered by that sub-section. 2012 NDAA § 1022(a). Section 1021 of the 2012 NDAA does not include such a requirement. NDAA § 1021. The Court does not need to decide the effect of NDAA § 1022 to resolve Mr. Abdullah's Second Motion, but it is notable that the structure

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 35 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 35 of 51

of the 2012 NDAA does not provide the clear support for Mr. Abdullah's position that he asserts it does.

Second, Mr. Abdullah attempts to distinguish his case from the four cases post-U.S. withdrawal from Afghanistan where courts have rejected similar arguments by asserting that he "is not alleged to have engaged in or supported any terrorist act. Rather, he is alleged at most to have been engaged in combat operations underway against U.S. troops in Afghanistan more than two decades ago, and was – perhaps unwittingly – thought to be in a large pool of recruits 'potentially available' for unrealized future combat." *Id.* at 5 (citing Guantanamo Detainee Profile, Detainee ISN: YM-841 (July 22, 2019)). Although the bases for Mr. Abdullah's detention have not been adjudicated, Respondents point to the unclassified version of Mr. Abdullah's factual return to assert that "[Mr. Abdullah] errs in implying that al-Qaida has no role in this case." Resp'ts' Opp'n to Second Mot., ECF No. 393 at 18–19. Therefore, to the extent Mr. Abdullah tries to distinguish his case by claiming he is not alleged to have any involvement with al-Qaeda, this contradicts Respondents' allegations in the factual return.

Having rejected Mr. Abdullah's argument for a standard of detention under the 2001 AUMF that is inconsistent with D.C. Circuit precedent and acknowledging that Mr. Abdullah is at least alleged to have been part of or provided substantial

support to al-Qaeda, the last question is whether hostilities against al-Qaeda and associated forces are ongoing. This Court agrees with the four courts to consider this question that they are. *Qassim*, 2023 WL 6294155, at *1-2 (internal quotations and alterations omitted) ("Because the relevant conflict has not ended, the Government's authority to detain Qassim pursuant to the AUMF has not terminated."); *Paracha*, 2022 WL 2952493, at *5-6; *Husayn*, 2022 WL 2093067, at *4-7; *Gul*, 2021 WL 5206199, at *2-4. And Mr. Abdullah does not dispute that the United Staes is engaged in continued hostilities against al-Qaeda and associated forces. Pet'r's Second Reply, ECF No. 397 at 5 ("Petitioner acknowledges that the U.S. government continues to fight terrorism around the world.").

Respondents also provided ample evidence in the record to corroborate their claim that hostilities against al-Qaeda and associated forces are ongoing. Resp'ts' Opp'n to Second Mot., ECF No. 393 at 20-24 (chronicling operations by U.S. forces against al-Qaeda and associated forces in Afghanistan, Yemen, East Africa, Somalia, Iraq, Syria, Central Asia, and the Indo-Pacific). Respondents' evidence includes two classified declarations from the Department of Defense that demonstrate that the U.S. military continues to engage in operations against al-Qaeda and associated forces, including in Central Asia, Africa, and the Indo-Pacific, and advise United States partners'

UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 37 of 51
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 37 of 51

security forces in such operations. *Id.* at 20-21 (citing Kacher
Decl., Ex. 1, ECF No. 393-2). Respondents also relied on
unclassified materials, including a recent letter from the
President about how the United States has a "small number" of
forces "deployed to Yemen to conduct operations against al-
Qa'ida in the Arabian Peninsula and ISIS." *Id.* at 21-22 (citing
Letter from the President, Letter to the Speaker of the House
and President Pro Tempore of the Senate Regarding the War Powers
Report (Dec. 7, 2023), Ex. 5, ECF No. 393-6). In the same
letter, the President reported on continued efforts by the
"United States Armed Forces to counter the terrorist threat
posed by ISIS and al-Shabaab, an associated force of al-Qa'ida,"
including airstrikes in Somalia. *Id.* Similarly, the President
reported having a "small presence of United States Armed Forces
remain[ing] in strategically significant locations in Syria to
conduct operations . . . to address continuing terrorist threats
emanating from Syria." *Id.* U.S. troops are reportedly in Iraq
for the same purpose. *Id.*

Respondents have also offered evidence about threats from
groups associated with al-Qaeda in Afghanistan. When describing
the threat ISIS—which the government asserts should be
considered a successor organization to al-Qaeda—poses, the
President reported that "ISIS-Khorasan almost certainly retains
the intent to conduct operations in the West and will continue

37

efforts to attack outside Afghanistan." *Id.* at 23. Respondents

also cite to a United Nations assessment that reported threats

of terrorism from Afghanistan and "identified ISIL-K as the most

serious current terrorist threat in Afghanistan, neighboring

countries and Central Asia, and reported the group had

'increased operational capabilities' over the preceding year."

*Id.* (quoting Report of the Analytical Support and Sanctions

Monitoring Team, U.N. Doc. S/2023/370 (June 1, 2023), Ex. 7, ECF

No. 393-8). Respondents assert that this evidence shows

"hostilities against al-Qaida and associated forces have not

ceased" and instead there is a "present and evolving threat from

al-Qaida and associated forces in Afghanistan and elsewhere . .

. ." *Id.* at 24.

    If there were a doubt about whether hostilities against al-

Qaeda and associated forces were ongoing, the Court would give

considerable deference to the Executive. *E.g.*, *Al-Alwi*, 438 U.S.

299 (quoting *Ludecke v. Watkins*, 355 U.S. 160, 168–69 (1948)

("The 'termination' of hostilities is 'a political act.' If the

'life of a statute' conferring war powers on the Executive 'is

defined by the existence of a war, Congress leaves the

determination of when a war is concluded to the usual political

agencies of the Government.'")); *Al-Bihani*, 590 F.3d at 874

("The determination of when hostilities have ceased is a

political decision, and we defer to the Executive's opinion on

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 39 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 39 of 51

the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war.").

Because D.C. Circuit precedent interpreting the 2001 NDAA permits for detention as long as hostilities against al-Qaeda and associated forces are ongoing, and this Court finds that Respondents have shown such hostilities are ongoing, Mr. Abdullah's Second Motion is denied. *See also Ali*, 959 F.3d at 370 (remarking how detention under the 2001 AUMF "is long because the armed conflict out of which it arises has been long.").[17] Despite the Court's conclusion, Mr. Abdullah's concern about perpetual detention is well taken and echoes many others. *See e.g.*, *Hamdi*, 542 U.S. at 520 ("We recognize that the national security underpinnings of the "war on terror," although crucially important, are broad and malleable. . . If the Government does not consider this unconventional war won for two generations, and if it maintains during that time that [Mr.] Hamdi might, if released, rejoin forces fighting against the United States, then the position it has taken throughout the litigation of this case suggests that [Mr.] Hamdi's detention could last for the rest of his life."); *Gul*, 2021 WL 5206199, at

---

[17] This decision does not mean that the Court concludes Mr. Abdullah was properly detained in the first instance. Instead, the Court rejects Mr. Abdullah's argument that Respondents lack detention authority on the grounds that the conflict in which he is alleged to have engaged has ended.

39

UNCLASSIFIED//FOR PUBLIC RELEASE

*3 (quoting *Hamdi*, 542 U.S. at 520) ("Despite its decision, the court shares [Mr.] Gul's concern that Respondents have asked it to endorse what is fast approaching 'perpetual detention.' [Mr.] Gul has been detained without charge since February 2007 . . . Fourteen years is, by any measure, an inordinate amount of time to be held without charge. And the events of the last two decades have demonstrated just how 'broad and malleable' the 'war on terror' is. The Supreme Court's warning in *Hamdi*, given more than thirteen years ago, seems more prescient now than ever."). But this Court applies the law interpreting this broad grant of authority as the D.C. Circuit has defined it.

### 4. Mr. Abdullah Does Not Allege Due Process Violations

Mr. Abdullah also asserts that his continued detention violates due process. Pet'r's First Mot., ECF No. 381 at 15. He incorporates arguments from his 2018 habeas petition and asserts that these arguments are only stronger now after the PRB's recommendation and Respondents' decision to transfer him. *Id.* Importantly, however, Mr. Abdullah does not ask the Court to rule on "the merits of his underlying detention in this motion," so the Court limits its analysis here to the due process arguments he raises in his First Motion. *Id.* at 15–16. Here, Mr. Abdullah asserts that Respondents "claim unreviewable discretion with respect to whether there is a battlefield, and whether

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 41 of 51

there is some kind of reasonable basis for concluding that [Mr.] Abdullah might return to it." *Id.* at 16. He argues that the essence of due process requires government decisions to be reviewable. *Id.* (citing *Fachua v. Louisiana*, 504 U.S. 71, 77 (1992)). Additionally, Mr. Abdullah asserts that imprisonment, which is a deprivation of a fundamental right, must serve a purpose. *Id.* at 16-17. If it does not serve such a purpose, as in Mr. Abdullah's case, that violates due process. *Id.* Finally, Mr. Abdullah contends that the government's failure to provide the "actual" reason for the delay in his transfer violates due process. *Id.* at 17.

Respondents argue that the Court does not need to decide whether due process applies to people detained at Guantanamo because even if it did apply, Mr. Abdullah's due process claims would fail. Resp'ts' Opp'n to First Mot., ECF No. 389 at 28-29. Specifically, Respondents argue that Mr. Abdullah's continued detention under the 2001 AUMF does not violate due process based on either the length of his detention or the PRB's determination and the government's decision to transfer him. *Id.* According to Respondents, because the D.C. Circuit has not overruled precedent that an individual's threat of returning to the battlefield is irrelevant to their continued detainability, the Court must continue applying this precedent. *Id.* at 30 (citing *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)).

Respondents argue that Mr. Abdullah's procedural due process claim is "even more tenuous." *Id.* Respondents point out that Mr. Abdullah gives no authority for his assertion that the Secretary must give an explanation for why he has not yet been transferred. *Id.* at 31 (citing, *c.f.*, *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979) ("rejecting in domestic incarceration context procedural due process claim for requirement of an explanation of reasons for parole denial where such decisions involve sensitive, discretionary choices and predictive judgments.")).

The Court agrees with Respondents that it does not need to decide whether and to what extent the due process clause applies to non-citizens detained at Guantanamo because even if it did, Mr. Abdullah has not shown it was violated based on the arguments in his First Motion. *Cf. Al-Hela II*, 66 F.4th at 242- 43.[18]

Mr. Abdullah does not prevail on either of his substantive due process arguments. With respect to the purpose of his imprisonment, Mr. Abdullah's argument fails for similar reasons to his statutory claim. Other courts have held that law of war

---

[18] Although Mr. Abdullah incorporates the due process arguments he raised in his 2018 habeas petition, the Court is not presently resolving whether he qualifies as an "enemy combatant" for purposes of detention and therefore its ruling here does not affect related due process arguments therein.

42

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 43 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 43 of 51

detention is a legitimate purpose for imprisonment and Mr.
Abdullah has not shown that or how an individual's risk should
be considered related to their detainability. *Supra* Part
II(A)(2); Resp'ts' Resp. to Court Order, Attach. 1, ECF No. 412-
1 at 10 n.4 (rejecting Mr. al-Kazimi's similar due process
arguments and relying on *Al-Hela II*, 66 F.4th at 242; *Ali*, 959
F.3d at 379)). Other than generally citing authority for the
proposition that imprisonment must be for a purpose, Mr.
Abdullah cites no authority to assert that even if an
individual's level of risk is irrelevant to their statutory
detainability it may nevertheless raise constitutional concerns.
Therefore, based on the arguments and posture of this case, Mr.
Abdullah has not shown that his continued detention shocks the
conscience. *Al-Hela*, 66 F.4th at 242 (internal quotations
omitted) ("Substantive due process prevents the government from
engaging in conduct that shocks the conscience, or interferes
with rights implicit in the concept of ordered liberty.").

Additionally, Mr. Abdullah does not show how Respondents'
decisions regarding whether there are hostilities and whether he
would return to the battlefield violate substantive due process.
First, as discussed above, even though the government receives
considerable deference as to when hostilities end, its decision
is still reviewable. In this case, Respondents produced
significant evidence to support their assertion that hostilities

43

UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 44 of 51
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 44 of 51

are ongoing and critically, Mr. Abdullah does not dispute that hostilities are ongoing against al-Qaeda and associated forces. The Court's rejection of Mr. Abdullah's "new" argument that the U.S. withdrawal from Afghanistan categorically ended the government's detention authority over law of war detainees is not the same as rendering the government's position regarding hostilities unreviewable.

Second, the reviewability of the government's decision about whether Mr. Abdullah poses a risk of returning to the battlefield does not pose a due process concern. As Respondents point out, EO 13,567 and the 2012 NDAA make clear that the PRB's determination is not binding on the Secretary and that the Secretary retains discretion regarding whether to transfer someone. Resp'ts' Opp'n to First Mot., ECF No. 389 at 21. The points raised in *al-Hela II* and discussed previously are not related to the government's decision itself, but whether the facts underlying these decisions undermine the government's law of war detention rationale. Regardless, the entire basis for Mr. Abdullah's First Motion is that the government already decided to transfer him, even though it has not yet carried out this transfer. Mr. Abdullah does not specify what exactly would change in his case if the government's decision to transfer him

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 45 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 45 of 51

were reviewable as he ostensibly would be asking the government to make the same decision that he should be transferred.[19]

Mr. Abdullah's claim that Respondents' failure to provide reasons for his delayed transfer violates procedural due process is also unpersuasive. For starters, Respondents have provided a reason for the delay, no matter how unsatisfactory it is to Mr. Abdullah. Mr. Abdullah understandably wants more information about why his transfer is delayed and when it will occur. But he does not expand on what process he is due in this situation nor provide any authority. In contrast, Respondents have put forth authority, albeit in a different context, for when individuals lack a right to an "explanation of reasons" when a decisionmaker exercises discretion consistent with their statutory authority, Resp'ts' Opp'n to First Mot., ECF No. 389 at 31 (citing *Greenholtz*, 442 U.S. at 7); and Mr. Abdullah does not refute this authority, Pet'r's First Reply, ECF No. 391 at 3-4. He therefore fails to show that Respondents' reason for delaying his transfer violates due process, presuming it applies.

---

[19] Mr. Abdullah appears to hint at an argument that the length of his detention could violate due process, "[Mr.] Abdullah has been held for more than 20 years, during nearly all of which Respondents have known that he presents no danger of returning to Afghanistan, or to any other war against the United States." Pet'r's First Mot., ECF No. 381 at 17. But Mr. Abdullah does not expand on this argument here.

45

Case 1:05-cv-00023-EGS   Document 430-1   Filed 01/28/25   Page 46 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS   Document 420 *SEALED*   Filed 12/31/24   Page 46 of 51

### B. The Transfer to Yemen Issue is Not Ripe

Mr. Abdullah asserts that Congress's alleged ban on allowing the government to send him home to Yemen in the 2024 National Defense Authorization Act ("2024 NDAA") is unconstitutional. Pet'r's First Mot., ECF No. 381 at 10, 18-20 (referencing but not citing Nat'l Defense Auth. Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136, 387 (2023) § 1033). In support, Mr. Abdullah points to the Agreement Between the United States of America and the Kingdom of Yemen Respecting Friendship and Commerce ("Yemen Recognition Agreement") (May 4, 1946). *Id.* at 18 (referencing 60 Stat. 1782). According to Mr. Abdullah, the Yemen Recognition Agreement "mandates that citizens of Yemen in United States custody be afforded all rights under international law (including the Geneva Conventions) and must not be treated less favorably than citizens of any other nation." *Id.* at 18-19 (citing Yemen Recognition Agreement art. III). Congress's ban on repatriation to Yemen, according to Mr. Abdullah, denies his right under international law to return to his home country and treats Yemeni citizens worse than citizens of other countries. *Id.* (citing Universal Declaration of Human Rights art. 13(2) Gen. Ass. Res. 217A (III), U. N. Doc. A/810 (1948)). Moreover, Mr. Abdullah argues that recognition of foreign countries is an

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 47 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 47 of 51

executive function and Congress cannot abrogate the recognition agreement. *Id.* at 19-20.

Respondents interpret Mr. Abdullah's arguments two different ways and disagree with both. First, if Mr. Abdullah is arguing that the Yemen Recognition Agreement requires his release from custody and return to Yemen, Respondents state that this claim has been previously rejected in this case. Resp'ts' Opp'n to First Mot., ECF No. 389 at 32 (citing *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013) (ECF 316), *aff'd*, 753 F.3d 193 (D.C. Cir. 2014)).[20] Second, if Mr. Abdullah's argument is that he should be able to be sent to Yemen when he is transferred, Respondents assert that "[Mr.] Abdullah admits it is not ripe." *Id.* at 32-33.

The Court understands Mr. Abdullah to be making the latter argument—that Congress lacks the authority to prohibit his transfer to Yemen.[21] Based on this interpretation, Mr. Abdullah's argument is not yet ripe according to his own words:

---

[20] The court previously rejected Mr. Abdullah's claim for release on the posture of a preliminary injunction and held that Mr. Abdullah failed to meet that high bar. *Abdullah*, 945 F. Supp. 2d at 66-67. It did not hold categorically that this argument could never prevail. *Id.*

[21] Mr. Abdullah focuses primarily on his argument that Congress impermissibly abrogated the Yemen Recognition Agreement by prohibiting transfers to Yemen and does not state as clearly in this First Motion how the Yemen Recognition Agreement might require his release writ large. Pet'r's First Mot., ECF No. 381 at 18-20.

47

> [Mr.] Abdullah is satisfied with the
> arrangement that has been negotiated for his
> transfer, and looks forward to starting a new
> life in the host country. If Respondents
> somehow botch this deal, however, they should
> then be directed to transfer him to Yemen.

Pet'r's First Mot., ECF No. 381 at 20. Respondents continue to

maintain that the government's underlying agreement with the

receiving country has not changed, despite the delay in Mr.

Abdullah's transfer. Resp'ts' Status Report, ECF No. 411. It is

therefore premature to consider whether Mr. Abdullah would be

entitled to transfer to Yemen if for some reason the transfer to

the other country does not go through. Furthermore, resolving

this question would require considering when an act of Congress

infringes on the Executive's constitutional authority, which is

a weighty constitutional issue that courts refrain from

resolving if unnecessary. Mr. Abdullah's request is therefore

denied without prejudice.

### C. Mr. Abdullah Fails to Show He Is Entitled to Interim Relief

Finally, Mr. Abdullah asks the Court to provide interim

relief while the Court considers his case. Pet'r's First Mot.,

ECF No. 381 at 10, 21-23. Mr. Abdullah asserts that Guantanamo

has an alternative form of detention for people in Mr.

Abdullah's position and requests to be "turned over to the care

of migration officials at the Naval Station, who routinely

process Cubans and other refugees who arrive at the base." *Id.*

48

Case 1:05-cv-00023-EGS    Document 430-1    Filed 01/28/25    Page 49 of 51
UNCLASSIFIED//FOR PUBLIC RELEASE
Case 1:05-cv-00023-EGS    Document 420 *SEALED*    Filed 12/31/24    Page 49 of 51

at 8. According to Mr. Abdullah, there is "legal and historical authority for this type of relief" and Mr. Abdullah's good record during his detention show he should be turned over to migration officials. *Id.* at 8-9. He focuses much of his argument on whether the relief is available instead of why it is warranted. *Id.* at 21-23. Mr. Abdullah claims that being placed in migration officials' custody would greatly improve his life while he is awaiting his transfer. *Id.*

Respondents again disagree. According to Respondents, "[Mr.] Abdullah is not entitled to any interim relief, let alone the relief he seeks." Resp'ts' Opp'n to First Mot., ECF No. 389 at 33-34. Respondents cite cases holding that interim relief is only available in extraordinary cases when necessary to make the habeas remedy effective. *Id.* (citing *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (*per curiam*); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Abdullah*, 945 F. Supp. 2d at 67; *Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986)). Here, according to Respondents, interim relief is not necessary to make the habeas remedy effective because Mr. Abdullah remains lawfully detained. *Id.* at 34. Respondents point out that Mr. Abdullah offers no authority for his position that the Court can order a transfer of someone being detained under the AUMF to migration-related detention in Department of Homeland Security/Department of State custody. *Id.* at 35. Moreover, Respondents assert that interim

relief would "raise serious constitutional concerns." *Id.* at 35
(citing *Qassim v. Bush*, 407 F. Supp. 2d 198, 202 (D.D.C. 2005)
("holding the Court lacks authority to order the military to
allow a civilian, much less a foreign national, access to a
military base") (citing *Cafeteria & Rest-Workers Union, Local
473 v. McElroy*, 367 U.S. 886, 890, 893 (1961))).

There is limited authority for when interim relief is
available in habeas cases. Respondents rely heavily on
persuasive authority articulated in *Mapp v. Reno*, which held
that interim relief is available when "necessary to make the
habeas remedy effective." 241 F.3d at 226. Mr. Abdullah again
makes a compelling argument rooted in fairness but fails to cite
relevant authority and show how he is entitled to the relief he
seeks as a matter of law. The Court does not need to reach the
question of whether it has the authority to order Mr. Abdullah's
transfer to migration custody because Mr. Abdullah has not shown
such relief is warranted. Pet'r's First Mot., ECF No. 381 at 20–
23, 10 (requesting interim relief "while [the Court] considers
the issues raised above and/or while Respondents resolve
whatever internal issues they have and get the transfer back on
track."). His assumption that interim relief is warranted seems
premised on the Court agreeing that Respondents no longer have
authority to detain him. *Id.* If that is the case, Mr. Abdullah's
request for interim relief is denied because his request for

immediate release is denied. If instead Mr. Abdullah seeks
interim relief pending his transfer, he fails to explain how
this relief is necessary to effectuate the habeas remedy.
Therefore, his request for interim relief pending his transfer
is similarly denied.

### IV.  Conclusion

For the foregoing reasons, the Court **DENIES** Mr. Abdullah's
First Motion, ECF No. 381; and **DENIES** Mr. Abdullah's Second
Motion, ECF No. 382-2. An appropriate Order accompanies this
Memorandum Opinion.

The parties shall post a public version of this Memorandum
Opinion on the docket for this case within 14 days of the date
of the Order accompanying this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan
             United States District Judge
             December 31, 2024**